**GIBSON, DUNN & CRUTCHER LLP**
LAUREN R. GOLDMAN (*pro hac vice*)
lgoldman@gibsondunn.com
DARCY C. HARRIS (*pro hac vice*)
dharris@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: (212) 351-4000
Facsimile: (212) 351-4035

ELIZABETH K. MCCLOSKEY, SBN 268184
emccloskey@gibsondunn.com
ABIGAIL A. BARRERA, SBN 301746
abarrera@gibsondunn.com
One Embarcadero Center, Suite 2600
San Francisco, CA 94111-3715
Telephone: (415) 393-8200
Facsimile: (415) 393-8306

*Attorneys for Defendant Meta Platforms, Inc.*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ALAN STARZINSKI, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>META PLATFORMS, INC.,<br><br>Defendant. | Case No. 3:24-cv-04501-AMO<br><br>**DEFENDANT META PLATFORMS, INC.'S NOTICE OF MOTION AND MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Date: June 26, 2025<br>Time: 2:00 p.m.<br>Dept.: Courtroom 10 – 19th Flr.<br><br>Action Filed: June 27, 2024<br>Honorable Araceli Martínez-Olguín |

## NOTICE OF MOTION AND MOTION

**PLEASE TAKE NOTICE** that on June 26, 2025, at 2:00 p.m., before the Honorable Araceli Martínez-Olguín of the United States District Court for the Northern District of California, San Francisco Division, Courtroom 10, Defendant Meta Platforms, Inc., will, and hereby does, move this Court pursuant to Federal Rule of Civil Procedure 12(b)(6) for an order dismissing the first amended complaint with prejudice.

The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof that follows; the proposed order filed concurrently herewith; the request for judicial notice and accompanying declaration; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters properly before the Court.

## STATEMENT OF ISSUES TO BE DECIDED

Should the first amended complaint be dismissed with prejudice under Rule 12(b)(6) for failure to state a claim?

# TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 3

A. Meta's Pixel .......... 3

B. The Streaming Services' Policies .......... 4

C. Meta's Policies .......... 5

D. Plaintiffs' Allegations .......... 7

LEGAL STANDARD .......... 7

ARGUMENT .......... 8

I. Plaintiffs Do Not Allege Meta Intended To Intercept Their Sensitive Data. .......... 8

A. Plaintiffs Affirmatively Plead That Meta Instructs Developers *Not* To Send Sensitive Data Through The Pixel. .......... 8

B. Plaintiffs' Remaining Allegations Cannot Save Their Claims. .......... 11

II. Plaintiffs Consented To Meta's Receipt Of Their Data. .......... 13

A. The Streaming Services' Policies Establish Plaintiffs' Consent. .......... 14

B. Meta's Policies Establish Plaintiffs' Consent. .......... 17

1. Meta's Policies Establish Consent For Meta To Receive Data Reflecting Users' Activity On Third-Party Websites. .......... 17

2. Plaintiffs' Contrary Assertions Are Meritless. .......... 18

III. Plaintiffs' Claims Also Fail For Other Claim-Specific Reasons. .......... 20

A. Web Developers' Consent Defeats Plaintiffs' Federal Wiretapping Claim. .......... 20

1. The streaming services consented to sharing data with Meta. .......... 20

2. The crime-tort exception does not apply. .......... 21

B. Plaintiffs Fail To Allege Meta Received The "Contents" Of Any Communication. .......... 23

C. Plaintiffs Fail To Allege Any "Highly Offensive" Conduct. .......... 24

CONCLUSION .......... 25


Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 7

*B.K. v. Desert Care Network*,
2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) ... 11

*New Mexico ex rel. Balderas v. Google, LLC*,
489 F. Supp. 3d 1254 (D.N.M. 2020) ... 14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 7

*Belluomini v. Citigroup Inc.*,
2013 WL 5645168 (N.D. Cal. Oct. 16, 2013) ... 24

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ... 23

*Brown v. Google LLC*,
685 F. Supp. 3d 909 (N.D. Cal. 2023) ... 21

*Doe I v. Google LLC*,
2024 WL 3490744 (N.D. Cal. July 22, 2024) ... 1, 2, 8, 9, 10, 11, 12, 13, 19, 20, 22

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ... 12, 21

*In re DoubleClick Inc. Priv. Litig.*,
154 F. Supp. 2d 497 (S.D.N.Y. 2001) ... 22

*F.B.T. Prods., LLC v. Aftermath Recs.*,
621 F.3d 958 (9th Cir. 2010) ... 18

*In re Facebook, Inc. Sec. Litig.*,
477 F. Supp. 3d 980 (N.D. Cal. 2020) ... 19

*Facebook, Inc. v. BrandTotal Ltd.*,
2021 WL 662168 (N.D. Cal. Feb. 19, 2021) ... 14

*In re Google Inc. Gmail Litig.*,
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ... 22

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) ... 2, 15, 17, 18

*Hammerling v. Google LLC*,
615 F. Supp. 3d 1069 (N.D. Cal. 2022) ... 24

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ....................24

*Hubbard v. Google LLC*,
2024 WL 3302066 (N.D. Cal. July 1, 2024) ....................24, 25

*In re iPhone Application Litig.*,
844 F. Supp. 2d 1040 (N.D. Cal. 2012) ....................24

*Katz-Lacabe v. Oracle Am., Inc.*,
2024 WL 1471299 (N.D. Cal. Apr. 3, 2024) ....................20, 21, 22

*Kearns v. Ford Motor Co.*,
567 F.3d 1120 (9th Cir. 2009) ....................13

*Lloyd v. Facebook, Inc.*,
2024 WL 3325389 (9th Cir. July 8, 2024) ....................2, 15, 17, 20, 24

*Lozano v. City of Los Angeles*,
73 Cal. App. 5th 711 (2022) ....................9

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ....................17, 18

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) ....................12, 17, 18, 21

*Mollaei v. Otonomo Inc.*,
651 F. Supp. 3d 1135 (N.D. Cal. 2023) ....................14

*In re Nickelodeon Consumer Priv. Litig.*,
2014 WL 3012873 (D.N.J. July 2, 2014) ....................23

*People v. Buchanan*,
26 Cal. App. 3d 274 (1972) ....................9

*People v. Superior Ct. of Los Angeles Cnty.*,
70 Cal. 2d 123 (1969) ....................9

*Perkins v. LinkedIn Corp.*,
53 F. Supp. 3d 1190 (N.D. Cal. 2014) ....................15, 16, 17

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022) ....................22

*Rickwalder v. Meta Platforms, Inc.*,
2022 WL 22462351 (Cal. Sup. Ct. Sept. 15, 2022) ....................20

*Rodriguez v. Google LLC*,
2021 WL 2026726 (N.D. Cal. May 21, 2021) ....................13, 21, 22

*Seismic Reservoir 2020, Inc. v. Paulsson*,
785 F.3d 330 (9th Cir. 2015) ....................7

Gibson, Dunn & Crutcher LLP

*Silver v. Stripe Inc.*,
2021 WL 3191752 (N.D. Cal. July 28, 2021) ....................14, 15, 16, 17

*Smith v. Facebook, Inc.*,
262 F. Supp. 3d 943 (N.D. Cal. 2017) ....................14

*Smith v. Facebook, Inc.*,
745 F. App'x 8 (9th Cir. 2018) ....................2, 14, 15, 16, 17, 18, 20, 24

*Smith v. Google, LLC*,
2024 WL 2808270 (N.D. Cal. June 3, 2024) ....................13

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018 (N.D. Cal. 2023) ....................19

*Sussman v. Am. Broad. Cos.*,
186 F.3d 1200 (9th Cir. 1999) ....................22

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) ....................1, 8, 12

*Vartanian v. VW Credit, Inc.*,
2012 WL 12326334 (C.D. Cal. Feb. 22, 2012) ....................9

*Vess v. Ciba-Geigy Corp. USA*,
317 F.3d 1097 (9th Cir. 2003) ....................13

*Whitaker v. Saleem*,
2013 WL 1149789 (N.D. Cal. Mar. 18, 2013) ....................8, 25

