**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

ALAN STARZINSKI, OLADEJI ODUMOSU, AURELIO MEDINA, and DARRNELL MCCOY, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

META PLATFORMS, INC.,

Defendant.

Case No. 3:24-cv-04501-AMO

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**

Date: June 26, 2025
Time: 2:00 p.m.
Courtroom: 10, 19th Floor
Judge: Hon. Araceli Martinez-Olguin

## TABLE OF CONTENTS

PAGE(S)


STATEMENT OF ISSUES TO BE DECIDED PER CIVIL L. R. 7-4(A)(3) .................................. 1

INTRODUCTION .................................................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

I. DEFENDANT'S BUSINESS TOOLS FUNCTION TO INTERCEPT CONFIDENTIAL INFORMATION WITHOUT THE CONSENT OF PLAINTIFFS AND CLASS MEMBERS ........................................................ 2

II. DEFENDANT KNOWS IT IS INTERCEPTING CONFIDENTIAL INFORMATION FROM THE STREAMING SERVICES .................................................. 4

III. DEFENDANT INTERCEPTED PLAINTIFFS' SENSITIVE VIDEO-VIEWING DATA ........................................................................................................ 4

IV. PLAINTIFFS DID NOT CONSENT TO DEFENDANT'S INTERCEPTION OF THEIR SENSITIVE INFORMATION COMMUNICATED TO THE STREAMING SERVICES ............................................................................ 6

LEGAL STANDARD .............................................................................................................. 7

ARGUMENT .......................................................................................................................... 7

I. PLAINTIFFS ADEQUATELY ALLEGE INTENT ........................................................... 7

II. PLAINTIFFS DID NOT CONSENT ........................................................................... 13

A. The Streaming Services Policies Do Not Establish Consent for Collection of Plaintiffs' Confidential Video-Viewing Information ......................... 13

B. Meta's Policies Do Not Establish Consent to Collection of Plaintiffs' Confidential Video-Viewing Information. ........................................................ 16

III. PLAINTIFFS STATE A CLAIM UNDER THE WIRETAP ACT, CIPA, AND FOR INVASION OF PRIVACY/INTRUSION UPON SECLUSION ...................... 20

A. The Crime-Tort Exception to the Wiretap Act's One-Party Consent Rule Applies Here ........................................................................................ 20

B. Defendant Received the Contents of Communications ........................................... 22

C. Defendant's Conduct was Highly Offensive ............................................................ 24

CONCLUSION .................................................................................................................... 25

## TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ... 7

*B.K. v. Desert Care Network*,
2024 WL 1343305 (C.D. Cal. Feb. 1, 2024) ... 21

*Backhaut v. Apple, Inc.*,
74 F. Supp. 3d 1033 (N.D. Cal. 2014) ... 7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ... 7

*Brodsky v. Apple Inc.*,
445 F. Supp. 3d 110 (N.D. Cal. 2020) ... 23

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ... 21

*Calhoun v. Google LLC*,
526 F. Supp. 3d 605 (N.D. Cal. 2021) ... 15

*Calhoun v. Google, LLC*,
113 F.4th 1141 (9th Cir. 2024) ... 17, 18

*Campbell v. Facebook Inc.*,
77 F. Supp. 3d 836 (N.D. Cal. 2014) ... 15

*Cousin v. Sharp Healthcare*,
702 F. Supp. 3d 967 (S.D. Cal. 2023) ... 23

*Doe I v. Google LLC,*
2024 WL 3490744 (N.D. Cal. July 22, 2024) ... 10, 11

*Doe v. FullStory, Inc.*,
712 F. Supp. 3d 1244 (N.D. Cal. 2024) ... 13, 25

*Doe v. Meta Platforms, Inc.*,
690 F. Supp. 3d 1064 (N.D. Cal. 2023) ... 11, 13

*Doe v. Microsoft Corp.*,
2023 WL 8780879 (W.D. Wash. Dec. 19, 2023) ... 16

*E.H. v. Meta Platforms, Inc.*,
2024 WL 557728 (N.D. Cal. Feb. 12, 2024) ... 25

*Gershzon v. Meta Platforms, Inc.*,
2023 WL 5420234 (N.D. Cal. Aug. 22, 2023) ........ 11

*Gladstone v. Amazon Web Servs., Inc.*,
2024 WL 3276490 (W.D. Wash. July 2, 2024) ........ 8, 12

*Godecke v. Kinetic Concepts, Inc.*,
937 F.3d 1201 (9th Cir. 2019) ........ 7

*Greenley v. Kochava, Inc.*,
684 F. Supp. 3d 1024 (S.D. Cal. 2023) ........ 23

*Hammerling v. Google LLC*,
2022 WL 17365255 (N.D. Cal. Dec. 1, 2022) ........ 23

*Hammerling v. Google, LLC*,
2024 WL 937247 (9th Cir. Mar. 5, 2024) ........ 18

*Heerde v. Learfield Commc'ns, LLC*,
2024 WL 3573874 (C.D. Cal. July 19, 2024) ........ 13

*Hernandez v. Hillsides, Inc.*,
47 Cal. 4th 272 (2009) ........ 8

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
402 F. Supp. 3d 767 (N.D. Cal. 2019) ........ 17

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ........ 24, 25

*In re Google Assistant Priv. Litig.*,
457 F. Supp. 3d 797 (N.D. Cal. 2020) ........ 7, 9, 13

*In re Google Inc.*,
2013 WL 5423918 (N.D. Cal. Sept. 26, 2013) ........ 15

*In re Google Inc., Gmail Litig.*,
2014 WL 1102660 (N.D. Cal. Mar. 18, 2014) ........ 21

*In re Google RTB Consumer Priv. Litig.*,
606 F. Supp. 3d 935 (N.D. Cal. 2022) ........ 13

*In re Grp. Health Plan Litig.*,
709 F. Supp. 3d 707 (D. Minn. 2023) ........ 21

*In re Meta Pixel Healthcare Litig.*,
647 F. Supp. 3d 778 (N.D. Cal. 2022) ........ passim

*In re Meta Pixel Tax Filing Cases*,
724 F. Supp. 3d 987 (N.D. Cal. 2024) ........ 11, 12, 16

*In re TikTok, Inc. In-App Browser Priv. Litig.*,
2024 WL 4367849 (N.D. Ill. Oct. 1, 2024) ........ 14

*In re Toys R Us, Inc., Priv. Litig.*,
2001 WL 34517252 (N.D. Cal. Oct. 9, 2001) ........ 22

*In re Zynga Priv. Litig.*,
750 F.3d 1098 (9th Cir. 2014) ........ 23

*Jackson v. LinkedIn Corp.*,
2024 WL 3823806 (N.D. Cal. Aug. 13, 2024) ........ 9

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ........ 7

*Mastel v. Miniclip SA*,
549 F. Supp. 3d 1129 (E.D. Cal. 2021) ........ 24

*Matera v. Google Inc.*,
2016 WL 5339806 (N.D. Cal. Sept. 23, 2016) ........ 15

*McDonald v. Kiloo ApS*,
385 F. Supp. 3d 1022 (N.D. Cal. 2019) ........ 24

*Opperman v. Path*,
87 F. Supp. 3d 1018 (N.D. Cal. 2014) ........ 24

*Planned Parenthood Fed'n of Am., Inc. v. Newman*,
51 F.4th 1125 (9th Cir. 2022) ........ 22

*Popa v. Harriet Carter Gifts, Inc.*,
426 F. Supp. 3d 108 (W.D. Pa. 2019) ........ 19

*Rickwalder v. Meta Platforms, Inc.*,
2022 WL 22462351 (Cal. Super. Ct. Sept. 15, 2022) ........ 2, 17, 22

*Rodriguez v. Google LLC*,
2025 WL 50425 (N.D. Cal. Jan. 7, 2025) ........ 20

*Rojas v. HSBC Card Servs. Inc.*,
20 Cal. App. 5th 427 (2018) ........ 8

*Shulman v. Grp. W Prods., Inc.*,
18 Cal. 4th 200 (1998) ........ 8

*Smith v. Google, LLC*,
2024 WL 2808270 (N.D. Cal. June 3, 2024) ........ 10, 14

*Sussman v. Am. Broad. Companies, Inc.*,
186 F.3d 1200 (9th Cir. 1999) ........ 21, 22