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ....................23

**Statutes**

18 U.S.C. § 2510(4) ....................23

18 U.S.C. § 2510(8) ....................23

18 U.S.C. § 2511(1)(a) ....................8

18 U.S.C. § 2511(2)(d) ....................20, 22

Cal. Civ. Code § 3515 ....................15

Cal. Penal Code § 631(a) ....................8, 23

Cal. Penal Code § 632(a) ....................8

**Other Authorities**

https://pacer.uscourts.gov/privacy (last visited Dec. 19, 2024) ....................3

https://www.bursor.com/privacy-terms (last visited Dec. 19, 2024) ....................3

# MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

Plaintiffs' claims against Meta for developing the Meta Pixel and making it publicly available for third-party use are meritless and misdirected. The Meta Pixel is a form of a commonly used analytics tool offered by numerous companies and used across the internet on third-party websites. Web developers, not Meta, choose whether and how to use this tool, and they can integrate it into their own websites to measure users' activity on their sites. Meta's policies expressly prohibit developers from using the Pixel to send sensitive data to Meta. Here, plaintiffs allege that four video-streaming websites—Paramount+, ESPN+, Hulu, and Starz—"violate[d] federal and state privacy laws" by using the Meta Pixel in violation of Meta's policies to send Meta "sensitive" information about their activity on those websites that the streaming services "had no legal right to transmit." First Amended Class Action Complaint ("Compl.") ¶¶ 1, 80, 87. But instead of suing the streaming services who exclusively control their own websites, plaintiffs claim that *Meta* engaged in unlawful wiretapping and eavesdropping when *the streaming services* chose to send allegedly sensitive data that Meta's policies forbid and that plaintiffs concede Meta "does not want." *Id.* ¶ 97 (quotation marks omitted). Plaintiffs assert one claim under the federal Wiretap Act, two claims under the California Invasion of Privacy Act ("CIPA"), and two privacy-tort claims. As Judge Chhabria recently concluded in a similar pixel case against Google, plaintiffs' legal theory is fundamentally flawed and their claims are misplaced. *Doe I v. Google LLC*, 2024 WL 3490744, at *1 (N.D. Cal. July 22, 2024) ("*Google Pixel*").

*First*, plaintiffs do not and cannot plausibly allege, as they must, that Meta *intended* to intercept any sensitive or legally protected information. To plead intent, plaintiffs must allege that Meta "'purposefully and deliberately'" acquired the communications at issue. *Google Pixel*, 2024 WL 3490744, at *4 (quoting *United States v. Christensen*, 828 F.3d 763, 790 (9th Cir. 2015)). Plaintiffs affirmatively allege the opposite: web developers (not Meta) choose whether and how to use the Pixel on their own websites, and the complaint repeatedly concedes that Meta's policies governing third parties' use of the Meta Pixel expressly forbid developers from sending Meta "any information defined as sensitive under applicable laws, regulations and applicable industry guidelines." Compl. ¶ 97 (quotation marks omitted). And, as plaintiffs acknowledge, Meta repeats this instruction over and over again in public-

facing articles, blog posts, and resources for developers who use the Pixel. Plaintiffs' cursory assertions that Meta does not *really* mean for developers to comply are insufficient: Where "a plaintiff alleges that the clients of a source code provider use the code contrary to the provider's instructions, the plaintiff should not be able to get around the intent requirement by simply intoning that the source code provider intended for the clients not to follow instructions." *Google Pixel*, 2024 WL 3490744, at *5.

*Second*, plaintiffs' claims fail because plaintiffs *consented* to the streaming services' data-sharing with Meta and to Meta's receipt of that data. Plaintiffs allege they are "subscribers" to the streaming services, Compl. ¶¶ 23–26, and subscribers must agree to the streaming services' privacy policies when they sign up. Those privacy policies disclose the use of pixels to share the information at issue with third parties like Meta, and those disclosures defeat each of plaintiffs' claims against Meta. *See Smith v. Facebook, Inc.*, 745 F. App'x 8, 8–9 (9th Cir. 2018); *see also, e.g., Hammerling v. Google, LLC*, 2024 WL 937247, at *3 (9th Cir. Mar. 5, 2024). Moreover, plaintiffs admit they "assent[ed] to" Meta's user agreements when they signed up for a Facebook account. Compl. ¶ 89. As the Ninth Circuit has held and recently reaffirmed, "[a] reasonable person viewing [Meta's] disclosures would understand that [Meta] maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes." *Smith*, 745 F. App'x at 8–9; *see also Lloyd v. Facebook, Inc.*, 2024 WL 3325389, at *2 (9th Cir. July 8, 2024). Thus, plaintiffs also consented to the alleged data practices through Meta's user agreements. *Smith*, 745 F. App'x at 8–9. That Meta forbids developers from sending sensitive information through the Pixel does not vitiate or even narrow the scope of plaintiffs' consent; there is no prohibition on a company obtaining broad consent from consumers and simultaneously placing narrower restrictions on third parties that share data with it.

*Third*, plaintiffs' claims also suffer from additional, claim-specific defects that compel dismissal. Their federal Wiretap Act claim is barred by the one-party consent rule. Both the federal Wiretap Act claim and the claim under CIPA § 631 fail because plaintiffs do not allege that Meta received the "contents" of their communications. And, for the privacy-tort claims, plaintiffs fail to clear the high bar for showing "highly offensive" conduct by Meta.

Plaintiffs have already amended once, and they failed to fix these problems. That confirms they cannot plead the facts necessary to state a claim, and the complaint should be dismissed with prejudice.

## BACKGROUND

### A. Meta's Pixel

This case centers on a common analytics tool offered by numerous companies and used across industries called a "pixel."[1] Meta's version of this tool, the Meta Pixel, is a free, publicly available piece of source code that third-party web developers can "integrate into their respective websites." Compl. ¶ 36; *see also id.* ¶ 34.[2] The Pixel helps web developers analyze activity on their websites by allowing them to measure certain "events," *i.e.*, actions that users take on their websites—such as "when a user visits a webpage" or "makes a purchase." *Id.* ¶¶ 35–36. Developers, not Meta, choose which events to measure, and developers share the occurrence of those events with Meta through a transmission to Meta's servers of the data that the web developer configured the Pixel to collect. *Id*. Using cookies and other information sent along with the events, Meta attempts to match this data to Facebook users, which allows web developers to better target their ads to individuals who have taken certain actions on their website. *See id.* ¶¶ 57–72. For example, a clothing website may wish to show ads to someone who placed an item in their online cart but did not complete the purchase.

Meta "offers a menu of 'standard events' from which [web developers] can choose, including what content a visitor views or purchases," and web developers can also create their own "custom event[s]" to measure other actions of their choice. *Id.* ¶ 35. Web developers can use that information to improve their websites or to serve ads to individuals who visited certain pages or purchased certain products. By facilitating these analytics services, the Meta Pixel "help[s] website owners and publishers . . . integrate with Facebook, understand and measure their products and services, and better reach

---

[1] Pixels and similar technology are ubiquitous across the web; the PACER website uses cookies "to identify users," and even lead counsel for plaintiffs use "cookies and other tracking technologies" on their website to collect data from visitors in order to "select and service relevant advertisements" to users who visit their website. *See* https://pacer.uscourts.gov/privacy (last visited Dec. 19, 2024); https://www.bursor.com/privacy-terms (last visited Dec. 19, 2024) (capitalization omitted).

[2] The complaint also describes other Meta Business Tools, like Meta's software development kit ("SDK") for mobile apps and the "Conversions API," that plaintiffs allege "function the same" as the Pixel. Compl. ¶¶ 45–46. But plaintiffs do not allege that any of the websites at issue used the Conversions API. And while plaintiffs cursorily allege the sites used the SDK, the SDK is "[f]or mobile applications," and plaintiffs do not allege they used any mobile apps. *Id.* ¶ 45; *see id.* ¶¶ 23–26, 50. This motion therefore focuses on the Meta Pixel, without conceding that Meta's other Business Tools "function the same."

and serve people who might be interested in their products and services." *Id.* ¶ 34 (quotation marks omitted).

**B. The Streaming Services' Policies**

Plaintiffs allege they are "subscribers" of the streaming services who "must pay money on a recurring basis" and who "frequent[]" the streaming services' websites. Compl. ¶¶ 23–26, 80. The streaming services require subscribers to agree to their privacy policies when creating an account. *See* Meta's Request for Judicial Notice ("Meta RJN") Exs. 18–21. And those policies disclose that the streaming services use tracking technologies like cookies and pixels to share the information at issue with third parties like Meta.