*Underhill v. Kornblum*,
2017 WL 2869734 (S.D. Cal. Mar. 16, 2017) .......... 7

*United States v. Christensen*,
828 F.3d 763 (9th Cir. 2015) .......... 7

*Yoon v. Meta Platforms, Inc.*,
2024 WL 5264041 (N.D. Cal. Dec. 30, 2024) .......... 2, 9, 14

**STATUTES**

18 U.S.C. § 2510 .......... 1, 23

18 U.S.C. § 2511 .......... 21, 22

18 U.S.C. § 2710 .......... 15

42 U.S.C. § 1320d-6 .......... 24

**RULES**

Fed. R. Evid. 901(a) .......... 14

**REGULATIONS**

45 C.F.R. § 164.508 .......... 24

## STATEMENT OF ISSUES TO BE DECIDED PER CIVIL L. R. 7-4(A)(3)

1. Whether Plaintiffs Alan Starzinski, Oladeji Odumosu, Aurelio Medina, and Darrnell McCoy (collectively "Plaintiffs") state a claim under the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq*., and California's Invasion of Privacy Act § 631(a) and § 632 where Defendant Meta Platforms, Inc. eavesdropped on Plaintiffs' and class members' communications involving sensitive and private video-viewing information with third party subscription video services Paramount+, ESPN+, Hulu, and Starz via their respective websites, using the Facebook Tracking Pixel, without consent. Whether Plaintiffs state a claim for invasion of privacy under the California Constitution and for common law intrusion upon seclusion where Plaintiffs had a reasonable expectation of privacy that the sensitive video viewing information they shared with third party subscription video services Paramount+, ESPN+, Hulu, and Starz would remain confidential between the parties to the communication, and where Defendant Meta Platforms, Inc. intercepted Plaintiffs' sensitive video-viewing information without their consent.

## INTRODUCTION

Plaintiffs hereby oppose Defendant Meta Platforms, Inc.'s Motion to Dismiss First Amended Class Action Complaint (ECF No. 27) ("MTD"). Plaintiffs state a claim under the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq*. ("Wiretap Act"), California Invasion of Privacy Act ("CIPA") § 631 and § 632, invasion of privacy under California's Constitution, and for common law intrusion upon seclusion because Defendant Meta Platforms, Inc. ("Defendant") intentionally, and without the consent of Plaintiffs and class members, intercepted sensitive and confidential communications between Plaintiffs (and class members) and third party subscription video services Paramount+, ESPN+, Hulu, and Starz (collectively the "Streaming Services). Specifically, Defendant intercepted Plaintiffs' and class members confidential video-viewing data, namely, the specific videos Plaintiffs and class members watched on the Streaming Services. Plaintiffs' video-viewing information is sensitive and is protected by federal law under the Video Privacy Protection Act ("VPPA") and state law. Despite being protected, Defendant, unbeknownst to Plaintiffs, using the Facebook Tracking Pixel and other Facebook Business Tools, intercepted Plaintiffs' sensitive communications with the Streaming Services in real time and then used this information by incorporating it into its advertising

machinery which functioned to place Plaintiff and class members into targeted audiences for advertisers of similar products to reach by serving them targeted advertising. Defendant makes the Facebook Tracking Pixel (and its other Business Tools) free for website owners to use for exactly that reason—so that it can surreptitiously receive information from website interactions, connect those interactions to a specific Facebook user, and then generate highly specific audience segments which it then uses to sell advertising.

Defendant now moves to dismiss Plaintiffs' claims, largely recycling arguments that have already been rejected in *Rickwalder v. Meta Platforms, Inc*., 2022 WL 22462351 (Cal. Super. Ct. Sept. 15, 2022) and *Yoon v. Meta Platforms, Inc.*, 2024 WL 5264041 (N.D. Cal. Dec. 30, 2024). For the reasons set forth herein, the Court should therefore deny Defendant's motion to dismiss.

## STATEMENT OF FACTS

Defendant, using software tools such as the Facebook Tracking Pixel, intentionally and without consent, intercepted Plaintiffs' and Class members' electronic communications with the Streaming Services. FAC ¶¶ 1, 3-4. The specifics of Defendant's tracking of Plaintiffs and Class members are as follows.

### I. Defendant's Business Tools Function To Intercept Confidential Information Without The Consent Of Plaintiffs And Class Members

Facebook is a real identity platform, which means that if someone wishes to create an account, he or she must use their real name and provide other identifying information, such as birthday and gender. *Id.* ¶ 30. Defendant generates almost all of its substantial revenue by providing highly specific advertising services designed to target its subscribers with advertising. *Id.* ¶ 31-32. Defendant can provide highly targeted advertising services because it surveils Facebook users both while using the platform and also while its users (and non-users) navigate to other sites on the internet to glean information about the user's interests, behaviors, and connections. *Id.* ¶ 32. Defendant compiles this vast amount of data from users and non-users and then organizes it into a dataset called "Core Audiences." *Id.* Defendant then makes the "Core Audiences" data available to third-party advertisers, who can then apply highly specific filters to target their advertisements to customers. *Id.* In addition to the Core Audiences data offered by Defendant, third-party advertisers can also build

"Custom Audiences" designed to reach people who have shown interest in the advertiser's products (such as existing customers). *Id.* ¶ 33. To create a "Custom Audience," the advertiser must either manually supply Facebook with the underlying data (such as a customer list) or use Defendant's Business Tools. From there, the advertiser can expand its reach using Defendant's tools, namely by crafting "Lookalike Audiences" of potential new customers by leveraging the information from the source audience. *Id.*

Defendant's Business Tools are bits of software code that advertisers can integrate into their websites, mobile applications, and servers which function to enable Defendant to intercept and collect the contents of user's interactions with the same. *Id.* ¶ 34. Defendant's Business Tools are designed to capture data such as the webpage's Universal Resource Locator (URL), metadata, and events such as when a user downloads a mobile application or makes a purchase on a website or mobile application. *Id.* ¶ 35. Defendant offers advertisers a list of "standard events" that the Business Tools capture, and advertisers can also create "custom events" to be tracked. *Id.*

Defendant's Business Tools[1] branch off into several types depending on the software involved, but they all serve the same ends. One of Defendant's Business Tools is the Facebook Tracking Pixel[2] which is designed to be integrated into websites, including the websites of the Streaming Services. *Id.* ¶ 36. The Facebook Tracking Pixel tracks users and their actions across the internet. *Id.* When a user navigates to a website embedded with the Facebook Tracking Pixel, it functions to surreptitiously direct the user's browser to duplicate the message to the website and send it to Defendant's servers, unbeknownst to the user. *Id.* Often, as here, the data surreptitiously transmitted to Defendant through the Facebook Tracking Pixel is sensitive data that the user believes is only being transmitted to the website owner.[3] *Id.* ¶ 37. Defendant knows it collects confidential

---

[1] The term "Business Tools" encompasses the Facebook Tracking Pixel for websites, Facebook SDKs (software development kits) for mobile applications, and the Conversions API for servers.

[2] Facebook SDKs allow advertisers to track the same types of information gleaned from the Facebook Tracking Pixel on mobile applications. *Id.* ¶ 45.

[3] Facebook's Conversion API functions exactly like the Facebook Tracking Pixel but allows an advertiser to circumvent a user's privacy settings by operating on the server side, which means that it does not appear as a third-party integration (like the Facebook Tracking Pixel) and therefore circumvents privacy controls that would otherwise block the Facebook Tracking Pixel. *Id.* ¶ 46.

information through the Facebook Tracking Pixel interceptions, as evidenced by its statement that it employs a filtering mechanism for "sensitive data" (the definition of which is decided unilaterally by Defendant and does not include video-viewing information). *Id.* ¶ 37-38. Defendant intercepts, and does not filter, sensitive information gleaned from Plaintiffs' interactions with the Streaming Services, including the identity of the videos watched by Plaintiffs. *Id.* ¶ 38.