For example, Paramount+'s Privacy Policy states: "We share your personal information with social media companies such as Meta . . . so that we can . . . provide you with relevant advertising related to your interests on those platforms." Meta RJN Ex. 22. It also explains what "cookies" and "pixels" are and "[t]he purposes for which we and our partners use cookies and similar technologies," including "collecting information about your use of the Paramount Services, . . . your browsing habits, and other preferences so that we can deliver more relevant and meaningful advertising to you." *Id.* For California residents (like plaintiffs), it also explains that Paramount+ shares "names . . . [and] [i]nformation about transactions or content choices made on or in connection with the Paramount Services" with "third parties to help us target and deliver personalized ads to you," including "[s]ocial media companies." *Id.*

Hulu and ESPN+ (both Walt Disney companies) share a privacy policy, which states that they collect "first name and surname" and "[a]ctivity information about your use . . . of our sites . . . such as the content you view," including through "technologies, such as cookies[] [and] pixels," to "[p]rovide you with targeted advertising based on your activity on our sites." Meta RJN Ex. 23. The policy also links to disclosures about "Online Tracking Technologies and Advertising," which state: "We may use your personal information to deliver relevant . . . advertising to you on our properties and on third parties' sites and applications. We may provide social media . . . platforms with limited personal information, such as certain identifiers . . . which they match with their customers' profiles. Based on this, the platform may show you our ads." Meta RJN Ex. 24. The policy tells subscribers

that they can change their "Hulu preferences regarding the sharing of your viewing information together with certain personal information by . . . editing [their] profile." Meta RJN Ex. 23.

The Starz Privacy Notice likewise discloses that Starz collects "[your] name . . . [and] [y]our activity on Services, Sites, and Applications, such as title selections, shows you have watched and search queries," as well as "clickstream data (including page clicks and scrolls)." Meta RJN Ex. 25. Starz uses this information to "provide you with . . . targeted advertising," including sharing it with "third-party marketing, advertising, and analytics providers." *Id.* It also discloses that this information may be "collect[ed] and shar[ed] . . . through the use of cookies and related technologies," including "pixels." *Id.*

### C. Meta's Policies

Plaintiffs acknowledge that, when users sign up for a Facebook account, they "assent[] to three agreements: the Terms of Service, the Cookies Policy, and the Data Policy." Compl. ¶ 89; *see* Meta RJN Exs. 1–3. Similarly, web developers must agree to Meta's Business Tools Terms in order to use the Meta Pixel. *See* Compl. ¶ 100; Meta RJN Ex. 4. These policies for Facebook users and third-party developers, respectively, provide important disclosures and limitations on the use of Meta's products: as relevant here, they tell users that Meta receives data from third-party websites about users' activity on those websites, and they forbid web developers from using the Meta Business Tools (including the Meta Pixel) to send any sensitive information to Meta.

***Terms of Service.*** Meta's Terms of Service "govern [the] use of Facebook, Messenger, and the other products, features, apps, services, technologies, and software" Meta offers. Meta RJN Ex. 1. The Terms explain:

> We don't charge you to use Facebook or the other products and services covered by these Terms, unless we state otherwise. Instead, businesses and organizations, and other persons pay us to show you ads for their products and services . . . that we think may be relevant to you and your interests. We use your personal data to help determine which personalized ads to show you.

*Id.* The Terms also expressly warn that, even though Meta "work[s] hard . . . to specify clear guidelines for everyone who uses [Meta's Products]," Meta does "not control . . . what . . . others do" and is "not responsible for their actions or conduct." *Id.* The Terms link to the Data Policy to further "explain[] how [Meta] collect[s] and use[s] your personal data to determine some of the ads you see." *Id.*

***Data Policy.*** Meta's Data Policy (now called the "Privacy Policy") details "what information [Meta] collect[s], and how [Meta] use[s] and share[s] it." Meta RJN Ex. 2. It tells users that third parties can use the tools Meta offers—including "the Meta Pixel"—to "advertise or support their products" and "understand and measure how people are using their products and services and how well their ads are working." *Id.* The Data Policy also specifically discloses that Meta "collect[s] and receive[s] information" from those third parties "about a variety of your information and activities on and off [Meta's] Products"—including "device information," "[p]urchases and transactions you make," "[h]ow you use [third parties'] products and services," and "[w]ebsites you visit and cookie data, like through Social Plugins or the Meta Pixel." *Id.* It explains that Meta receives "information like your email address, cookies and advertising device ID" that "helps [Meta] match your activities with your account, if you have one." *Id.* The policy states that third parties "collect your information when you visit their site or app or use their services," and that Meta requires those parties "to have the right to collect, use and share your information before giving it to us." *Id.* And it provides specific examples to illustrate concretely what this means for users: "For example, Jane buys a pair of shoes from an online shoe store or in an online chat with a shoe seller. The seller shares Jane's activity with [Meta] using [Meta's] Business Tools, subject to [Meta's] Business Tools Terms." *Id.*

***Cookies Policy.*** The Cookies Policy further discloses that Meta uses cookies—small pieces of text that allow a website to recognize a browser it has interacted with before—to "enable Meta to offer the Meta Products to you and to understand the information that [Meta] receive[s] about you, including information about your use of other websites and apps, whether or not you are registered or logged in." Meta RJN Ex. 3. Cookies also allow Meta to "provide insights about . . . the people who interact with the ads, websites and apps of [Meta's] advertisers and the businesses that use" the products and tools Meta offers. *Id.* The policy discloses that third-party websites may "choose to share information with Meta from cookies set in their own websites' domains," and specifically mentions that third-party websites may use the "Meta Pixel" to share information with Meta. *Id.*

***Business Tools Terms.*** Any web developer who chooses to use the Meta Pixel must agree to Meta's Business Tools Terms. Meta RJN Ex. 4. These Terms require web developers to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and

permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." *Id.* They further forbid developers from sharing any "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *Id.* The Business Tools Terms also require web developers to provide "robust and sufficiently prominent notice" to users about the developers' collection of users' data through the Pixel, including "clear and prominent notice on each web page where our pixels are used" that discloses particular details and how users can opt out. *Id.*

### D. Plaintiffs' Allegations

Plaintiffs are four California residents with Facebook accounts who allege that they "subscribe[] to and frequent[]" four websites: Paramount+, ESPN+, Hulu, and Starz. Compl. ¶¶ 23–26. Plaintiffs allege that each of these websites "integrates" the Meta Pixel, and that as a result, these websites sent data to Meta reflecting "what [plaintiffs] clicked on, searched for, and the videos [plaintiffs] viewed." *Id.* Plaintiffs further allege that this data revealed their "video-viewing history" and was sensitive and protected under the federal Video Privacy Protection Act ("VPPA") and a similar California statute—but plaintiffs do not assert any claims under those statutes. *Id.* ¶¶ 80–81.[3] Plaintiffs instead assert three wiretapping and eavesdropping claims—under the federal Wiretap Act, CIPA § 631, and CIPA § 632—and two privacy-tort claims. *Id.* ¶¶ 134–209.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). On a motion to dismiss, the Court must first separate the complaint's legal conclusions—which are disregarded—from its factual allegations. *Id.* at 678–79. The remaining factual allegations must "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. If the complaint pleads facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Claims also may be dismissed based on a dispositive issue of law. *Seismic*

---

[3] Meta does not concede that any data transmitted through the Pixel actually revealed users' "video-viewing history" or otherwise constituted sensitive or protected information. For purposes of this motion, however, Meta takes these allegations as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

*Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015).

## ARGUMENT

Plaintiffs allege that four streaming services—Paramount+, ESPN+, Hulu, and Starz—decided to use the Meta Pixel "unlawfully" to send "sensitive" information that they "had no legal right to transmit." Compl. ¶¶ 1, 87. That might be a valid theory for a suit against the streaming services, but it does not permit plaintiffs to sue Meta, for multiple reasons. *First*, plaintiffs do not plead intent. A plaintiff who alleges that the defendant *forbade* web developers from sending sensitive data through a tool like the Pixel cannot simultaneously and plausibly plead that the defendant *intended* to intercept sensitive data through that tool. *See Google Pixel*, 2024 WL 3490744, at *3–5. As a matter of law, plaintiffs do not and could not plausibly allege that Meta "purposefully and deliberately" intercepted sensitive communications, as binding Ninth Circuit precedent requires. *Id.* at *4 (quoting *Christensen*, 828 F.3d at 790–91). *Second*, plaintiffs consented through both the streaming services' privacy policies and Meta's user policies, which fully disclosed the data practices of which plaintiffs now complain. *Third*, plaintiffs' claims also fail for other, claim-specific reasons.