## II. Defendant Knows It Is Intercepting Confidential Information From The Streaming Services

Defendant intentionally does not filter out video viewing data that it receives via the Facebook Tracking Pixel from the Streaming Services because the Streaming Services are major customers of Defendant that pay large sums of money on advertising. *Id.* Because the Streaming Services are among Defendant's largest customers, Defendant provides them with hands-on assistance in targeted advertising through use of the Business Tools. *Id.* ¶¶ 38-39. The Streaming Services coordinate with Defendant in setting up the Business Tools for maximum effectiveness. *Id.* ¶ 48. Specifically, Defendant's agents provide strategic advice to the Streaming Services regarding the latter's use of the Business Tools. *Id.* ¶ 49.

Defendant knows, both through its hands-on interaction with the Streaming Services and through prior litigation involving the same type of conduct (namely intercepting video-viewing information using the Facebook Tracking Pixel), that it is intercepting Plaintiffs' and Class members private video viewing information in contravention of federal law. *Id.* ¶¶ 39-42. Defendant has had knowledge of the Facebook Tracking Pixel collecting sensitive video-viewing data for years and has not taken any remedial action. *Id.* ¶ 43. Defendant knows that the Streaming Services unlawfully disclose Plaintiffs' and Class members' personally identifiable information due to it close connection with the Streaming Services as major customers of Defendant. *Id.* ¶ 96.

## III. Defendant Intercepted Plaintiffs' Sensitive Video-Viewing Data

Defendant intercepted Plaintiffs' electronic communications, including their sensitive video-viewing data, each time they accessed the Streaming Services websites. *Id.* ¶ 47. This includes when Plaintiffs and Class members requested specific video material from the Streaming Services. *Id.* The Streaming Services use, at minimum, the Facebook Tracking Pixel and the Facebook SDKs. *Id.*

¶ 50. The Facebook Tracking Pixel, as configured on the Streaming Services' websites, transmits PageView data to Defendant, which includes the unique URLs for specific videos viewed by users, thereby permitting Defendant to identify specific videos Plaintiffs and Class members watched. *Id.* ¶¶ 51-56. More than that, Defendant then matches Plaintiffs and Class members (Streaming Service subscribers) to their Facebook profiles. *Id.* ¶ 57. The Facebook Tracking Pixel, as configured on the Streaming Services' websites, uses Automatic Advanced Matching which intercepts communications with the website's form fields and information such as the user's name and email address, as well as the "event, or action, that took place" on the webpage. *Id.* ¶ 58. The purpose of Automatic Advanced Matching is so Defendant can match Streaming Services website visitors with their Facebook profiles to provide more targeted advertising. *Id.* ¶ 60. In addition to the Facebook Tracking Pixel, Defendant uses software cookies which function to match the video viewing information of Plaintiffs and Class members with their Facebook profiles. *Id.* ¶¶ 62-70.

Defendant intercepts and collects the information from form fields and related actions regardless of whether the individual is a Facebook user. *Id.* ¶ 61. A Facebook ID is personally identifiable because one need only append the Facebook ID to the end of Facebook.com to reach that user's profile. *Id.* ¶ 71. Using the above-mentioned software tools, Defendant intercepts information regarding what specific videos Plaintiffs and Class members watched through the Streaming Services. *Id.* ¶¶ 72-77. The intercepted communications are confidential because what specific videos a user watches are protected from unauthorized disclosure by federal (and state) law, yet Defendant intercepts this sensitive information at scale. *Id.* ¶¶ 78-87, 101. Plaintiffs and Class members had and have a reasonable expectation of privacy in their video-viewing information and communications with the Streaming Services. *Id.* ¶¶ 82-83.

After Defendant unlawfully intercepts Plaintiffs' and Class members private video viewing information, it analyzes the information and assimilates it into its datasets, such as Core Audiences and Custom Audiences. *Id.* ¶ 44. Defendant is not a passive conduit for the Streaming Services' unlawful conduct; rather, Defendant aids and abets the Streaming Services' disclosure of personally identifiable information, then profits from it. *Id.* ¶¶ 95-96. Indeed, Defendant's own reports confirm that it intercepted Plaintiffs' communications with the Streaming Services. *Id.* ¶¶ 104-105.

Plaintiff Starzinski is a California resident and subscriber to Paramount+ who has accessed the service through its website, paramountplus.com, which embeds the Facebook Tracking Pixel. *Id.* ¶ 23. Plaintiff Starzinski maintains a Facebook account. *Id.* When Plaintiff Starzinski visited the Paramount+ website, the Facebook Tracking Pixel tracked what he clicked on, searched for, and the videos he viewed. *Id.* Among other things, the Facebook Tracking Pixel captured the buttons Plaintiff Starzinski clicked and the video-specific URLs for the pages he viewed. *Id.* Plaintiff Starzinski was unaware that Defendant was intercepting his communications with Paramount+ in real time, and did not consent to Defendant's interceptions. *Id.* Plaintiff Odumosu makes virtually identical allegations regarding ESPN+ and Hulu. *Id.* ¶ 24. Plaintiff Medina makes virtually identical allegations regarding Hulu. *Id.* ¶ 25. Plaintiff McCoy makes virtually identical allegations regarding Starz. *Id.* ¶ 26.

## IV. Plaintiffs Did Not Consent To Defendant's Interception Of Their Sensitive Information Communicated To The Streaming Services

Defendant does not receive consent from users to intercept and collect electronic communications, and in fact (falsely) represents through its Terms of Service, Cookies Policy, Data Policy, and California Privacy Policy (for California residents) that it will not collect sensitive information (even though it does in practice). *Id.* ¶¶ 88-95, 99-100, 102. Defendant makes similar false representations in other similar policies, such as its Advertising Policy, as well as in other public facing publications. *Id.* ¶¶ 97-99. Rather than adhering to the standards set forth in its various policies and publications, Defendant intercepts Plaintiffs' confidential information knowing that such interceptions violate federal and state privacy laws. *Id.* ¶¶ 95, 99. In addition to wanton breach of its policies and consumer-facing statements, Defendant also obfuscates or hides from consumers the scope of the data it is collecting about them such that consumers cannot make an informed choice about the data being conveyed to Defendant. *Id.* ¶¶ 103-119. For example, Defendant provides a private tool for the Streaming Services which shows, with particularity, the content intercepted (such as specific videos watched), but omits this information from Plaintiffs in its reports, representing only that Defendant received a "custom event" without disclosing the specifics of the communication. *Id.* ¶ 112. Defendant's consumer facing reports also do not disclose Defendant's

off-site tracking of them from manually uploaded data, and such data is also outside the scope of the consumer's control as Defendant's privacy settings circumvent tracking and matching based on manually uploaded data. *Id.* ¶¶ 114-117.

As such, Plaintiffs and Class members did not consent to said interception and did not know at the time that the Streaming Services used Defendant's Business Tools, let alone the scope of information they collected. *Id.* ¶ 96.

## LEGAL STANDARD

Rule 12(b)(6) requires dismissal when a complaint lacks either a "cognizable legal theory" or "sufficient facts alleged" under such a theory. *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (citation omitted). A complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When evaluating a motion to dismiss, the court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

## ARGUMENT

### I. PLAINTIFFS ADEQUATELY ALLEGE INTENT

Under the Wiretap Act, the "intent requirement of § 2511 requires the interception to have been 'purposeful[ ] and deliberate[ ]' and not 'a result of accident or mistake.'" *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d 797, 815 (N.D. Cal. 2020) (quoting *United States v. Christensen*, 828 F.3d 763, 774 (9th Cir. 2015)) (alteration in original). "[I]nterceptions may be considered intentional where a defendant is aware of the defect causing interception and takes no remedial action." *Id.*; *see also Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1044 (N.D. Cal. 2014) (collecting cases). The intent requirement under CIPA § 631(a) and § 632(a) is governed by the same standard. *Underhill v. Kornblum*, 2017 WL 2869734, at *6 (S.D. Cal. Mar. 16, 2017) ("The analysis for a violation of CIPA is the same as that under the federal Wiretap Act."). For CIPA § 632(a), the statute punishes "a person who intends to make a recording of a confidential

communication." *Rojas v. HSBC Card Servs. Inc.*, 20 Cal. App. 5th 427, 435 (2018) (cleaned up). As to the intrusion upon seclusion claim, Plaintiffs must show that Defendant "intentionally intrude[d] into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy." *Hernandez v. Hillsides, Inc.*, 47 Cal. 4th 272, 286 (2009); *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 232 (1998), *as modified on denial of reh'g* (July 29, 1998) ("To prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff.").