Plaintiffs' amended complaint does not cure the problems Meta identified in its first motion to dismiss. Because the amended complaint confirms they cannot allege the facts necessary to state a claim against Meta, this Court should dismiss it with prejudice. *See Whitaker v. Saleem*, 2013 WL 1149789, *2 (N.D. Cal. Mar. 18, 2013).

### I. Plaintiffs Do Not Allege Meta Intended To Intercept Their Sensitive Data.

#### A. Plaintiffs Affirmatively Plead That Meta Instructs Developers *Not* To Send Sensitive Data Through The Pixel.

Each of plaintiffs' claims requires them to allege that Meta *intentionally* (or *willfully*) intercepted or eavesdropped upon their communications. *See* 18 U.S.C. § 2511(1)(a) ("intentionally"); Cal. Penal Code § 631(a) ("willfully"); Cal. Penal Code § 632(a) ("intentionally"); *Google Pixel*, 2024 WL 3490744, at *7 ("intent . . . is a necessary element of an invasion of privacy claim"). To satisfy this intent element, the Ninth Circuit has held, plaintiffs must allege facts plausibly showing that Meta "purposefully and deliberately" acquired the communications at issue, *Christensen*, 828 F.3d at 774 (quotation marks omitted)—not merely that Meta was aware that third parties were sending certain

information and failed to prevent it. In other words, plaintiffs must "set forth specific factual circumstances that make plausible [Meta's] intent to record a confidential communication." *Vartanian v. VW Credit, Inc.*, 2012 WL 12326334, at *2 (C.D. Cal. Feb. 22, 2012); *see also, e.g., People v. Superior Ct. of Los Angeles Cnty.*, 70 Cal. 2d 123, 133 (1969) ("[I]t is not the purpose of the statute to punish a person who intends to make a recording but only a person who intends to make a recording of a confidential communication."); *Lozano v. City of Los Angeles*, 73 Cal. App. 5th 711, 728 (2022) (similar); *People v. Buchanan*, 26 Cal. App. 3d 274, 289 (1972) (similar). Their complaint pleads the opposite: web developers (not Meta) choose whether to integrate the Pixel into their own websites, and Meta tells developers *not* to send confidential communications to it. Plaintiffs' halfhearted, cursory assertions that Meta does not mean what it says are insufficient to state a claim.

Judge Chhabria's recent analysis in "another pixel case" against Google is instructive. *Google Pixel*, 2024 WL 3490744, at *1. There, the plaintiffs alleged that "their health care providers use Google source code to analyze traffic on their web properties, that their personal health information is transmitted to Google as part of this process, and that Google feeds this information into its own advertising machinery." *Id.* Judge Chhabria noted that "[i]n many pixel cases, the plaintiffs sue the owner of the web property they interacted with"—*i.e.*, the healthcare providers in *Google Pixel*, the streaming services here. But there, as here, the plaintiffs instead "sued the third party that offers the source code." *Id.* That decision was surprising, because Google "admonished health care providers *not* to use the source code in a way that causes users' personal health information to be transmitted." *Id.* (emphasis added). In light of those policies, Judge Chhabria concluded that "the complaint does not adequately allege that Google intends to receive this information, or that Google intends to feed the information into its own advertising machinery." *Id.*

Notably, it was not enough for the plaintiffs to plead that Google was *aware* that some website operators were sending sensitive data in violation of its policies. Under Ninth Circuit precedent, Judge Chhabria explained, intent requires more than just "awareness that information is likely being transmitted," and where "the clients of a source code provider use the code contrary to the provider's instructions, the plaintiff should not be able to get around the intent requirement by simply intoning that the source code provider intended for the clients not to follow instructions." *Id.* at *3–5. Nor was it

sufficient for the plaintiffs to allege that Google was "capable of preventing the inadvertent transmission of private information . . . and that its failure to do so is reflective of an intent to obtain the information." *Id.* at *4. Indeed, for plaintiffs to claim that a source-code provider's "instructions are just a ruse to mask the company's true objective," they "may well" need to satisfy "the heightened pleading standard of Federal Rule of Civil Procedure 9(b)." *Id.* at *4–5.

So too here. Plaintiffs claim that four streaming services "unlawfully" sent "sensitive" information that they "had no legal right to transmit" under the VPPA. Compl. ¶ 87; *see also, e.g., id.* ¶¶ 80–81 (alleging "the Streaming Services flagrantly violate federal and state privacy laws"), 96 (similar). But plaintiffs acknowledge that Meta (like Google) instructs third parties that it "does *not* want websites or apps sending [it] sensitive information about people." *Id.* ¶ 97 (emphasis added; quotation marks omitted); *see also, e.g., id.* ¶¶ 98, 100. Meta's Business Tools Terms, to which every third-party web developer who uses the Meta Pixel must agree, require web developers to "represent and warrant that you (and any data provider that you may use) have all of the necessary rights and permissions and a lawful basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." Meta RJN Ex. 4. Further, the Business Tools Terms expressly forbid web developers from sending "sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)." *Id.*; *see also* Compl. ¶ 100 (acknowledging that sharing sensitive information violates the Business Tools Terms). And as with Google, Meta goes further and emphasizes these policies through multiple other outlets—including, as plaintiffs' complaint makes clear, in public-facing articles, blog posts, and resources for web developers who use the Pixel. *See, e.g.,* Compl. ¶¶ 97–98. To take just a few examples from the materials plaintiffs invoke in their complaint:

- In a webpage directed to third-party advertisers that plaintiffs cite and quote (¶ 97), Meta underscores that advertisers "are responsible for understanding and complying with all applicable laws and regulations," as well as with Meta's "terms and guidelines." Meta RJN Ex. 16.
- In a Meta Business Help Center webpage that plaintiffs cite and quote (Compl. ¶ 97), Meta reiterates that it "do[esn't] want or permit advertisers to use the Meta Business Tools to share prohibited information about people, which is information defined as sensitive under applicable laws, regulations or industry guidelines, or otherwise not allowed under our terms and policies." Meta RJN Ex. 17. The page makes clear that "[a]dvertisers must ensure their integrations do not send such information to Meta." *Id.*

- On that same webpage, Meta instructs that web developers "must not share . . . sensitive information about people, including information defined as sensitive under applicable laws, regulations and industry guidelines." Meta RJN Ex. 17. Meta also instructs developers to "[r]emember, you must comply with all applicable laws, regulations and industry guidelines when using the Meta Business Tools, including having all of the necessary rights, permissions and a lawful basis for disclosure and use of the data you share." *Id.* There are also instructions for how to "avoid sending Meta prohibited information." *Id.*

The "takeaway from these allegations is that [Meta] purposefully acted so as *not* to receive any [sensitive or protected] information." *Google Pixel*, 2024 WL 3490744, at *4. That is the antithesis of purposefully and deliberately acquiring it. Indeed, in a recent case against healthcare providers based on their alleged use of Meta's Pixel, a court rejected an aiding-and-abetting claim against the healthcare providers after finding no "predicate CIPA violation by Meta" (who was not a defendant). *B.K. v. Desert Care Network*, 2024 WL 1343305, at *7 (C.D. Cal. Feb. 1, 2024). There, as here, the plaintiffs acknowledged that "Meta notified its partners, including [the healthcare providers], to have the rights to collect, use, and share user data before providing any data to Meta," and the court concluded those allegations "indicate[d] that Meta either had no intention of receiving the data at issue or had some alternative *mens rea* not rising to the level of intentionality." *Id.* (quotation marks omitted). In short, plaintiffs are unable to plead that Meta intended for web developers to send sensitive or statutorily protected information in violation of Meta's policies.

**B. Plaintiffs' Remaining Allegations Cannot Save Their Claims.**

Even after amending their complaint in response to Meta's first motion to dismiss, plaintiffs offer only a few cursory allegations that seek to contradict their clear, highly specific allegations about Meta's policies. None is sufficient to plead intent.