Here, Plaintiffs adequately plead intent under each applicable cause of action. *See* Statement of Facts ("SOF"), Section II., *supra*. As a threshold matter, however, "[w]hether a person possesses the requisite intent under CIPA is generally a question of fact." *Gladstone v. Amazon Web Servs., Inc.*, 2024 WL 3276490, at *10 (W.D. Wash. July 2, 2024).

Regardless, Plaintiffs allege that Defendant acted with intent in intercepting Plaintiffs' communications with the Streaming Services. *First*, Plaintiffs allege that Defendant's Business Tools, specifically the Facebook Tracking Pixel, is specifically designed for the purpose of recording and analyzing communications between its customers (like the Streaming Services) and consumers. FAC ¶¶ 30-39; *see also Gladstone*, 2024 WL 3276490, at *11 (finding intent element under CIPA § 631(a) and § 632(a) satisfied where "[t]he SAC alleges that Amazon Connect is designed for the purpose of recording and analyzing communications between its customers (like Capital One) and consumers or other entities"). *Second*, Defendant is aware that the Facebook Tracking Pixel (and other Business Tools) are intercepting private and confidential information because it works closely with the Streaming Services, as high-spend customers of Defendant, to craft the Business Tools to intercept Plaintiffs and Class members' communication with the Streaming Services. FAC ¶¶ 38-39, 48-49, 96. Defendant assisted the Streaming Services in configuring the Business Tools and knew they allowed Defendant to intercept confidential information, specifically the video-viewing information of Plaintiffs (among other confidential information), and intentionally did not filter the confidential information and took no other steps to remediate the conduct. FAC ¶¶ 37-38, 40-43, 96. *Third*, Defendant's intent is also based on its longstanding knowledge from dozens of prior, similar litigations that the Business Tools have been used to intercept and transmit sensitive information to

Defendant, and Defendant's failure to remediate that conduct. FAC ¶ 39-43; *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 815 ("The Court agrees with Plaintiffs and these various courts that interceptions may be considered intentional where a defendant is aware of the defect causing interception and takes no remedial action.").

In short, Defendant's interception of Plaintiffs' and Class members' confidential information was no accident, it was intercepted with Defendant's knowledge and approval, and Defendant then used the intercepted confidential information to power its own algorithms and advertising products (such as Core and Custom Audiences) to derive a profit. FAC ¶¶ 44, 95-96. Indeed, in a near identical case against Defendant involving the embedded Facebook Tracking Pixel in other websites wherein the pixel transmitted "video viewing history" to Defendant, Judge Cousins found that the plaintiffs plausibly alleged a violation of CIPA § 631(a), thereby necessarily finding that Defendant acted with the requisite intent to intercept the information. *Yoon*, 2024 WL 5264041, at *5-6 (denying motion to dismiss CIPA § 631 claim); *see also Jackson v. LinkedIn Corp.*, 2024 WL 3823806, at *5-6 (N.D. Cal. Aug. 13, 2024) (denying motion to dismiss CIPA § 631 claim based on similar LinkedIn pixel).

Notably, Defendant blocks receipt of sensitive information in ceratin instances, but not regarding the Streaming Services. As Defendant's employee Tobais Wooldridge stated in a declaration: "Meta developed and implemented a filtering mechanism to screen out potentially sensitive data it detects . . . including health data, and the filter prevents that detected data from being ingested into Meta's ads ranking and optimization systems." *See* RJN, Ex. A (Woolridge Decl. ¶ 8, ECF No. 76-1, *In re Meta Pixel Healthcare Litig*, No. 3:22-cv-03580 (N.D. Cal. Jun 17, 2022)). "When Meta's systems detect and filter out data they categorize as potentially sensitive, Meta sends notifications to the developer (1) via email and (2) in two locations in Meta's developer dashboard, Events Manager. These notifications inform the developer that Meta detected and blocked data that may not comply with Meta's terms; confirm that the removal may affect ad performance; and provide details about the affected data, including the URL where the events occurred, the location (but not the contents) of the potentially violating information, steps the developer can take to address the issue, and an email address to contact with questions." *Id.* ¶ 9. But Defendant does not filter any

event data relating to the viewing of videos here, even though such wiretapping is prohibited by the VPPA. FAC ¶¶ 39-42, 78-87, 101.

Defendant argues that "web developers (not Meta) choose whether to integrate the Pixel into their own websites, and Meta tells developers not to send confidential communications to it." MTD at 9. This argument disregards the FAC's allegations regarding Defendant's close association, cooperation, and assistance to the Streaming Services. SOF, Section II, *supra*. Further, as to Defendant allegedly telling developers not to send confidential communications, that is a question of fact that cannot be determined at the pleading stage. *Smith v. Google, LLC*, 2024 WL 2808270, at *5 (N.D. Cal. June 3, 2024) ("While Google argues that judicially noticeable policy documents suggest that Google did not actually want to receive personally identifiable information and expressly prohibited developers from transmitting such data, this presents a question of fact that the Court cannot resolve at this stage."). As the FAC alleges, Defendant's representations regarding its purported desire not to receive confidential information are false, and not what it really does in practice. *See* SOF, Section IV. This is sufficient. And to the extent Defendant argues Plaintiffs must satisfy Rule 9(b) to state a wiretapping claim (MTD at 13), that is wrong. *Smith*, 2024 WL 2808270, at *5 ("Because plaintiffs are directly challenging Google's alleged data collection rather than challenging any potentially fraudulent or misleading representations about this collection, their claims do not sound in fraud and are not subject to Rule 9(b)."). Even under the heightened strictures of Rule 9(b) (which do not apply here as Plaintiffs' claims are governed by Rule 8), "intent, knowledge, and other conditions of a person's mind may be alleged generally."

Defendant clings to *Doe I v. Google LLC,* 2024 WL 3490744 (N.D. Cal. July 22, 2024) ("*Google*"), where the court granted a motion to dismiss regarding a similar Google pixel embedded on certain websites of health care providers where the plaintiffs' allegations were "too vague to support an inference that the providers have, contrary to [Google's] admonition [not to use the pixel to transmit health information], caused Google to receive the plaintiffs' personal health information" and that the plaintiffs did not "adequately allege that Google intends to receive this information, or that Google intends to feed the information into its own advertising machinery." *Id.*, at *1. But numerous other cases in this District have correctly departed from the reasoning in *Google*.

For example, Defendant's counsel here made the same exact arguments regarding intent in *Doe v. Meta Platforms, Inc.*, 690 F. Supp. 3d 1064, 1076 (N.D. Cal. 2023) ("*Meta*"), *motion to certify appeal denied*, 2024 WL 4375776 (N.D. Cal. Oct. 2, 2024). Judge Orrick rejected Defendant's argument, finding "[w]hile plaintiffs acknowledge that Meta may tell third parties and Facebook users that it intends to prevent receipt of sensitive health information, plaintiffs contend that is not what Meta *really* intends. . . What Meta's true intent is, what steps it actually took to prevent receipt of health information, the efficacy of its filtering tools, and the technological feasibility of implementing other measures to prevent the transfer of health information, all turn on disputed questions of fact that need development on a full evidentiary record. . . At this stage, intent has been adequately alleged." *See also In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1003 (N.D. Cal. 2024) ("Meta's argument presents a question of fact that the Court cannot resolve at this stage. Whatever agreements may have been in place, those agreements do not establish as a matter of law that Meta did not intend to receive the information plaintiffs claim was transmitted."); *Gershzon v. Meta Platforms, Inc.*, 2023 WL 5420234, at *11 (N.D. Cal. Aug. 22, 2023) (finding intent met with regard to implementation of the Facebook Tracking Pixel and rejecting many of the same arguments raised by Defendant here). Here too, Defendant knew the Streaming Services were using the Facebook Tracking Pixel to intercept confidential communications and took no steps to implement remedial action. FAC ¶¶ 38, 42-43.