*First*, plaintiffs claim that Meta was *aware* that the streaming services were sending sensitive data, and did not do enough to *prevent* that activity. Like the plaintiffs in *Google Pixel*, plaintiffs allege that Meta "knows" the streaming services "unlawfully disclosed information" and has failed to take "remedial action." Compl. ¶¶ 40–43, 87, 138–39; *see also, e.g., id.* ¶¶ 37–38 (alleging Meta "does not filter out the video viewing data it receives"); *id.* ¶¶ 96, 100–02 (suggesting Meta does not do enough to "enforce . . . compliance with its terms"). But as Judge Chhabria explained, those allegations fail as a matter of law: Under binding precedent, intent requires "more than mere awareness that an

Gibson, Dunn & Crutcher LLP

interception might occur due to the failure of the health providers to follow instructions." *Google Pixel*, 2024 WL 3490744, at *4 (citing *Christensen*, 828 F.3d at 791); *see also id.* at *3 (plaintiffs "set the legal bar too low" in "argu[ing] that intent only requires awareness that information is likely being transmitted"). Nor, as Judge Chhabria explained, is it enough for plaintiffs to "allege that [Meta] is capable of preventing the inadvertent transmission of private information . . . and that its failure to do so is reflective of an intent to obtain the information." *Id.* at *4. Rather, "the operative question" is "whether [Meta] acted consciously and deliberately" to receive sensitive, statutorily protected information. *Id.* (quoting *Christensen*, 828 F.3d at 791). Here, as in the case against Google, there are no plausible allegations that Meta acted with that intent, especially "against the backdrop of [Meta's] admonitions that providers must avoid transmitting" such information. *Id.*

Meta recognizes, as Judge Chhabria did, that Judge Orrick previously adopted a lower standard for alleging intent in another case involving third parties' alleged transmission of health information to Meta. *See Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023); *see also, e.g.*, *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1003 (N.D. Cal. 2024) ("*Meta Tax*") (adopting Judge Orrick's analysis in case involving tax information). Judge Orrick relied on case law suggesting that an "interception may be considered intentional where a defendant is aware of the defect causing the interception but takes no remedial action." *Doe*, 690 F. Supp. 3d at 1076 (quotation marks omitted). Judge Chhabria acknowledged but respectfully "disagree[d]" with that analysis because it is contrary to "binding" Ninth Circuit case law holding that "intentionally" means "'purposefully and deliberately.'" *Google Pixel*, 2024 WL 3490744, at *4–5 (quoting *Christensen*, 828 F.3d at 790). Simply put, allegations that Meta was *aware* of the streaming services' violations and failed to stop them do not show *purposeful and deliberate* action to acquire sensitive information. This Court should follow Judge Chhabria's thorough analysis and dismiss plaintiffs' claims.

*Second*, plaintiffs assert that Meta's advertising teams sometimes help some developers target their advertisements. *See* Compl. ¶ 48 ("The Streaming Services coordinate with Facebook to target their advertisements and set up their Business Tools."); *see also id.* ¶¶ 39, 49, 95. There are at least two problems with that theory. For one thing, these vague allegations have nothing to do with the developers at issue here: Plaintiffs cite generic articles and statements from 2017, 2018, and 2019

about Meta's support teams—but none of those materials even mentions any of the streaming services at issue here, and most of them concern Meta's work with campaigns in "the 2016 presidential race." *See id.* ¶¶ 48–49.[4] That does not plausibly allege that Meta worked with the streaming services years later to set up the Pixel. And even if plaintiffs *did* plead that Meta worked with the streaming services, plaintiffs do not allege that Meta instructed the services to send sensitive data in violation of Meta's policies. After all, there are countless ways for streaming services (like other web developers) to use the Pixel *without* sending sensitive or legally protected data. *Cf. Google Pixel*, 2024 WL 3490744, at *4 ("[t]here is nothing inherently unlawful about Google offering its source code to health care providers"). Promoting the Pixel does not suggest any unlawful intent to receive protected information.

Plaintiffs have thus failed to plead that Meta secretly intended for web developers to violate its policies; their factual allegations do not even come close to making out such a conspiracy. Moreover, because that theory sounds in fraud, under settled Ninth Circuit precedent it is subject to Rule 9(b)'s higher pleading standard. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125–27 (9th Cir. 2009); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103–04 (9th Cir. 2003); *but see Smith v. Google, LLC*, 2024 WL 2808270, at *5 (N.D. Cal. June 3, 2024). Plaintiffs do not come close to clearing that bar by setting forth with particularity "the who, what, when, where, and how of the misconduct charged." *Rodriguez v. Google LLC*, 2021 WL 2026726, at *6 (N.D. Cal. May 21, 2021) (quotation marks omitted). Indeed, as Judge Chhabria concluded with respect to the allegations in *Google Pixel*, plaintiffs' allegations of intent "do not even satisfy the basic Rule 8 standard." 2024 WL 3490744, at *5. Here, as in *Google Pixel*, their claims should be dismissed.

## II. Plaintiffs Consented To Meta's Receipt Of Their Data.

All of plaintiffs' claims fail because plaintiffs consented to the streaming services' sharing of the data at issue with Meta. The absence of consent is an essential element of plaintiffs' CIPA claims.

---

[4] In amending their complaint, plaintiffs added a citation of a February 2024 article stating generically that "Meta organizes its ad sales teams based on the amount of money spent by advertisers and how much potential they have for growth" and that "[b]igger advertisers . . . have their own dedicated client solutions manager." Compl. ¶ 39 & n.57. Ironically, that article focuses on a perceived *lack* of engagement from Meta with advertisers. *See id.* In any event, it says nothing about the streaming services at issue here and never even suggests that Meta intended for them to send information in violation of the Business Tools Terms. The lack of any such factual allegations—even after Meta highlighted the deficiency in its first motion to dismiss—is telling.

*See, e.g.*, *Silver v. Stripe Inc.*, 2021 WL 3191752, at *2–3 (N.D. Cal. July 28, 2021) ("lack of consent is an element" of a CIPA claim); *see also Mollaei v. Otonomo Inc.*, 651 F. Supp. 3d 1135, 1143 (N.D. Cal. 2023) (dismissing CIPA claim where plaintiff "did not plausibly plead a lack of consent" and "did not plead whether his vehicle contract disclosed and required consent for tracking his movement"). Consent likewise defeats plaintiffs' privacy-tort claims, which require them to allege a reasonable expectation of privacy. *See, e.g.*, *Smith v. Facebook, Inc.*, 262 F. Supp. 3d 943, 955 (N.D. Cal. 2017), *aff'd*, 745 F. App'x 8 (9th Cir. 2018). And even where consent is an affirmative defense, it can serve as the basis for dismissal where it is "obvious on the face of a complaint." *Facebook, Inc. v. BrandTotal Ltd.*, 2021 WL 662168, at *8 (N.D. Cal. Feb. 19, 2021) (quotation marks omitted).

Tellingly, even though Meta's prior motion to dismiss called out this omission, plaintiffs' amended complaint still contains no allegation that they did not assent to the streaming services' privacy policies. That is unsurprising, given those policies clearly disclose that they share information with third parties like Meta, as set forth below. And even ignoring this fatal flaw in their pleading, plaintiffs do admit that Facebook users (like themselves) assent to *Meta's* policies—and, for the reasons that follow, Meta's policies likewise establish consent and independently warrant dismissal.

**A. The Streaming Services' Policies Establish Plaintiffs' Consent.**

The streaming services' privacy policies establish plaintiffs' consent to Meta's receipt of their information through the Pixel. Plaintiffs assert that they were "unaware" of and "did not consent" to the Meta Pixel "tracking" their information on the streaming services' websites. Compl. ¶¶ 23–26. But those conclusory allegations are insufficient. *See, e.g.*, *New Mexico ex rel. Balderas v. Google, LLC*, 489 F. Supp. 3d 1254, 1263 (D.N.M. 2020) ("conclusory" allegation of "inadequate notice" insufficient to state privacy-related claim). Plaintiffs must allege *facts* showing that "the circumstances, considered as a whole," would not have permitted a "reasonable person" to understand "that an action would be carried out so that their acquiescence demonstrates knowing authorization." *Smith*, 745 F. App'x at 8. Plaintiffs do not and cannot do so here.