The weight of existing authority favors Judge Orrick's analysis in *Meta*, which this Court should apply here. Defendant mischaracterizes *Google* as "binding precedent" (MTD at 11-12), but it is an unpublished district court decision. However, even if this Court were to decline to follow the factually analogous cases involving the same technology (*Meta*, *In re Meta Pixel Tax Filing Cases*, and *Gershzon*), and instead follow the decision in *Google*, it is distinguishable. Here, unlike in *Google*, Plaintiffs' allegations regarding Defendant's actions in receiving confidential information are not "too vague." Instead, Plaintiffs specifically allege Defendant closely consulted with the Streaming Services in integrating the Business Tools and knew from that close contact that it was receiving confidential information such as the video-viewing information of Plaintiffs. SOF, Section II, *supra*. Further, unlike in *Google*, where there was no allegation that "Google intends to feed the

information into its own advertising machinery," here, Plaintiffs allege just that—namely, that Defendant knowingly receives the confidential video-viewing information and integrates it into its proprietary advertising products (such as Core and Custom Audiences) to make them more compelling for sale to advertisers. FAC ¶¶ 44, 95-96.

Defendant contends that its Business Tools Terms and the public facing documents state that it does not wish to collect sensitive information (MTD 10-11), but the point is that Defendant acts contrary to its stated position by actually collecting sensitive data by the means set forth above, and, as the New York State Department of Financial Services stated in its investigation of Defendant: "Merely stating a rule, however, has little meaning if the rule is not enforced, and the unfortunate fact is that Facebook does little to track whether app developers are violating this rule and takes no real action against developers that do." FAC ¶ 100; *see also In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1003 ("Meta argues that it could not have intended to receive the information at issue because its Business Tools Terms forbid developers from sending sensitive information to Meta and require that developers have all necessary rights and permissions to lawfully share whatever information they send. . . [T]he Court cannot conclude from their mere existence that Meta and developers intended to or did comply with the terms rather than deviating from them to their mutual benefit."). Defendant's intent is therefore a question of fact. *Id.*; *Gladstone*, 2024 WL 3276490, at *11 ("Defendant points out that it contractually requires companies that use Amazon Connect to provide notice and obtain consent from their customers . . . but the Court is not convinced that [Defendant's] inclusion of a catch-all provision requiring its customers to comply with the law generally is enough to satisfy its legal obligations under CIPA.") (cleaned up).

Conceding, as it must, Plaintiffs' allegations that Defendant works closely with the Streaming Services to configure their use of the Business Tools (MTD at 12-13), Defendant still protests that these are "vague" allegations because Plaintiffs do not point to conclusive evidence at the pleading stage. MTD at 12-13. But it is axiomatic that Plaintiffs' factual allegations must be taken as true at the pleading stage, and, more than that, Defendant does not even deny the key allegations that 1) the Streaming Services are major spenders that receive close support from Defendant or 2) that the Streaming Services' Business Tools are configured to intercept Plaintiffs' video-viewing

information. Defendant seeks to impose an evidentiary burden at the pleading stage that does not exist. Defendant continues that "plaintiffs do not allege that Meta instructed the services to send sensitive data in violation of Meta's policies" (MTD at 13), but no such allegation is required. It is sufficient that Defendant "is aware of the defect causing interception and takes no remedial action." *In re Google Assistant Priv. Litig.*, 457 F. Supp. 3d at 815. As set forth above, Plaintiffs have adequately alleged both Defendant's knowledge of the unlawful interception and its failure to take remedial action.

## II. PLAINTIFFS DID NOT CONSENT

"On a motion to dismiss, the burden of proof to show consent rests with defendants." *Doe v. FullStory, Inc.*, 712 F. Supp. 3d 1244, 1253 (N.D. Cal. 2024); *Meta*, 690 F. Supp. 3d at 1077-78 ("On this motion to dismiss, the issue of consent is front and center and the burden of proof to show this exemption applies is on Meta."); *In re Google RTB Consumer Priv. Litig.*, 606 F. Supp. 3d 935, 949 (N.D. Cal. 2022) ("Google next claims there was lawful consent from both the account holder and the websites. Google bears the burden of proof on consent."); *Heerde v. Learfield Commc'ns, LLC*, 2024 WL 3573874, at *8 (C.D. Cal. July 19, 2024) (collecting cases). Here, Plaintiffs allege they did not consent to Defendant's interception of their confidential information conveyed to the Streaming Services. FAC ¶¶ 3-5, 23-26, 88, 102, 152-53, 163-64, 198. Nevertheless, Defendant argues that Plaintiffs consented based on 1) the Streaming Services' policies, and 2) Defendant's policies. MTD at 14-18. Neither argument has merit.

### A. The Streaming Services Policies Do Not Establish Consent for Collection of Plaintiffs' Confidential Video-Viewing Information

Before even getting to the substance of the alleged privacy policies of the Streaming Services, there are several glaring issues that prevent dismissal. *First*, as to Paramount+, Defendant appends the *current* version of the Paramount+ sign-up page. *See* Declaration of Abigail A. Barrera in Support of Defendant Meta Platforms, Inc.'s Motion to Dismiss First Amended Complaint (ECF No. 27-2) ("Barrera Dec."), Ex. 18. But it is a question of fact whether that is the actual page that Plaintiff Starzinski saw when he registered for his Paramount+ account, and resolution of that fact is important because it is not clear whether or to what extent Plaintiff Starzinski is bound by the Paramount+

terms (*i.e.* whether it is a browsewrap or clickwrap agreement and whether there was mutual assent). *See Yoon*, 2024 WL 5264041, at *4 ("Defendant has not shown that Plaintiffs had the requisite actual or constructive knowledge of the policies."); *id.* ("It is not sufficient to simply allege that the policies exist . . . to prove consent"). The same is true for the other Plaintiffs. *See* Barrera Dec., Ex. 19-21, 23-25. Defendant's counsel also cannot authenticate the third-party Streaming Services documents. *See* Federal Rule of Evidence 901(a); *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at *9 (N.D. Ill. Oct. 1, 2024) ("Although the consent defense is, thus, fairly before the court at this stage, the court concludes, for now, that Defendants' submissions are too limited to allow a definitive ruling on the merits of that defense. As an initial matter, the authenticity of the submissions is disputed: Plaintiffs argue that Defendants must verify them . . .").

Similarly, Defendant only appends the current version of the Paramount+ Privacy Policy, effective April 15, 2024 (*id.* Ex. 22). Even if properly authenticated and binding, these terms do not establish the existing terms prior to April 15, 2024, which remains a question of fact. *In re TikTok, Inc. In-App Browser Priv. Litig.*, 2024 WL 4367849, at *9 (explaining "the court would need to see the version of the Privacy Policy then in effect [at the time of registration] before determining whether these Plaintiffs had consented to its collection of data"). The sign-up screens and privacy policies appended by Defendant for Hulu, ESPN+, and Starz suffer from the same defect. Barrera Dec. Ex. 19-21, 23-25. This is bolstered by Plaintiffs' allegations that they were unaware of the conduct at issue and did not consent to the same. FAC ¶¶ 23-26; *see also Smith*, 2024 WL 2808270, at *3 ("Although these documents suggest that plaintiffs *could* have consented to Google's alleged data collection, plaintiffs specifically allege that they did not. The mere existence of various terms of service and privacy policies cannot establish at this stage, where the Court must draw all reasonable inferences in plaintiffs' favor, that any of the plaintiffs *did* in fact consent. Google's consent arguments do not provide a basis to dismiss the Section 631 claim."). Defendant's argument that "[t]o sign up as subscribers, plaintiffs had to agree to the streaming services' privacy policies" (MTD at 15) is a question of fact not supported either by the FAC or by the cited exhibits (as the agreements themselves do not speak to the issue of assent).