At most, plaintiffs allege that the streaming services' terms were not sufficient to show consent *under the VPPA*. *See* Compl. ¶ 80. That might support a VPPA claim against the streaming services, but when it comes to plaintiffs' claims against Meta, plaintiffs' "[k]nowing authorization of the

practice" is sufficient to defeat their claims. *Smith*, 745 F. App'x at 8–9; *see also, e.g.*, *Silver*, 2021 WL 3191752, at *4–5 (dismissing wiretapping claims where "terms plainly disclose that partners . . . may install tracking software to collect data concerning users' activities across websites"); *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1211–14 (N.D. Cal. 2014) (Koh, J.) (similar); Cal. Civ. Code § 3515 ("He who consents to an act is not wronged by it."); *Hammerling*, 2024 WL 937247, at *3 (affirming dismissal of invasion of privacy claim because Google "expressly disclosed" tracking on third-party apps); *Lloyd*, 2024 WL 3325389, at *2 (similar). Plaintiffs here were on notice of and agreed to the alleged data practices.

Plaintiffs repeatedly allege that they are "subscribers" of the streaming services who "must pay money on a recurring basis" and who "frequent[]" the streaming services' websites—cherry-picking aspects of their subscriber relationship to form the basis of their claims. Compl. ¶¶ 23–26, 80, 96. Despite these allegations—and despite the fact that lack of consent and a reasonable expectation of privacy are elements of their claims—plaintiffs refer only to the homepages for each of the streaming services' websites, *see id.* ¶¶ 23–26, while selectively omitting their sign-up processes and the privacy policies to which plaintiffs agreed to become subscribers.

To sign up as subscribers, plaintiffs had to agree to the streaming services' privacy policies. *See* Meta RJN Exs. 18–21. Those privacy policies disclosed that the streaming services use tracking technologies like pixels and cookies to share the information at issue with third parties like Meta. The following chart shows how the streaming services disclosed what plaintiffs claim they did not know:

| Plaintiff | Allegations | Disclosures |
|---|---|---|
| Plaintiff Starzinski (Paramount+ subscriber) | Did not know that the "buttons [he] clicked" and the "videos he viewed" would be shared with Meta through its Pixel. Compl. ¶ 23. | "We ***share your personal information with*** social media companies such as ***Meta*** . . . so that we can . . . provide you with relevant advertising related to your interests on those platforms." Explains what "cookies" and "***pixels***" are and "[t]he purposes for which we and our partners use cookies and similar technologies," including "collecting information about your use of the Paramount Services, . . . ***your browsing habits***, and other preferences so that we can deliver more relevant and meaningful advertising to you." And Paramount+ shares "names . . . [and] [i]nformation about transactions or ***content choices*** made on or in connection with the Paramount Services" with "third parties to help us target and deliver personalized ads to you," including "***[s]ocial media companies***." Meta RJN Ex. 22 (emphases added). |
| Plaintiff Odumosu (Hulu and ESPN+ subscriber) and Plaintiff Medina (Hulu subscriber) | Did not know the "buttons [they] clicked" and the "videos [they] viewed" would be shared with Meta through its Pixel. Compl. ¶¶ 24–25. | Hulu and ESPN+ collect "first name and surname" and "[a]ctivity information about your use . . . of our sites . . . such as the ***content you view***," including through "technologies, such as cookies[] [and] ***pixels***," to "[p]rovide you with targeted advertising based on your activity on our sites." Meta RJN Ex. 23 (emphases added).<br>"We may use your personal information to deliver relevant . . . advertising to you on our properties and on third parties' sites and applications. We may provide ***social media . . . platforms*** with limited personal information, such as certain identifiers . . . which they ***match with their customers' profiles***. Based on this, the platform may show you our ads." Meta RJN Ex. 24. The policy tells subscribers that they can change their "Hulu preferences regarding the ***sharing of your viewing information together with certain personal information*** by . . . editing [their] profile." Meta RJN Ex. 23 (emphases added). |
| Plaintiff McCoy (Starz subscriber) | Did not know that "what he clicked on, searched for, and the videos he viewed" would be shared with Meta through its Pixel. Compl. ¶ 26. | Starz collects "name . . . [and] [y]our activity on Services, Sites, and Applications, such as ***title selections, shows you have watched and search queries***," as well as "clickstream data (including ***page clicks and scrolls***)." Meta RJN Ex. 25 (emphases added). Starz uses this information to "[p]rovide you with . . . targeted advertising," including sharing the information with "***third-party marketing, advertising, and analytics providers***." *Id.* It also discloses that this information may be "collect[ed] [and] share[d] . . . through the use of cookies and related technologies (including . . . ***pixels*** . . .)." *Id.* |

In short, each of the streaming services' privacy policies disclosed the same data practices of which plaintiffs now complain. Plaintiffs' claims thus fail because they cannot allege lack of consent or a reasonable expectation of privacy. *See Smith*, 745 F. App'x at 8–9 (dismissing federal Wiretap Act, CIPA, common-law tort, and invasion of privacy claims based on consent); *Silver*, 2021 WL 3191752, at *4–5 (dismissing federal and CIPA wiretapping claims where "the privacy policy [] clearly disclose[d] the challenged conduct"); *Perkins*, 53 F. Supp. 3d at 1211–14 (granting motion to dismiss

Gibson, Dunn & Crutcher LLP

because plaintiffs "consented to or authorized the collection of" their data); *Hammerling*, 2024 WL 937247, at *3 (finding that Google's disclosures precluded plaintiffs' privacy claims).

**B. Meta's Policies Establish Plaintiffs' Consent.**

**1. Meta's Policies Establish Consent For Meta To Receive Data Reflecting Users' Activity On Third-Party Websites.**

Plaintiffs, all of whom allege they are Facebook users, acknowledge that "[w]hen first signing up [for Facebook], a user assents to three agreements: the Terms of Service, the Cookies Policy, and the Data Policy." Compl. ¶ 89; *see id.* ¶¶ 23–26. Those policies contain clear and broad disclosures stating that Meta may receive data reflecting users' activity on third-party websites that use the Meta Business Tools. *See supra* 5–6. The Ninth Circuit has held, and recently reaffirmed, that "[a] reasonable person viewing those disclosures would understand that Facebook maintains the practices of (a) collecting its users' data from third-party sites and (b) later using the data for advertising purposes," and "[k]nowing authorization of the practice constitutes [p]laintiffs' consent." *Smith*, 745 F. App'x at 8–9; *see Lloyd*, 2024 WL 3325389, at *2 (affirming dismissal of claims that Meta "impermissibly track[s] . . . online activity" because "Facebook's data policy gives clear notice that third party partners may share data with Facebook"); *see also, e.g.*, *Silver*, 2021 WL 3191752, at *4–5 (dismissing wiretapping claims where "terms plainly disclose that partners . . . may install tracking software to collect data concerning users' activities across websites"); *Perkins*, 53 F. Supp. 3d at 1211–14 (similar). Because the data at issue here all reflects plaintiffs' activity on third-party websites that use the Meta Business Tools, it is squarely within the scope of consent.

Some courts have nevertheless declined to follow these principles where allegedly *sensitive* data was at issue. *See, e.g.*, *Meta Tax*, 724 F. Supp. 3d at 1003–04 (tax information); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) (health information). Those courts have reasoned that "generalized notice" is not enough; instead, those courts posit, Meta's policies must "specifically indicate" that it will receive the precise type of data at issue in order to establish consent. *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793; *see Meta Tax*, 724 F. Supp. 3d at 1003–04. That analysis cannot be squared with the broad language in Meta's policies, which explain at length that Meta "collect[s] and receive[s] information" from third parties "about a variety of your information

Gibson, Dunn & Crutcher LLP

and activities on and off our Products," including "[w]ebsites you visit and cookie data." *Supra* 5–6. That language broadly encompasses data about users' activity on third-party websites, and the Ninth Circuit has admonished that "[a] contractual term is not ambiguous just because it is broad." *F.B.T. Prods., LLC v. Aftermath Recs.*, 621 F.3d 958, 964 (9th Cir. 2010). Meta's broad disclosures that it receives data about users' activity on third-party websites must be given full effect.

The Ninth Circuit recently reiterated that principle in assessing the scope of Google's privacy policy, rejecting a district court's narrow reading where the policy broadly "disclose[d] Google's collection of user activity data in third-party apps." *Hammerling*, 2024 WL 937247, at *2. The court emphasized that "where a contract expressly defines a term, we cannot reject that definition simply because it may deviate from our expectations." *Id.* This recent precedent was not considered by the courts in *In re Meta Pixel Healthcare Litigation* or *Meta Tax*. Its analysis holds true here. There is no basis to require Meta to "specifically indicate" each type of information third-party websites may convey (especially because third parties, not Meta, decide what information to send). *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793; *see Meta Tax*, 724 F. Supp. 3d at 1003. Indeed, when the Ninth Circuit affirmed dismissal of claims regarding Meta's receipt of "browsing data from various healthcare-related websites," *Smith*, 745 F. App'x at 8, it did not ask whether Meta's policies "specifically indicated" that Meta would receive "healthcare-related" browsing data. Instead, the Ninth Circuit pointed out that "many other kinds of [web-browsing] information are equally sensitive" and nevertheless held that "the practice complained of falls within the scope of [p]laintiffs' consent to Facebook's Terms and Policies." *Id.* at 9. So too here.