Moreover, Plaintiffs did not consent because the Streaming Services' terms did not

"explicitly notify" Plaintiffs of the practice at issue. *See Calhoun v. Google LLC*, 526 F. Supp. 3d 605, 620 (N.D. Cal. 2021) ("In order for consent to be actual, the disclosures must 'explicitly notify' users of the practice at issue."); *In re Google Inc.*, 2013 WL 5423918, at *13 (N.D. Cal. Sept. 26, 2013) ("Google points to its Terms of Service and Privacy Policies, to which all Gmail and Google Apps users agreed, to contend that these users explicitly consented to the interceptions at issue. The Court finds, however, that those policies did not explicitly notify Plaintiffs that Google would intercept users' emails for the purposes of creating user profiles or providing targeted advertising."); *Campbell v. Facebook Inc.*, 77 F. Supp. 3d 836, 848 (N.D. Cal. 2014) ("However, as discussed above in the context of express consent, any consent with respect to the processing and sending of messages itself does not necessarily constitute consent to the specific practice alleged in this case—that is, the scanning of message content for use in targeted advertising."). Here, to satisfy the consent requirement under the VPPA, the Streaming Services were required to obtain "informed, written consent" of Plaintiffs "distinct and separate from any form setting forth other legal or financial obligations of the consumer" (18 U.S.C. § 2710), which the Streaming Services failed to do. FAC ¶ 80. Therefore, Plaintiffs did not consent as a matter of law. *See Matera v. Google Inc.*, 2016 WL 5339806, at *17 (N.D. Cal. Sept. 23, 2016) ("Under the Wiretap Act, the question of express consent is usually a question of fact, where a fact-finder needs to interpret the express terms of any agreements to determine whether these agreements adequately notify individuals regarding the interceptions."). Indeed, Defendant concedes that the Streaming Services' policies "were not sufficient to show consent" under the VPPA. MTD at 14. Defendant cites numerous sections of the terms for Paramount+, ESPN+, Hulu, and Starz, but none amount to informed, written consent for the Streaming Services to share video-viewing information. Even if they did, they are not distinct and separate from the other legal obligations contained within the terms, in violation of the VPPA.

Should the Court consider the Streaming Services' privacy policies and find they provide general notice that third parties may receive information, none of them provide notice that sensitive data such as video-viewing history was being intercepted by Defendant. Courts in the Ninth Circuit have repeatedly drawn a line where sensitive information is at issue, finding that where sensitive information (such as video-viewing information) is at issue, the defendant must provide specific

notice of the precise type of sensitive information disclosed. *See In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d at 1003 ("Meta does not contend that its Terms of Service specifically disclosed that it would receive sensitive financial information. To the contrary, Meta asserts that it publicly stated that such information would *not* be collected. . . As with intent, whether plaintiffs consented to having their data collected is a question of fact."); *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793 (N.D. Cal. 2022) ("Meta's policies do not, however, specifically indicate that Meta may acquire health data obtained from Facebook users' interactions with their medical providers' websites. Its generalized notice is not sufficient to establish consent."); *Doe v. Microsoft Corp.*, 2023 WL 8780879, at *6 (W.D. Wash. Dec. 19, 2023) ("Although Kaiser informed users that it may disclose 'personal information to third parties,' a reasonable user would not have understood this to include personal *health* information. . ."). The Streaming Services did not specifically disclose that they were transmitting to Defendant sensitive information such as private video-viewing information, which vitiates consent.

**B. Meta's Policies Do Not Establish Consent to Collection of Plaintiffs' Confidential Video-Viewing Information.**

Defendant's arguments regarding its own policies fail for many of the same reasons outlined in Section II.A., above. Specifically, neither Defendant's Terms of Service nor Cookies Policy nor Data Policy "explicitly notify" Plaintiffs of the fact that it is intercepting sensitive data, including Plaintiff's specific video viewing data. More than that, Defendant's Privacy Policy states that it requires third parties using the Business Tools (such as the Streaming Services) to "have lawful rights to collect, use and share your data before providing any data to us." FAC ¶¶ 88, 92. This conveys to Plaintiffs and any reasonable user that any such sharing of information from a third party to Defendant will be in compliance with the law. Here, that is not the case because the Streaming Services' disclosure violates the VPPA. As such, even on their own terms, Defendant's policies do not inform users that its tracking technology will intercept private information in violation of state and federal law, and as such do not compel a finding of consent as a matter of law.

Defendant violated its own terms by intercepting Plaintiffs' and Class members' private video-viewing information in violation of the VPPA. The Meta Business Tools Terms apply to

Defendant's use of Facebook's Tracking Pixel (ECF No. 27-6). These terms state that, when an entity such as Defendant uses "any of the Meta Business Tools to send us or otherwise enable the collection of Business Tool Data (as defined in Section 1 below), these Business Tools Terms govern the use of that data." RJN Ex. 4. In relevant part, Section 1(h) of the Business Tools Terms state that "<u>You represent and warrant that you will not share Business Tool Data with us that you know or reasonably should know … includes . . . categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)</u>. *Id.* (emphasis added). Thus, Defendant violated these terms by sharing Plaintiffs' private video-viewing information (protected by the VPPA), which is "sensitive under applicable laws." FAC ¶¶ 97, 138. For this reason, Defendant's exact argument was rejected in *Rickwalder v. Meta Platforms, Inc*., 2022 WL 22462351, at *12 (Cal. Super. Ct. Sept. 15, 2022), where the court found that "Facebook does not show that Plaintiffs—specifically, Ms. McDaniel—consented to HBO's disclosure of personally identifiable information to Facebook in violation of the VPPA." *Id*., at *15. The same result follows here.

The Ninth Circuit's ruling in *Calhoun v. Google, LLC*, 113 F.4th 1141 (9th Cir. 2024) is instructive. Specifically, the Ninth Circuit explained, "[i]f that user could have plausibly understood the disclosures "as *not* disclosing that [the defendant] would engage in particular conduct," then the disclosures are insufficient to establish consent." *Id.* at 1147 (citing *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 789 (N.D. Cal. 2019)). Here, where the Meta Business Terms expressly state that Meta will not collect sensitive information or information that it is illegal to track, a reasonable consumer could plausibly understand that Meta would not track that information, regardless of what Meta's other policies say.

Defendant further argues that the language in its policies contains a broad disclosure of Defendant's activities. MTD at 17-18. But that is not the point. The case law (and VPPA) makes clear that regardless of the breadth of the disclosure, where sensitive video-viewing information is involved, there must be specific notice of the specific type of sensitive data collected, which Defendant's policies do not contain. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 793.

Plaintiffs and Class members had the right to expect, based on Defendant's own policies, that any collection using tracking technology would be in accordance with the law.

Defendant cites the Ninth Circuit's unpublished decision in *Hammerling v. Google, LLC*, 2024 WL 937247, at *2 (9th Cir. Mar. 5, 2024), but that case provides no support to Defendant. *First*, the Ninth Circuit's decision did not involve CIPA because the plaintiffs did not appeal the dismissal of the CIPA claim. *Id.* at *3 n.2 ("Because Plaintiffs did not appeal the dismissal of their claim under California's Invasion of Privacy Act, we do not consider that claim."). *Second*, the alleged misconduct was that the defendant, Google, was collecting "user activity data in third-party apps." *Id.* at *2. That is, the case did not involve sensitive information such as the specific video-viewing information at issue here, which requires heightened consent under the VPPA and also triggers the heightened requirement of a specific disclosure under the CIPA case law set forth above. As such, *Hammerling* is distinguishable and does not change the analysis. Indeed, the Ninth Circuit distinguished *Hammerling* in *Calhoun*. *See* 113 F.4th at 1149 ("More to the point, *Smith*, and our recent unpublished decision in *Hammerling v. Google, LLC*, 2024 WL 937247, at *2 (9th Cir. Mar. 5, 2024) are inapposite, because plaintiffs in those cases had not argued that Facebook or Google had service-specific privacy policies that could reasonably be read to say the opposite of what its general privacy policies disclosed.").