**2. Plaintiffs' Contrary Assertions Are Meritless.**

Plaintiffs' complaint asserts that Meta's policies are insufficient to establish consent, but that position is meritless. *First*, plaintiffs assert that Meta "never receives consent" to receive "sensitive and unlawfully-disclosed information" because Meta's Privacy Policy states that it "[r]equires [third parties that use the Meta Business Tools] to have lawful rights to collect, use and share your data before providing any data to us." Compl. ¶¶ 88, 92. That statement, which is true, does not vitiate or narrow plaintiffs' consent. As the complaint acknowledges, Meta *does* require users of the Meta Business Tools to "represent and warrant that [they] have all of the necessary rights and permissions and a lawful

basis (in compliance with all applicable laws, regulations and industry guidelines) for the disclosure and use of Business Tool Data." Meta RJN Ex. 4; *see* Compl. ¶¶ 97–98, 100. That requirement is expressed in a binding agreement and, as plaintiffs themselves highlight, in numerous public-facing documents directed toward developers. *See* Compl. ¶¶ 97–98, 100; *supra* 6–7, 10–11.

The possibility that some web developers might violate this requirement and send Meta unwanted data might give plaintiffs claims *against the web developers*, as plaintiffs in other cases have pursued. *See, e.g.*, *Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018 (N.D. Cal. 2023) (addressing VPPA and other claims against web developer that allegedly shared data through the Meta Pixel); *see also Google Pixel*, 2024 WL 3490744, at *1 ("In many pixel cases, the plaintiffs sue the owner of the web property they interacted with[.]"). But nowhere does Meta's Privacy Policy say that Meta will never receive information from third parties that do not have the right to share that information. *Cf. In re Facebook, Inc. Sec. Litig.*, 477 F. Supp. 3d 980, 1013 (N.D. Cal. 2020) (concluding Meta's "policy only represents that it would 'require' data to be deleted" and "makes no guarantees about how Facebook would enforce that requirement," and noting "*nowhere* in Facebook's data policy is there any representation that Facebook would confirm deletion"), *aff'd in part and rev'd in part on other grounds*, 87 F.4th 934 (9th Cir. 2023). Rather, Meta's terms expressly warn that—although it "specif[ies] clear guidelines for everyone who uses" its products—Meta does "not control . . . what . . . others do" and is "not responsible for their actions or conduct." Meta RJN Ex. 1. At bottom, third-party conduct does not undermine plaintiffs' assent to Meta's broad disclosures that it may receive data reflecting their activity on third-party websites or give plaintiffs a claim against Meta every time a third party violates Meta's policies.

*Second*, plaintiffs also allege that even Meta's receipt of *non*-sensitive web-browsing data is unconsented because, they claim, Meta "obfuscates the volume, specificity, and type of data it collects." Compl. ¶ 103. Meta provides a tool to users—the "Off-Facebook Activity" (or "OFA") tool—that provides "a summary of activity that businesses and organizations share with [Meta] about [users'] interactions with them." *Id.* ¶ 104 (quotation marks omitted). Plaintiffs assert this tool is misleading because it does not identify *all* of the data Meta receives from third parties. *Id.* ¶¶ 103–19. That contention is meritless. As plaintiffs acknowledge in their complaint, Meta tells users that the OFA is

simply "a summary"—not a comprehensive account. *Id.* ¶ 118 (quotation marks omitted). Meta's provision of this additional tool giving users *more* information does not plausibly limit the scope of consent set out in plaintiffs' agreements with Meta. Accordingly, a California court expressly rejected this exact argument in a case brought by the same plaintiffs' counsel, concluding "[t]hese allegations do not show that Facebook's offering of the OFA tool—which is expressly described as a 'summary' that is incomplete—limits the broad consent to data-sharing that [p]laintiffs provided." *Rickwalder v. Meta Platforms, Inc.*, 2022 WL 22462351, at *15 (Cal. Sup. Ct. Sept. 15, 2022). Notably, too, "there is no allegation that [p]laintiffs ever saw or used the OFA tool, or that they tried to disable Off-Facebook Activity." *Id.* And other courts, including the Ninth Circuit, have repeatedly held that Meta's policies establish users' consent for Meta to receive data reflecting their activity on third-party websites. *See, e.g.*, *Lloyd*, 2024 WL 3325389, at *2; *Smith*, 745 F. App'x at 8–9.

## III. Plaintiffs' Claims Also Fail For Other Claim-Specific Reasons.

Plaintiffs' claims also suffer other deficiencies that require dismissal. This Court need not reach these issues given the intent and consent problems with all of plaintiffs' claims, but these issues supply additional, independent bases for dismissing plaintiffs' claims.

### A. Web Developers' Consent Defeats Plaintiffs' Federal Wiretapping Claim.

#### 1. The streaming services consented to sharing data with Meta.

The federal Wiretap Act is a one-party consent statute, so there cannot be a violation if even "*one* of the parties to the communication has given prior consent." 18 U.S.C. § 2511(2)(d) (emphasis added). Plaintiffs allege Meta intercepted communications between them and the websites they visited. Compl. ¶¶ 23–26. But as plaintiffs admit, the Meta Pixel is a tool that *web developers* can "integrate into their respective websites." *Id.* ¶ 36; *see also, e.g.*, *id.* ¶ 34. Web developers choose whether and how to use the Pixel, including what information they want to send to Meta. *See id.* ¶ 35. Independent of Meta's agreements with users, a website owner's decision to share information with Meta using the Pixel establishes one-party consent (the website's) and precludes a wiretapping claim. As Judge Chhabria explained in *Google Pixel*: "[T]he health care providers choose to install Google source code on their web properties. This must mean the providers consented to the operation of Google source code." 2024 WL 3490744, at *5; *see also, e.g.*, *Katz-Lacabe v. Oracle Am., Inc.*, 2024 WL 1471299, at *4

Gibson, Dunn & Crutcher LLP

(N.D. Cal. Apr. 3, 2024) ("Oracle's customers chose to deploy Oracle's tools on their websites, and it necessarily follows that 'one of the parties to the communication'—the websites themselves—gave 'prior consent to such interception.'"); *Rodriguez*, 2021 WL 2026726, at *5 (similar). By installing the Pixel on their sites, the websites here likewise consented to send information to Meta.

In cases challenging healthcare and tax-service providers' use of Meta's Pixel, two courts concluded discovery was necessary to determine whether those providers "*actually* consented to the sending of sensitive" information. *Doe*, 690 F. Supp. 3d at 1078; *see Meta Tax*, 724 F. Supp. 3d at 1004 (following *Doe*). In *Doe*, the healthcare case, Judge Orrick acknowledged Chief Judge Seeborg's dismissal of a similar claim in *Katz-Lacabe*, but concluded *Doe* was "closer to" *Brown v. Google LLC*, 685 F. Supp. 3d 909 (N.D. Cal. 2023). *See Doe*, 690 F. Supp. at 1078. In *Brown*, the court had rejected a one-party consent argument at the pleadings stage because it concluded that Google's disclosures could have suggested that its tools would *not* collect users' information when users were in "private browsing mode"; the *Brown* court reasoned that a fact question existed about whether "website developers knew about Google's collection of private browsing data." 685 F. Supp. 3d at 934.

Meta respectfully submits that *Doe* and *Meta Tax* were wrongly decided. Even assuming users would read Meta's user-facing policies to mean that third parties never send Meta sensitive information (*but see supra* 17–20), as Chief Judge Seeborg has explained, *web developers'* consent cannot be "dependent on a *user*'s privacy expectations." *Katz-Lacabe*, 2024 WL 1471299, at *4 (rejecting this "consent-upon-consent" theory). Regardless, *Doe* and *Meta Tax* are inapposite because there are no allegations here that suggest the streaming services were somehow unaware of the data they were sending to Meta. To the contrary, the complaint alleges the streaming services "*knowingly* violate the Video Privacy Protection Act." Compl. ¶ 80 (emphasis added); *see also Rodriguez*, 2021 WL 2026726, at *5 (dismissing wiretapping claim based on one-party consent where no allegations suggested "developers somehow misapprehend[ed] the product's general function or purpose"). That establishes their consent and precludes liability under the federal Wiretap Act.