Defendant contends that its "terms expressly warn that—although it 'specif[ies] clear guidelines for everyone who uses' its products—Meta does 'not control . . . what . . . others do' and is 'not responsible for their actions or conduct.'" MTD at 19 (quoting RJN Ex. 1). But that section, when read in context, talks about what *other Facebook users* do while using the Facebook platform or offline; it does not reference what third party actors do on their own websites:

> We work hard to provide the best Products we can and to specify clear guidelines for everyone who uses them. Our Products, however, are provided "as is," and we make no guarantees that they always will be safe, secure, or error-free, or that they will function without disruptions, delays, or imperfections. To the extent permitted by law, we also DISCLAIM ALL WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE, AND NON-INFRINGEMENT. We do not control or direct what people and others do or say, and we are not responsible

> for their actions or conduct (whether online or offline) or any content they share (including offensive, inappropriate, obscene, unlawful, and other objectionable content).

RJN Ex. 1 (ECF No. 27-3) (p. 7/10). Therefore, this provision has no relation to the conduct at issue here and does not in any way establish consent for Defendant to intercept sensitive video-viewing data from Plaintiffs' interactions with third parties (*i.e.* the Streaming Services).

In short, nowhere in Defendant's terms is there any reference to private video-viewing information, or even a suggestion that Plaintiffs' private video-viewing information would be transmitted to Defendant from a third-party website. *See Popa v. Harriet Carter Gifts, Inc.*, 426 F. Supp. 3d 108, 118 (W.D. Pa. 2019) ("Even if a privacy statement discloses some kinds of tracking, a defendant can still be liable for other kinds of tracking that the privacy statement does not disclose."). *Calhoun* instructs this is insufficient to establish consent.

Defendant relies on the Facebook Terms of Service, particularly the portion that states:

> We don't charge you to use Facebook or the other products and services covered by these Terms, unless we state otherwise. Instead, businesses and organizations, and other persons pay us to show you ads for their products and services. By using our Products, you agree that we can show you ads that we think may be relevant to you and your interests. We use your personal data to help determine which personalized ads to show you.

MTD at 5; RJN Ex. 1. However, under Section 2, titled "How our services are funded", Facebook elaborates on what it means by "personal data":

> Instead of paying to use Facebook and the other products and services we offer, by using the Meta Products covered by these Terms, you agree that we can show you personalized ads and other commercial and sponsored content that businesses and organizations pay us to promote on and off Meta Company Products. We use your personal data, **<u>such as information about your activity and interests</u>**, to show you personalized ads and sponsored content that may be more relevant to you.

*Id.* (emphasis added). Taken together, these paragraphs reasonably convey to a Facebook user that Facebook is free to them because businesses and organizations pay Facebook to show them ads, and that Facebook uses the user's personal information, namely information gathered from the user's activity on Facebook and interests expressed thereon, to show the user ads. These Terms of Service

by no means convey or express—let alone obtain consent—for a third-party (*i.e.* the Streaming Services) to permit Defendant to intercept sensitive information such as confidential video-viewing information from Plaintiffs' communications with said third party.

The same conclusion follows with respect to the "Cookies Policy" which generally describes how cookies work but does not mention the Facebook Tracking Pixel and does not disclose that Facebook may intercept Plaintiff's private video-viewing information communicated to the Streaming Services. RJN Ex. 3 (ECF No. 27-5).

Plaintiffs' video-viewing information is sensitive and protected by federal (the VPPA) and state law. None of Defendant's terms or policies come close to conveying to a reasonable Facebook user that its technology can be used to intercept the user's private video-viewing information. It is one thing for a shoe seller to share with Defendant that a Facebook user bought a pair of shoes (MTD at 6), but it is another thing altogether for Defendant to intercept sensitive information (which it explicitly states in its Privacy Policy that it will not obtain). As such, none of Facebook's Terms warrant dismissal. *See, e.g.*, *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 793-94 (N.D. Cal. Dec. 22, 2022) ("I am skeptical that a reasonable user who viewed Meta's policies would have understood that Meta was collecting protected health information."); *Rodriguez v. Google LLC*, 2025 WL 50425, at *5 (N.D. Cal. Jan. 7, 2025) ("As in *Calhoun*, Google provides Plaintiffs with several disclosures, ranging from general privacy disclosures in its PP to more specific disclosures surrounding the WAA/(s)WAA buttons. From the perspective of a reasonable user, it is unclear Plaintiffs were consenting to the data collection at issue.").

## III. PLAINTIFFS STATE A CLAIM UNDER THE WIRETAP ACT, CIPA, AND FOR INVASION OF PRIVACY/INTRUSION UPON SECLUSION

Defendant makes several claim-specific arguments for dismissal of Plaintiffs' claims under the Wiretap Act, CIPA, and Plaintiffs' constitutional and common law right to privacy claims. For the reasons set forth below, each of Defendant's arguments fail.

### A. The Crime-Tort Exception to the Wiretap Act's One-Party Consent Rule Applies Here

Defendant argues that Plaintiffs' Wiretap Act claims fail because the Streaming Services consented to the wiretapping and the crime-tort exception to one-party consent does not apply.

MTD at 21-22. That is wrong. Here, the crime-tort exception applies.

In general, the Wiretap Act is a one-party consent statute. 18 U.S.C. § 2511(1)(c). But consent is not a defense where the "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). This exception applies when the "primary motivation or a determining factor in [the interceptor's] actions has been to injure plaintiffs tortiously." *Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal. 2021) (quoting *In re Google Inc., Gmail Litig.*, 2014 WL 1102660, at *18 n.13 (N.D. Cal. Mar. 18, 2014)).

Courts have held that the surreptitious tracking of users on the internet falls under this exception. In *Brown*, the plaintiffs "alleged that Google intercepted their communications for the purpose of associating their data with preexisting user profiles." *Id.* The court held that because using the plaintiffs' data in this way constituted a violation of state law, "including CDAFA, intrusion upon seclusion, and invasion of privacy," the crime-tort exception to one-party consent applied. *Id.* Likewise, in *B.K. v. Desert Care Network*, 2024 WL 1343305, at *6 (C.D. Cal. Feb. 1, 2024) the court held that the sharing of prescription information and medical appointments with Meta were made "in violation of various state tort claims and state and federal laws" and, therefore, the "ECPA's one-party consent exception [did] not apply." Here, Plaintiffs' allegations similarly make out claims for violations of CDAFA, CIPA, intrusion upon seclusion, and invasion of privacy, not to mention facilitating violations of the VPPA by the Streaming Services. *See In re Grp. Health Plan Litig.*, 709 F. Supp. 3d 707, 720 (D. Minn. 2023) ("Plaintiffs, without the benefit of discovery, have met the pleading requirements to plausibly allege the crime-tort exception applies.").

Defendant argues that the crime-tort exception does not apply here because its underlying motivation in committing the wiretapping was to generate revenue. MTD at 22. "But the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose." *Sussman v. Am. Broad. Companies, Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999).

> For example, assume that a news gathering organization secretly videotapes bedroom activities. Even though there may be a legitimate news gathering purpose (e.g., listening for "pillow talk" about some newsworthy event), public airing of such a tape may be illegal or tortious under state law. Under these circumstances, the taping could

> be for both a legitimate purpose (news gathering) and also an unlawful or tortious purpose (airing private intimate conduct). The existence of the lawful purpose would not sanitize a tape that was also made for an illegitimate purpose; the taping would violate section 2511.

*Id.* Moreover, as one court reviewing nearly identical allegations found, "in *Brown*, Google's purposes were similarly commercial." *Rickwalder*, 2022 WL 22462351, at *16. In *Rickwalder*, because the plaintiffs "allege[d] that Facebook intended to use customers' HBO data in a manner that violated their privacy, which is a relatively-specific allegation of intent," the court held that "*Brown* therefore applies." *Id.* Here, Plaintiffs similarly allege that Defendant acted with a criminal and tortious purpose. FAC ¶¶ 154, 163-64; *see also In re Toys R Us, Inc., Priv. Litig.*, 2001 WL 34517252, at *8 (N.D. Cal. Oct. 9, 2001) ("Liberally construed, these allegations are sufficient to allege that Coremetrics intercepted plaintiffs' electronic communications for such tortious purposes as 'spying' on plaintiffs' private Websurfing activities and/or to essentially steal from plaintiffs information for which Coremetrics would otherwise have to pay plaintiffs.").