**2. The crime-tort exception does not apply.**

The complaint asserts, in conclusory fashion, that Meta's alleged interceptions "were unlawful and tortious." Compl. ¶ 154. That is an apparent reference to the federal Wiretap Act's "crime-tort

exception." Under the crime-tort exception, one-party consent is insufficient where a communication "is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d). But that exception does not apply here for two reasons.

*First*, numerous cases going back more than twenty years have held the crime-tort exception does not apply where a defendant's "underlying motivation in collecting and selling data about internet users was . . . to generate revenue." *Katz-Lacabe*, 2024 WL 1471299, at *3.[5] That is precisely what plaintiffs allege here. Compl. ¶ 95 (alleging "Facebook aids and abets the Streaming Services' disclosure of personally identifiable information, then profits from it"); *see also, e.g.*, *id.* ¶¶ 6–10, 32, 87, 96, 179–80.

*Second*, the Ninth Circuit has made clear that for the crime-tort exception to apply, a defendant's "criminal or tortious purpose must be separate and independent from the act of the recording." *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022). The "focus is not upon whether the interception itself violated another law; it is upon whether the *purpose* for the interception—its intended use—was criminal or tortious." *Sussman v. Am. Broad. Cos.*, 186 F.3d 1200, 1202 (9th Cir. 1999). Plaintiffs assert that "[t]he interception by Facebook in the aforementioned circumstances were [sic] unlawful and tortious," Compl. ¶ 154, but even if that were true (it is not), it focuses on "the interception itself," not any "separate and independent" criminal or tortious purpose. *Newman*, 51 F.4th at 1136 (quotation marks omitted). Nor does it suffice to allege that Meta "used the contents of the communications knowing or having reason to know that such information was obtained through the interception of electronic communications in violation of 18 U.S.C. § 2511(a)." Compl. ¶ 155; *see also id.* ¶ 180. Meta's use of data received from third-party developers using the Pixel is not *independently* criminal or tortious; Meta's policies disclose that practice in detail, and plaintiffs consented to it. *Supra* 17–20. Plaintiffs' suggestion that this use becomes unlawful merely because an interception itself is allegedly unlawful is exactly the sort of bootstrapping the "separate and independent" requirement forbids. *Newman*, 51 F.4th at 1136; *see also, e.g.*, *Google Pixel*, 2024 WL 3490744, at *5 n.4 (rejecting similar allegations).

---

[5] *See also, e.g.*, *Google Pixel*, 2024 WL 3490744, at *5 n.4; *Rodriguez*, 2021 WL 2026726, at *6 n.8; *In re Google Inc. Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014); *In re DoubleClick Inc. Priv. Litig.*, 154 F. Supp. 2d 497, 518 (S.D.N.Y. 2001).

### B. Plaintiffs Fail To Allege Meta Received The "Contents" Of Any Communication.

To state a claim under the federal Wiretap Act and CIPA § 631, plaintiffs also must allege that Meta received "the *contents* of any wire, electronic, or oral communication," defined to include "any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8) (emphasis added); *see* Cal. Penal Code § 631(a) ("contents or meaning"); *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act." (quotation marks omitted)). The Ninth Circuit has held that "the term 'contents' refers to the intended message conveyed by the communication, and does not include record information regarding the characteristics of the message that is generated in the course of the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). "There is no language in ECPA equating 'contents' with personally identifying information." *Id.* at 1106–07.

Data reflecting plaintiffs' web-browsing activity—*i.e.*, which webpages they viewed, which buttons they clicked, and which videos they watched, *see* Compl. ¶¶ 23–26—is not "the intended message conveyed" of any "communication" between users and web developers. *Zynga*, 750 F.3d at 1106. While URLs may sometimes *contain* contents (for example, if the URL contains the search query a person typed into Google's search box—such as https://google.com/search?q=**<u>best+shows+on+Hulu</u>**), a URL that merely reflects a webpage a person has visited is not itself contents. *Id.* at 1107–08 (the "webpage address identifies the location of a webpage a user is viewing on the internet" and is not "contents"). In an apparent attempt to cure this deficiency, plaintiffs amended their complaint to assert that "[t]he data collected by Facebook constitutes 'contents of communications' because it includes the titles of the videos that were streamed." Compl. ¶ 178. But, again, URLs that merely reflect where a person has navigated online are not "contents," even when the fact that a person visited a particular webpage allegedly implies certain information about the person. *See Zynga*, 750 F.3d at 1106–08. Indeed, as another court has explained in a similar factual scenario, "the file path and video title information contained in the URLs allegedly intercepted" are not "'contents.'" *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *15 (D.N.J. July 2, 2014).

Plaintiffs also assert that Meta received "form field entries like email address and name." Compl. ¶ 143. That information may be contents, but it is not the allegedly sensitive video-viewing

information that forms the basis of plaintiffs' complaint. In other words, even assuming plaintiffs did not consent to Meta's receipt of their video-viewing data, they clearly consented to Meta's receipt of other information "like email address and name." *Id.*; *see, e.g.*, *Lloyd*, 2024 WL 3325389, at *2; *Smith*, 745 F. App'x at 8–9. The only allegedly *sensitive* information plaintiffs allege Meta received—URLs that allegedly reveal their "video-viewing history," Compl. ¶¶ 81, 178—is not contents.

**C. Plaintiffs Fail To Allege Any "Highly Offensive" Conduct.**

To state a claim for intrusion upon seclusion or constitutional invasion of privacy, plaintiffs must allege that any intrusion was both "highly offensive to a reasonable person" and "sufficiently serious and unwarranted as to constitute an egregious breach of the social norms." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 295 (2009) (quotation marks omitted). That standard "set[s] a high bar for an invasion of privacy claim," *Belluomini v. Citigroup Inc.*, 2013 WL 5645168, at *3 (N.D. Cal. Oct. 16, 2013), and confines the tort to the sort of conduct that sparks outrage in a reasonable person. Plaintiffs do not and cannot clear that bar here.

"Contemporary internet browsing involves the collection of users' data, including by tracking users across the internet, and a reasonable user should expect as much." *Hubbard v. Google LLC*, 2024 WL 3302066, at *7 (N.D. Cal. July 1, 2024) (dismissing privacy claims brought on behalf of children whose YouTube viewing data was tracked by Google) (emphasis omitted). Accordingly, "[c]ourts in this district have held that data collection and disclosure to third parties that is 'routine commercial behavior' is not a 'highly offensive' intrusion of privacy," including "[e]ven disclosure of highly personal information." *Hammerling v. Google LLC*, 615 F. Supp. 3d 1069, 1090 (N.D. Cal. 2022); *see also, e.g.*, *Hubbard*, 2024 WL 3302066, at *7–8 (concluding online tracking is "ubiquitous, commercial behavior" that is not "highly offensive"); *In re iPhone Application Litig.*, 844 F. Supp. 2d 1040, 1063 (N.D. Cal. 2012) ("Even assuming this information was transmitted without [p]laintiffs' knowledge and consent, a fact disputed by [d]efendants, such disclosure does not constitute an egregious breach of social norms."). Nothing in the complaint's allegations here distinguishes this case from others that have declined to find a "highly offensive" intrusion in the internet-tracking context, particularly given Meta's role as a mere alleged *recipient* of information that the streaming services chose to send. *See, e.g.*, *Hubbard*, 2024 WL 3302066, at *7–8 (rejecting claims even where plaintiffs

"point[ed] to Google's collection of *children's* [video-viewing] data") (quotation marks omitted); *see also id.* at *8 (even "violations of law do not necessarily represent highly offensive behavior").

**CONCLUSION**

The Court should dismiss the complaint in full. Because plaintiffs have already had a chance to amend and have failed to cure these problems, dismissal should be with prejudice. *See, e.g.*, *Saleem*, 2013 WL 1149789, at *2.

DATED: December 19, 2024

**GIBSON, DUNN & CRUTCHER LLP**

By: */s/ Lauren R. Goldman*
Lauren R. Goldman