Defendant also argues that the crime-tort exception does not apply because the criminal or tortious purpose must be "separate and independent from the act of the recording." MTD at 22 (quoting *Planned Parenthood Fed'n of Am., Inc. v. Newman*, 51 F.4th 1125, 1136 (9th Cir. 2022)). But that is precisely what Plaintiffs allege. Defendant did not wiretap Plaintiffs' activity on the Streaming Services just to obtain that data. It did so for the purpose of creating Core and Custom Audiences that its advertisers could use to reach certain groups of consumers. FAC ¶¶ 44, 96.

**B. Defendant Received the Contents of Communications**

Defendant argues that data about "web-browsing activity" does not constitute the contents of communications for purposes of the Wiretap Act and CIPA § 631. MTD at 23. That is incorrect. The event data sent via the Facebook Tracking Pixel included the central message included in the communications at issue: what videos users asked to see and what they were shown. Specifically, Defendant intercepted a video-specific URLs which, via their interception, conveyed to Defendant what specific videos and content Plaintiffs watched and engaged with on the Streaming Services. FAC ¶¶ 51-56. Defendant then monetized that data for its own purposes. *Id.* ¶¶ 95-96; *In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 784; *id.* at 798 ("Meta mounts a single challenge to a

single element here, arguing that plaintiffs cannot show that the intercepted information is "content" based on its arguments under the federal Wiretap Act. . . For the reasons given above, this challenge fails."); *Cousin v. Sharp Healthcare*, 702 F. Supp. 3d 967, 976 (S.D. Cal. 2023) ("Plaintiffs allege that their data included personal search queries—such as specialty healthcare providers and treatments for medical conditions—and therefore plausibly conveyed content: their PHI.").

The Wiretap Act broadly defines "content" to include "any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8) (emphasis added). The "contents" requirement under CIPA is interpreted the same as under the Wiretap Act. *Brodsky v. Apple Inc.*, 445 F. Supp. 3d 110, 127 (N.D. Cal. 2020). Courts have also interpreted the "content" of a communication to include "the intended message conveyed by the communication." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1106 (9th Cir. 2014). On the other hand, "content" does not include mere "record information" regarding peripheral characteristics related to the communication, such as a user's name or address. *Id.*

Here, Plaintiffs allege that the placement of the Facebook Tracking Pixel on the Streaming Services allowed Defendant to collect "event data" that showed, among other things, "which videos a subscriber has watched." FAC ¶¶ 51-53, 72, 73-77, 196; *see also id.* ¶¶ 23-26 ("[T]he Facebook Tracking Pixel tracked what [Plaintiffs] clicked on, searched for, and the videos [they] viewed."). This is not record information that is merely peripheral to the communication at issue, such as the length of the videos watched or users' geolocations. Rather, the event data sent to Defendant includes substantive information central to the communications: the titles of episodes and movies that users accessed. *Id.* Courts have not hesitated in finding that this kind of information constitutes the content of a communication for purposes of the Wiretap Act (and, by extension, CIPA). *See, e.g.*, *Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1051 (S.D. Cal. 2023) ("[I]nformation about particular activity conducted . . . on an app qualif[ies] as the 'contents' of communication."); *Hammerling v. Google LLC*, 2022 WL 17365255, at *10 (N.D. Cal. Dec. 1, 2022) ("[P]articular activity on those apps, including . . . services they used within the application" are the "contents" of a communication.).

### C. Defendant's Conduct was Highly Offensive

Plaintiffs adequately plead a claim for invasion of privacy under both the California Constitution and common law intrusion upon seclusion. These claims share similar elements and are plausibly alleged where "(1) there exists a reasonable expectation of privacy, and (2) the intrusion was highly offensive." *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 601 (9th Cir. 2020) ("*Facebook Internet Tracking*"). When, as here, both causes of action are pleaded in the same complaint, courts evaluate the two causes of action together. *Id.*; *see also McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1037 (N.D. Cal. 2019). Defendant does not challenge that Plaintiffs have a reasonable expectation of privacy in their private video-viewing information. Defendant contends "Plaintiffs do not and cannot clear th[e] bar" of establishing highly offensive conduct. MTD at 24.

As a threshold matter, "questions of whether conduct is 'egregious,' 'offensive,' or violates 'social norms' tend by their very nature to be subjective . . . [and] these questions are typically more appropriately resolved by a jury." *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1139 (E.D. Cal. 2021). Indeed, the Ninth Circuit held this determination "requires a holistic consideration of factors" and raises "an issue that cannot be resolved at the pleading stage." *Facebook Internet Tracking*, 956 F.3d at 606. Regardless, Plaintiffs have identified sufficient facts to survive a motion to dismiss because they plead that Defendant surreptitiously collected their private video-viewing information in unexpected ways (and contrary to Defendant's express assertions in its Privacy Policy and accompanying documents). Indeed, under similar circumstances, the court in *In re Meta Pixel Healthcare Litig.* found:

> There is support for plaintiffs' position that Meta has behaved egregiously. By enacting criminal and civil statutes forbidding the disclosure of protected health information without proper authorization, Congress has made policy decisions regarding the importance of safekeeping this information. *See, e.g.*, 42 U.S.C. § 1320d-6 (providing criminal and civil penalties for disclosing protected health information without authorization); 45 C.F.R. § 164.508 (requiring a "valid authorization" for use or disclosure of protected health information). Courts have also found that taking personal contact information without consent could be deemed highly offensive. *See Opperman v. Path*, 87 F. Supp. 3d 1018, 1060–61 (N.D. Cal. 2014) (finding that a jury must decide whether the "surreptitious theft of personal contact information" is highly offensive). Finally, I

> note that Meta's policies forbid the transmission of health-related information, which the Ninth Circuit has found to be relevant in the "highly offensive" inquiry. *See In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d at 606 (finding that highly offensive element was sufficiently pleaded where Facebook collected full-string detailed URLs and where "Plaintiffs have alleged that internal Facebook communications reveal that the company's own officials recognized these practices as a problematic privacy issue."). These arguments have merit.

647 F. Supp. 3d at 800-01.

The same analysis applies here. Plaintiffs disclosed private video-viewing information when interacting with the Streaming Services, which is entitled to stringent protections under the law, namely the VPPA and corresponding state laws. Further, Defendant purports to forbid the transmission of sensitive information through the Facebook Tracking Pixel (even though it acts contrary to its stated policy), which reveals that Defendant's own officials recognized that collection of such data is a problematic privacy issue.

Defendant seeks to re-cast Plaintiffs' interactions with the Streaming Services as "routine commercial behavior" (MTD at 24), but because Defendant's interception involved sensitive information, it falls outside the scope of "routine commercial behavior." *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d at 799 (distinguishing private health information sent over the internet from mere routine commercial behavior and noting that disclosure of private health information over the internet is properly considered confidential); *E.H. v. Meta Platforms, Inc.*, 2024 WL 557728, at *2-3 (N.D. Cal. Feb. 12, 2024) (interception of sensitive information over the internet gives rise to an invasion of privacy claim because disclosure of sensitive information is different than "simply surfing the web"); *Doe v. FullStory, Inc.*, 712 F. Supp. 3d at 1257 (finding that Defendant's intrusions were "highly offensive" at the motion to dismiss stage).

## CONCLUSION

Plaintiffs respectfully request that the Court deny Defendant's motion to dismiss. Should the Court grant any part of Defendant's motion, Plaintiffs respectfully request that they be granted leave to amend to cure any such deficiencies.

Dated: January 21, 2025

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Philip L. Fraietta*

Philip L. Fraietta (State Bar No. 354768)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-mail: pfraietta@bursor.com

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: ltfisher@bursor.com

*Attorneys for Plaintiffs*