UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION
-------------------------------------x
ALAN STARZINSKI, et al.,

Plaintiffs, Case No. 4:24-cv-04501-AMO(SK)

vs.

META PLATFORMS, INC.,

Defendant.
-------------------------------------x

VIDEOTAPED
DEPOSITION OF OLADEJI ODUMOSU
New York, New York
Tuesday, June 23, 2026

Reported by:
FRANK J. BAS
Job No. 8267933



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

June 23, 2026

9:32 a.m.

Videotaped Deposition of OLADEJI ODUMOSU, taken by Defendant, pursuant to Notice, held at the offices of Gibson Dunn & Crutcher LLP, 200 Park Avenue, New York, New York, before Frank J. Bas, a Shorthand Reporter and Notary Public of the State of New York.

A P P E A R A N C E S:

BURSOR & FISHER, P.A.
Attorneys for Plaintiffs
1330 Avenue of the Americas
New York, New York 10019
BY: SPENCER N. MIGOTSKY, ESQ.
smigotsky@bursor.com

GIBSON DUNN & CRUTCHER LLP
Attorneys for Defendant
One Embarcadero Center, Suite 2600
San Francisco, California 94111
BY: ABIGAIL A. BARRERA, ESQ.
abarrera@gibsondunn.com
-and-
GIBSON DUNN & CRUTCHER LLP
200 Park Avenue
New York, New York 10166
BY: TAYLOR BERNSTEIN, ESQ.
tbernstein@gibsondunn.com

ALSO PRESENT:
MARK J. BALLESTEROS, Bursor & Fisher
PHIL GLAUBERSON, Videographer

STENOGRAPHER'S NOTE:
All quotations from exhibits are reflected in the manner in which they were read into the record and do not necessarily indicate an exact quote from a document.

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:32 a.m. on June 23, 2026.

Please note that microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time and place them away from the microphones as they can interfere with the audio.

Audio and video recording will continue to take place unless all parties agree to go off the record.

This is media unit 1 of the video-recorded deposition of Oladeji Odumosu in the matter of Alan Starzinski, et al., versus Meta Platforms, Inc. filed in the United States District Court, Northern District of California, Oakland Division, 4:24-cv-04501-AMO(SK).

The location of this deposition is Gibson, Dunn & Crutcher, LLP, 200 Park Avenue, New York, New York.

My name is Phil Glauberson representing Veritext and I am the videographer; the court reporter is Frank

Bas from Veritext.

I am not authorized to administer an oath; I am not related to any party in this action, nor am I financially interested in the outcome. If there are any objections to proceeding please state them at the time of your appearance.

Counsel will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. BARRERA: Abbey Barrera on behalf of Meta Platforms, Inc. with Gibson, Dunn & Crutcher.

MS. BERNSTEIN: Taylor Bernstein on behalf of Meta Platforms, Inc. with Gibson, Dunn & Crutcher.

MR. MIGOTSKY: Spencer Migotsky from Bursor & Fisher for the plaintiff, Oladeji Odumosu.

MR. BALLESTEROS: Mark Ballesteros on behalf of the plaintiff, for Bursor & Fisher.

THE VIDEOGRAPHER: Will the court reporter please swear in the witness.

– – –

OLADEJI ODUMOSU,
called as a witness, having been first duly sworn by a Notary Public, was examined and testified as follows:

EXAMINATION BY
MS. BARRERA:

Q. Good morning. Can you please state your full name for the record?
A. Yes, it's Oladeji Odumosu.
Q. The oath that you just took just a minute ago, is the same oath that you would take in open court. Do you understand?
A. Yes.
Q. It will be important today that you give me audible responses. So sometimes it's easy to shake your head yes or no, I'll need you to say actually yes or no so that the court reporter can get everything down. Okay?
A. Yes.
Q. Is this the first time you've been deposed?
A. Yes.
Q. If I ask a question that you don't

understand just let me know, I'm happy to clarify my questions for you.

We'll also plan to take regular breaks about every hour, hour and a half but if you need a break before that just let me know. I would just ask that you finish answering the question that's pending before we break.

A. Sounds good.

THE COURT REPORTER: Just keep your voice up.

Q. Can you say that a little bit louder?

A. Thank you. Yes. That's fine.

Q. Great. Is there any reason you can't provide your complete and accurate testimony today?

A. No.

Q. You're not taking any medication or drugs that would prevent you from giving accurate testimony today?

A. No.

Q. Have you ever been arrested?

A. No.

Q. You've never been convicted of any crimes?

A. No.
Q. Have you ever testified under oath before?
A. I... yes. Yes.
Q. When?
A. During a civil trial in 2013. It's the one I could recall at this moment.
Q. What was the civil trial about?
A. Neighborly dispute.
Q. And what was the neighborly dispute about?
A. Just a minor nuisance between neighbors.
Q. What was the nuisance?
A. Noise.
Q. Did you bring the case or did your --
Were you one of the neighbors involved in the dispute?
A. Yes.
Q. Did you bring the case or did your neighbor bring the case?
A. I don't feel it's relevant.
Q. Even if you don't feel it's relevant you still have to answer my questions.

A. I, um, was part of the party who brought it.
Q. What do you mean you were part of the party? It was not only you?
A. No.
Q. So who were the other parties that brought the lawsuit?
A. Family.
Q. And is that case resolved now?
A. Yes.
Q. Did you win any money or any other relief in that case?
A. No.
Q. How did it resolve?
A. In favor of the other party.
Q. Are there any other instances when you've testified under oath?
A. Not that I could think of.
Q. Have you been involved in any other litigation besides that case?
A. Yes.
Q. What other litigation have you been involved in?
A. Settlements and -- yeah.
Q. What settlements have you been

involved in?

A. Things like unfair classification. I used to -- there was a time I did some gig work and, you know, I employed classification settlements.

Q. For those settlements that you are referring to, were those settlements that you got a notice about and then you filed a claim to get money from the settlements?

A. Yes.

Q. You weren't a named plaintiff in those cases?

A. I don't think I was.

Q. Have you been a party to any other lawsuits besides settlements where you've claimed money?

A. No. I don't think I was.

Q. Were you involved in a case in 2001 relating to a car accident?

A. In 2001? I don't think so.

Q. Okay. And are you --

MR. MIGOTSKY: I'm sorry, did you say 2001 or 2021?

MS. BARRERA: 2001.

MR. MIGOTSKY: Okay.

BY MS. BARRERA:

Q. And are you involved in a case against Google relating to Incognito mode?

A. I'm not a hundred percent sure about that.

Q. Why are you not a hundred percent sure?

A. Because as mentioned, there are some settlements and things like that, so that's possible. But I don't recall.

Q. So as far as you know you're not a named plaintiff in a lawsuit against Google, right?

A. I don't remember clearly at this time.

Q. You don't remember whether you're a named plaintiff in a case against Google?

A. I would have to check the facts. I don't honestly.

Q. You don't remember?

A. No.

Q. Do you know what Incognito mode is?

A. Yes.

Q. What is it?

A. When users go Incognito on Google's

browser, in other words they can't be tracked.

Q. And are you familiar with the allegations against Google in a case about Incognito mode?

A. Somewhat.

Q. What are you familiar with about those allegations?

A. I think it's something to the effect of Google kind of snooping around and not giving users privacy when they thought they had it.

Q. Do you use Incognito mode?

A. Occasionally.

Q. When do you use it?

A. When I want extra privacy.

Q. In what instances would you want extra privacy?

A. I don't know.

Q. Can you give me some examples?

A. I honestly don't. I've used it a few times, um, and generally, say, for example, I just want to Google something, I'm curious about, but it might be like, you know, a health complaint or something that might be a little awkward, I might use it. Something like that. But not much.

Q. So when you do choose to use it, it's because there's something that you might feel embarrassed about that you wouldn't want people to know?
MR. MIGOTSKY: Objection.
A. I -- yeah, I don't know.
Q. Well, you just said that you might use it for something you're searching for that might feel a little awkward, right?
A. Yes.
Q. And you are saying it might feel a little awkward because you might not want other people to know that you're searching for that, or for another reason?
A. I didn't say that. I just said maybe like a health kind of condition that might be a little awkward. But I didn't say I don't want people to know.
Q. So then what do you mean by a little awkward?
A. I just mean, um, something unusual.
Q. And you would use Incognito mode because why? Why do you think you would use it for something that feels a little awkward or unusual?

A. It's honestly for privacy, and nothing additional. I don't know. Just human health kind of issue.
Q. Okay. So there's some information that you would consider more private than others, right?
A. Yes. For example, I know I've had a personal health challenge, I only tell people in my inner circle. So something like that I might use Incognito mode for.
Q. Makes sense. And at this deposition today are you represented by the counsel who is here?
A. Yes.
Q. Did you review any documents in preparation for the deposition?
A. Yes.
Q. What documents did you review?
A. Discovery-related documents.
Q. What discovery-related documents did you review?
A. Just case summaries, things explaining what happened, what the deposition is about, the charges. The whole case basically kind of summarized.

Q. Who put together the summaries?
A. My attorneys.
Q. Other than summaries put together by your attorneys did you review any documents in connection with this deposition?
A. I'm not a hundred percent sure.
Q. Sitting here now, you can't remember other documents that you reviewed other than the summaries your attorneys put together?
A. No, I don't.
Q. Did you meet with your attorneys to prepare for this deposition?
A. Yes.
Q. How many times did you meet?
A. Just a few times. I don't remember all the -- I wasn't counting, but a few is what I will say.
Q. What is a few? Three to five?
A. I would say -- again, not counting but definitely single digits.
Q. So under ten?
A. Yes.
Q. Were those meetings in person or over Zoom or phone?
A. A combination.

Q. And how many of them were in person?
A. This is my first time meeting them, so you can say one short meeting. Just one in person.
Q. And how long were each of the meetings?
A. Generally not too long. I would say shorter than -- yeah, I don't know an exact length of time. But not too long.
MR. MIGOTSKY: I just want to caution that you should not divulge any communications that you've had with counsel, they're protected by the attorney-client privilege, during this line of questioning.
BY MS. BARRERA:
Q. And to be clear, I'm not asking what you discussed with them. Just how long you met with them for.
So you said not too long. Would you say less than 30 minutes for each meeting?
A. I don't remember. This is definitely -- it wasn't like an overnight thing. So I don't know exactly. I wasn't timing it.
Q. Would you say all of the meetings

were under an hour?
A. I don't remember.
Q. Were any of the meetings over an hour?
A. I'm not sure.
Q. Were any of the meetings over two hours?
A. That I don't know.
Q. You can't remember anything about the length of any of your meetings with your attorneys?
A. No. I wasn't keeping a record.
Q. Well, you would probably remember if you had a really long meeting versus a short meeting, right?
A. Yeah. But the precise hour, minute, second, I don't know. I can't tell you.
Q. I am not asking for the precise hour, minute, second. I am asking you approximately how long on average your meetings were?
A. I think they varied in length so I can't tell you.
Q. So they varied in length but you don't remember if any of them were more than two

hours long?
A. No. I wasn't keeping -- I didn't have a stopwatch. I don't know.
Q. Were any of them more than three hours long?
A. I don't know.
Q. Were any of them more than four hours long?
A. I don't know.
Q. Were any of them more than five hours long?
A. I don't remember.
Q. You don't remember if you spent more than half a day meeting with your attorneys?
A. Yeah, it's just -- I wasn't keeping track.
Q. Did you spend a full day preparing with your attorneys?
A. That hasn't happened yet.
Q. Okay. So somewhere between a half day and a full day you may have spent preparing with them?
A. I'm not sure.
Q. Did you speak with anyone about this case other than your counsel?

A. No.
Q. Do you have any lawyers representing you in this case other than the two who are here today?
A. I don't think I do.
Q. When did you first have contact with your lawyers?
A. When I first became aware of the case, over a year ago.
Q. How did you first become aware of the case?
A. I filled a form, there was a submission, and I was, um, contacted. They responded.
Q. Where did you fill out the form?
A. Online. I don't remember the source.
Q. How did you learn about the form?
A. I came across it somewhere. Signed up, filled it. And they reached out.
Q. Did you receive an ad that notified you about the case?
A. It might have been. I don't know.
Q. Do you regularly check other sources looking for opportunities to be involved in

litigation?
A. No.
Q. At what point did you decide to have Bursor & Fisher represent you in this matter?
A. I think it was shortly after they initiated contact. So -- I don't remember the exact year but I know it was not too long ago. But not -- not obviously yesterday.
Q. You said you thought it was over a year ago, right?
A. Yes.
Q. Did you know any of the lawyers involved in this case before the case was filed?
A. No.
Q. Did you know any of them before you received the ad or filled out the form?
A. No.
Q. Have you ever met a lawyer named Timothy Fisher?
A. I don't recall.
Q. Does that name sound familiar to you?
A. I honestly am not sure if I've heard or met that person.
Q. Have you ever heard the name Philip

Fraietta before?
A. That doesn't sound familiar.
Q. Who is paying the fees and expenses of your lawyers in this case?
A. I don't know.
Q. Are you paying them anything?
A. So far no.
Q. Are you expecting to pay them anything in the future?
A. I don't think.
Q. You don't think so?
A. I don't think so.
Q. You had to travel for this deposition, right?
A. Yes.
Q. Where did you travel from?
A. Europe.
Q. Where in Europe?
A. The Czech Republic.
Q. And where in the Czech Republic specifically?
A. Prague.
Q. Did your lawyers pay for your flight and your expenses while you are here?
A. Yes.

Q. Have you received any payments for participating in this lawsuit?
A. No.
Q. Do you have a retention agreement in this case with your lawyers?
A. I am not sure.
Q. You don't know if you have any kind of contract with them?
A. I believe I do.
Q. Are you familiar with Alan Starzinski?
A. I wouldn't -- I don't know, honestly.
Q. Are you familiar -- have you heard the name Alan Starzinski before?
A. I have seen -- I know I'm a named plaintiff and I believe that person is, too. I don't know for sure.
Q. Have you ever met Alan Starzinski?
A. No.
Q. How about Aurelio Medina, have you ever met Aurelio Medina?
A. No.
Q. Have you ever had any contact with Aurelio Medina?

A. No.
Q. Have you ever met Darrnell McCoy?
A. No.
Q. Have you ever had any contact with Darrnell McCoy?
A. No.
Q. Have you discussed this lawsuit with anyone other than your attorneys?
A. No.
Q. You mentioned earlier that you've submitted some claims in other class actions after receiving notices. How many times have you done that?
A. I don't recall.
Q. How much money have you earned from submitting claims in the class action?
A. I don't know.
Q. Would you say it's more than a hundred dollars?
A. Yes.
Q. Would you say it's more than $500?
A. Yes.
Q. Would you say it's more than a thousand dollars?
A. I think so.

Q. Would you say it's more than $2,000?
A. I'm not sure.
Q. Would you estimate you've earned somewhere between one and $2,000 from submitting claims in class actions?
A. I'm not sure. I would have to dig up and check.
Q. Have you earned more than $5,000 from claims in class actions?
A. I don't remember.
Q. How about more than $10,000?
A. I don't know.
Q. So you could have earned more than $10,000 from submitting claims in class actions, but you don't remember?
A. I honestly don't know. And I'll have to research. I -- I don't.
Q. Have you earned more than $50,000 from submitting claims in class actions?
A. No.
Q. Okay. Have you earned more than $30,000 from submitting claims in class actions?
A. Yeah, again, I don't remember. I -- you know, it's a large number. I don't know.
Q. Okay. So somewhere between $1,000

and $50,000 you've earned from submitting claims from class actions, can we agree on that range?
A. It's fuzzy. I have earned money but I don't know the exact amount.
Q. I understand you don't remember the exact amount. But somewhere between 1 and $50,000?
A. That's possible. I'll have to sit down and calculate.
Q. You can't narrow the range for me any more than that?
A. No.
Q. Do you monitor certain websites to look for opportunities to submit claims in class actions?
A. No.
Q. How do you learn about the claims that you submit?
A. You know, I honestly don't know. Sometimes it's just appropriate to my situation.
Q. That didn't answer my question. I was asking about how you learned about the claims that you submit?
A. I don't remember. Just -- it might be -- yeah. Somehow it just happens. I don't

remember.

Q. You get emails for class actions or letters?

A. You know, I don't remember that. I think I have like one email that comes in. But usually the claims and settlements don't apply to me. And that's recent. That's only like the last few months they started.

Q. What email are you referring to?

A. I think I get something from Top Class Actions, and I mostly ignore them.

Q. Have you ever received notice that you were a member of a class action in a case against Meta or Facebook?

A. Besides this one, you know, I honestly don't know.

Q. You don't recall receiving notice that you were a member of a class in any other cases against Meta or Facebook?

A. Besides this, I'm not sure.

Q. Have you ever received notice that you were a member of a class action in a case against ESPN or ESPN+?

A. You know, as -- I'm not a hundred percent sure if I had like a separate case

against them or ... I don't know.

Q. You think you had a separate case against ESPN?

A. I am not sure.

Q. You don't keep track of cases that you file against other companies?

A. Sometimes. I -- I don't keep like very granular records of them. But -- yeah, I'm not sure.

Q. You trust your lawyers to just handle any cases that you're involved in?

A. I didn't say that.

Q. Well, you said you don't have granular records and you're not sure if you have a case against ESPN. That's not something you would keep track of?

A. Okay. I know that this Meta/Facebook, I'm a named plaintiff, and ESPN is connected to it that I know. But, um, do I keep track of, let's say a completely separate case with ESPN having nothing to do with Meta? I don't know.

Q. That's what I am asking about. Do you know if ESPN first is a defendant in this case?

A. I'm not sure. I know they're connected to it. But I don't know.

Q. Okay. Well, I will represent to you that ESPN is not a defendant in this case. So I am asking whether you have any other cases against ESPN specifically?

A. I don't know.

Q. And that's what I am trying to understand. You don't know if you have filed a lawsuit against ESPN?

A. You know, honestly, um, it's not something I can say a hundred percent. I don't remember.

Q. Have you met with other attorneys to represent you in a case against ESPN?

A. No.

Q. Have you discussed that -- strike that. How about Hulu? Have you filed any cases against Hulu?

A. Like ESPN, I don't know if I had any separate stand-alone case against them. I don't remember.

Q. Why did you decide to bring this lawsuit?

A. Because I believe my privacy has

been violated.
Q. How do you believe your privacy was violated?
A. Things that I thought were to be held in strict confidence between me and a party were not essentially.
Q. What party?
A. ESPN specifically.
Q. And what things do you think were supposed to be held in strict confidence that were not?
A. My viewing habits.
Q. And what about your viewing habits?
A. Generally what I was viewing.
Q. Those were things that you believed were strictly confidential between you and ESPN?
A. Correct.
Q. Why did you bring claims against Meta?
A. Because I thought it was a violation of federal and state statutes.
Q. What did you think was a violation of federal and state statutes?
A. The fact that Meta had a tracking pixel which was essentially eavesdropping on my

communications.

Q. Why did you bring claims against Meta and not against ESPN?

A. Because I -- I'm aware that the tracking pixel originated with Meta, not ESPN.

Q. What do you mean by "originated"?

A. It was -- it's called a Facebook tracking pixel. And Facebook is a subsidiary of Meta.

Q. And what do you hope to accomplish through this lawsuit?

A. I want damages to be, um, atoned for, basically, to be known that damages occurred. I want to bring this out to the light to show it's not okay to eavesdrop and violate people's privacy.

Q. You referenced damages. Are you talking about monetary damages?

A. Yes. Because I'm entitled to them by law.

Q. How much money are you seeking in this case?

A. By federal law, $10,000. By state, $5,000.

Q. Total?

A. That I'm aware of are the hard numbers. But could there be more? I don't know.

Q. So as far as you're aware you're seeking $15,000 in total in this lawsuit?

A. I'm not sure if it's limited to that. But I know that's the law with those numbers I gave.

Q. Where do you live currently?

A. Prague, Czech Republic.

Q. When did you move to Prague?

A. April 2026.

Q. Why did you move to Prague?

A. Because I felt a calling to teach there. I've been a teacher in the U.S. for years, and I felt -- I fell in love when I first visited years ago. Europe in general I love.

Q. And what are you teaching?

A. Math, English, science. I've mostly taught math. I might teach any of those three, and possibly more.

Q. Where do you teach?

A. At this moment I'm interviewing.

Q. Are you hoping to teach at the university level or --

A. Somewhere between elementary to university.
Q. Before you moved to Prague in April of 2026 where were you living?
A. California.
Q. Where in California?
A. Idyllwild.
Q. When did you move to Idyllwild?
A. In August 2025.
Q. Where were you living before you moved to Idyllwild in August 2025?
A. The Los Angeles area.
Q. And when did you move to Los Angeles?
A. May 2019.
Q. Where did you live before you moved to Los Angeles in May of 2019?
A. Twin Cities.
Q. Twin Cities?
A. Minnesota.
Q. And when did you move to Twin Cities, Minnesota?
A. December 2018.
Q. And before you moved to Twin Cities in December of 2018 where were you living?

A. Ontario, Canada.
Q. When did you move to Ontario, Canada?
A. August 2017.
Q. Okay. And before you moved to Ontario, Canada in August 2017, where were you living?
A. Buffalo, New York.
Q. When did you move to Buffalo, New York?
A. December 2015.
Q. Okay. And before Buffalo, New York where did you live?
A. The Phoenix area. Arizona.
Q. When did you move to Phoenix?
A. You can say twice, but I -- yeah, I've moved quite a bit. And I honestly don't -- I don't see how, you know, it pertains.
Q. Just to be clear, you do have to answer my questions even if you don't see how it pertains. But I don't need more details than that on the years. But before Phoenix, Arizona where did you live?
A. I briefly lived in South Dakota.
Q. Okay. Where else besides South

Dakota?
A. New Jersey.
Q. Anywhere else?
A. Nigeria.
Q. Anywhere else?
A. I think I have all -- every place I've lived.
Q. Okay. Where were you born?
A. Nigeria.
Q. How old were you when you moved to the U.S. ?
A. Twelve.
Q. Do you enjoy traveling?
A. Yes.
Q. Have you traveled to many places over the last ten years?
A. I would say a decent number.
Q. Are most of those places in the U.S. or outside the U.S.?
A. Both.
Q. Do you remember any places you traveled in 2021?
A. Not off the top of my head.
Q. I would have a hard time remembering that myself, but just to double-check. In June

of 2021 do you remember if you took any trips?
A. No, I don't.
Q. Do you remember if you took any trips in January of 2022?
A. The only trip I remember was coming back from Arizona to LA after a recent -- the passing of my mom due to cancer.
Q. I'm sorry to hear that. Was that in 2022 January?
A. January, yes.
Q. So at that time you were living in Los Angeles, correct?
A. Yes.
Q. When you traveled to Arizona?
A. Yes.
Q. Do you remember the date that you were in -- or the dates that you were in Arizona?
A. Not the precise dates, but it was around the Christmas/New Years season, 2021 to 22.
Q. You're a sports fan, right?
A. Yes.
Q. What sports do you follow?
A. I like several sports. Soccer,

called football around the world. Basketball, tennis. Baseball. I like a few.

Q. Do you ever go to any sporting events?

A. If I can.

Q. What types of sporting events do you go to?

A. Said sporting events from the sports mentioned.

Q. Have you ever been to a professional tennis match?

A. I honestly don't remember.

Q. Have you ever been to any soccer matches?

A. Yes.

Q. Basketball games?

A. Yes.

Q. Do you like to wear clothing that represents your favorite sports teams?

A. Sometimes.

Q. What are your favorite sports teams that you would wear?

A. Obviously Nigeria, my country. You know, maybe random places I've lived. But I'm not crazy over sports, but a little bit.

Q. Do you watch sporting events from all of those sports that you mentioned? Basketball, soccer, tennis?
A. Yes. For example, the World Cup I'm watching now.
Q. What's your date of birth?
A. November 10, 1982.
Q. Do you have a LinkedIn account?
A. Yes.
MS. BARRERA: I am going to introduce the first exhibit, which will be Exhibit 1.
(Odumosu Exhibit 1, LinkedIn profile was marked for identification, as of this date.)
BY MS. BARRERA:
Q. If you could take a minute to review this LinkedIn profile and let me know if this is your LinkedIn profile?
(The witness reviews document.)
A. Yes, it is.
Q. Is there anything that's inaccurate or out of date in this LinkedIn profile?
A. From a cursory review, I would say this looks like it was printed straight from my

LinkedIn profile. And to see anything out of date or inaccurate might take a few minutes.

Q. That's fine.

A. Okay.

(The witness reviews document.)

A. Okay. I see something that I'm not sure where the source is, but maybe it's just -- maybe I didn't update it. I thought I did. It says I currently tutor an eighth grader in Los Angeles, which is not true. So maybe I did not. It's possible whoever printed it could possibly, you know ... but that might just be something minor. Yeah, some of these things that say I'm still doing. That's the only thing. So basically anything that has me still living in Los Angeles until the present is not accurate. So maybe I need to update it.

Q. Since you just moved to Prague in April of 2026, is that when you stopped tutoring?

A. Yes. That French eighth grader in Los Angeles.

Q. Okay.

A. Or actually -- no. I stopped when I used to Idyllwild. Because I moved from the Los

Angeles area to Idyllwild in August 2025. So just to be precise it was, yeah, recently.

Q. Thank you. So you stopped tutoring that student in August 2025?

A. Something around that summer, yes.

Q. Okay. And then if you turn to the last page it lists your education, and it says you graduated from Arizona State, right?

A. Yes.

Q. And you had a BA in mathematics?

A. Correct.

Q. Did you study anything else while you were there?

A. I studied geography. And then -- yeah, those were the two.

Q. And then it lists Redeemer University. Did you get a degree from Redeemer University?

A. No.

Q. You were studying theatre/film there?

A. Yes.

Q. Did you get a certificate from there or you were just taking classes there?

A. Yeah, no, um, certificate or degree.

Q. And then from Penn State it looks like you got a certificate in geographic information science and cartography?
A. No.
Q. Okay. What's that referring to then?
A. Studies also.
Q. So you studied that for two years but you didn't get a degree or certificate from there, is that right?
A. Yes.
Q. And then you list the New Jersey Institute of Technology and it says mechanical engineering. Can you tell me what more specifically you did at the New Jersey Institute of Technology?
A. Yes. I studied mechanical engineering there. That's what it says.
Q. For how long?
A. A few years.
Q. When was that?
A. Just before Arizona State University.
Q. So sometime before 2006?
A. Yes.

Q. And did you get any degree or certificate there?
A. No.
Q. Have you taken any classes in computer science?
A. Yes.
Q. What computer science classes have you taken?
A. I'm part of the education you see listed here, as needed for my major.
Q. Do you remember what classes, like what kind of programming language you were learning, for example?
A. Popular ones, like Java, C++.
Q. Do you know how to code currently?
A. I'm learning. As you see, it says I've learned Python. So I'm learning. So the short answer is not fully. But learning.
Q. Have you ever taken any classes in advertising?
A. I don't remember.
Q. Have you taken any marketing classes?
A. I don't recall.
Q. Do you remember taking any classes

where you learned about pixels or cookies or other advertising technology?

A. I don't remember if I did.

Q. Have you ever placed any advertisements before?

A. Yes.

Q. When?

A. Around -- when I lived in Los Angeles, so 20 -- early-to-mid- 2020s.

Q. What were the advertisements for?

A. Things that interest me that I am passionate about. Like travel, which I said I enjoy.

Q. What were you advertising?

A. Social media, travel, tours, flights and things I've done. Like taken helicopter tours.

Q. Were you a travel agent?

A. No.

Q. Were you working with a travel agent?

A. No.

Q. So what were you -- were you trying to get people to buy those tours?

A. No. Just personal, because I like

travel. Just social media kind of thing.

Q. Were you trying to make money from those things at all in any way?

A. I was an upcoming travel kind of TV host, and the short answer is I honestly don't know. I was just learning the ropes.

Q. What was the goal of the advertisements?

A. The typical goal for most. But in a nascent travel show host, publicity.

Q. So you wanted to increase the number of followers that you had?

A. I think so.

Q. Where were you advertising?

A. I used Google Ads. And that's -- I might have used Facebook ads. I don't remember.

Q. Besides Google and maybe Facebook did you advertise anywhere else?

A. I don't remember.

Q. How did you go about placing your Google Ads?

A. Using the whole Google Ads platform, you know, analytics and things like that. I just researched, found a way and did so.

Q. Were the ads helpful to growing your

travel business?

A. I don't know. Maybe.

Q. During what time period were you advertising?

A. I don't understand the question.

Q. Well, let's start with when you were trying to become -- is it a travel blogger? You said a travel host, right?

A. Yeah, travel blogger might be a good, you know, way to describe it.

Q. Okay. And blogger is a video blogger, right?

A. Yes, mm-hmm.

Q. So you wanted to be a travel blogger?

A. Mm-hmm.

Q. When was that?

A. Just a few years ago. You know, the last -- mostly when I was living in the LA area.

Q. Okay. So that would be in 2025 or before you moved to Idyllwild?

A. Yes, before.

Q. Before Idyllwild?

A. Yes.

Q. So sometime between May 2019 and

August 2025?
A. Yes.
Q. Okay. So during that time period were you placing ads on Google and maybe Facebook throughout the time period that you were trying to be a travel blogger?
A. Not every moment of that, but sporadically in that time frame.
Q. How much would you say you spent on ads for your travel blogger sites?
A. I don't remember.
Q. Where were you posting your videos?
A. Where I thought people might see them, on social media.
Q. And what social media platforms were you using?
A. I used the popular ones, but I mostly used Google Ads, maybe Facebook. I don't know anything else.
Q. But what are the social media sites where you were posting? You said the popular ones. What are the popular ones?
A. I don't know.
Q. You don't remember where you were posting your videos?

A. No.
Q. Were you posting your travel videos on Instagram?
A. I had Instagram accounts. Did I, you know, advertise, post them? I don't know. One thing I know is let's say I went to the Empire State Building, I would do what the average person does. I take photos, post it there. Was it for business or personal? I don't know.
Q. So let's distinguish between two things. So you were a travel blogger so you would post videos of trips you took, places you visited, right?
A. Yes.
Q. Sometimes you could promote those videos or advertise for those videos and sometimes you would just post them so your audience could see them, right?
A. Yes.
Q. So right now I'm just talking about -- put advertising aside for a minute, where were you sharing these videos about your travels? Instagram? Facebook? TikTok?
A. I -- I don't remember. I had, you

know -- there was a personal aspect as mentioned, there was a professional aspect. The personal, I might post it to any social media, which I don't remember all -- the extent of all of them. But the professional are the ones I mentioned, I would post, I had YouTube and I would use Google Ads to disseminate and broadcast it and maybe Facebook.

Q. Okay. Did you have separate Facebook or Instagram accounts for your blogging specifically, apart from your personal Facebook and Instagram accounts?

A. Yes.

Q. What were the names of those accounts?

A. I had one personal and I had one professional Instagram account.

Q. What were the names of the personal and professional Instagram accounts?

A. I simply used my two -- the variations of my name.

Q. What are those?

A. I used my full name for my personal one. And for the professional I used essentially my stage name.

Q. What was your stage name?
A. Just my first name without the O-l-e. Deji. D-e-j-i. And then my last name.
Q. And your last name or no last name?
A. And my last name.
Q. So is "Deji Odumosu," that was the Instagram handle that was for your blogging business?
A. Yes.
Q. Okay.
A. TV hosting is probably a better word than blogging. But yes.
Q. TV hosting, okay. So that was for Instagram. For Facebook was it the same? Did you have a separate Facebook account for your TV hosting business and your personal account or no?
A. I had, and I still have, a Facebook. But like a page. Not like a totally separate account. I don't know. I don't remember.
Q. Okay. So when you were advertising for your TV hosting through Google analytics did you use any pixels or cookies on your -- the sites where you were posting the videos?
A. Not that I'm aware of. I'm not

someone who invades privacy, so that's something I wouldn't do.

Q. Do you think it's possible to use those advertising and analytics tools without invading privacy?

A. Um, I --

MR. MIGOTSKY: Objection; calls for speculation.

A. Yeah, I don't know. I think that's speculative. I don't know.

Q. Do you have a website?

A. I don't.

Q. Have you had a website in the past?

A. Yes.

Q. What was the website called?

A. My first name ".com." First, last name ".com" I should say.

Q. So can you just say the full URL?

A. Yeah. Dejiodumosu.com.

Q. And that website is no longer active?

A. No.

Q. When was that website active?

A. About 2020 to 20-something. I don't remember. But definitely not 2026.

Q. Were you also posting your videos about your travels on that website?
A. Yes.
Q. Was that the main purpose of the website?
A. Entertainment, travel, TV, acting. Things like that.
Q. And did you have advertising on your website?
A. I did not.
Q. Did you have a privacy policy for your website?
A. I don't remember.
Q. You don't remember drafting a privacy policy for that?
A. No.
Q. Were people able to log in to your website or it was just general browsing?
A. General.
Q. And you didn't use any cookies or pixels on your website?
A. I don't think so.
Q. Do you have a Facebook ads account?
A. I don't remember.
Q. Do you remember promoting posts on

Facebook?

A. I'm not sure. I said Google, I know. But Facebook I'm not sure.

Q. And the same with Instagram; do you remember if you promoted posts on Instagram?

A. I also don't remember.

Q. Did you post videos on TikTok?

A. Yes.

Q. Did you also advertise on TikTok?

A. I don't remember.

Q. You don't remember if you used any of their analytics and advertising tools?

A. You know, sometimes it's confusing, what's an ad, what's like a short boost, promotion. So I don't know. Yeah, I can't tell you a hundred percent.

Q. You paid TikTok for something but you don't remember what?

MR. MIGOTSKY: Leading question, objection.

A. Yeah, I don't remember.

Q. Just to clarify, do you remember if you paid TikTok for any type of promotion or boost?

A. You know, I'm -- yeah, it's fuzzy.

I don't remember.

Q. Other than your TV hosting, ads to support your TV hosting have you ever served any other ads?

A. It's always been related to TV hosting, acting, modeling. Those have been the main things I've pursued in Los Angeles. So it's always those.

Q. Anywhere else that you have placed any ads besides Google, maybe TikTok, maybe Facebook?

A. None that I could think of right now.

MR. MIGOTSKY: Let's take a break, ten minutes?

MS. BARRERA: That's fine. We could do that.

MR. MIGOTSKY: Great.

THE VIDEOGRAPHER: This will end media unit 1. Going off the record at 10:31.

(Recess.)

THE VIDEOGRAPHER: We are back on the record at 10:50. This will begin media unit 2.

BY MS. BARRERA:
Q. Going back to Exhibit 1, which is your LinkedIn profile, on the last page we were talking about how you have Penn State listed there. But you never were living in Pennsylvania, right?
A. No.
Q. Was that a virtual --
A. Yes.
Q. -- virtual courses you were taking?
A. It was.
Q. You are not currently working, right? You're interviewing for jobs?
A. Yes.
Q. Do you earn income from any other ways other than your prior employment?
A. No.
Q. Do you own any stock?
A. I don't think so.
Q. Any other investments to generate income?
A. No.
Q. Do you know what Meta's business tools are?
A. I don't think I do.

Q. Do you know what the pixel is?
A. I have a rough idea what it is.
Q. What's your understanding of what the pixel is?
A. It's like a tracking cookie. It's some kind of code that tracks users information and things like viewing habits, what they do online without their knowledge or consent.
Q. How did you come to that understanding?
A. I don't fully know, but it was like a combination I think of, you know, research. I generally am, as you see on my LinkedIn profile, I have a career spanning multiple technical fields and some entertainment. So I generally am someone who is curious. So, you know, that's how I kind of observed that.
Q. When did you first learn about the Meta Pixel?
A. A few years ago when this case came up, you know, like the last few years. I don't remember the exact date.
Q. Did you know anything about the Meta Pixel before this case?
A. Maybe vaguely. Generally it has,

you know, many tech giants tend to have some kind of tracking apparatus. So ...
Q. Putting aside the Meta Pixel specifically, were you familiar with analytics, cookies and technologies before filing this case?
A. Yes.
Q. How long would you say have you been aware of analytics, cookies and technologies?
A. Over a decade.
Q. Are you familiar with the SDK or software development kit that Meta offers?
A. Not fully.
Q. You said not fully. What do you understand about it, if anything?
A. Yeah, I would say not much. I don't know, honestly. But I've heard terms like that. But I don't fully know.
Q. Are you familiar generally what software development kits are used for?
A. I -- you know, I don't know.
Q. Do you know what Conversions API is?
A. A little.
Q. What do you know about it?
A. You know, I -- I don't know, but I

think it has to do with, um, you know, as indicated, how many conversions and, you know, like success rates and metrics companies use to track things. And that's all I can say.

Q. You know what an URL is, right?

A. Yes.

Q. Do you understand what the different components of an URL are?

A. Yes.

Q. And who controls what is part of the URL?

A. I don't fully know.

Q. Do you know if the website that owns the URL has control over what information is contained in the URL string?

A. Not fully.

Q. What do you know about it? You said not fully, so I want to make sure I get, even if it's a little bit of information, what you do know?

A. I -- I don't know what the owners may or may not own or control. I know when I had my website I was able to choose the name for my, you know, my brand for entertainment, TV, acting, hosting. But besides that I don't fully

know.

Q. Do you know what an event is in connection with pixels, cookies and other electronic or advertising and analytics technologies?

A. No.

Q. Have you ever heard the terms custom events and standard events?

A. No. I don't think I did.

Q. Do you know what a custom audience is?

A. Not really. I -- you know, I can guess but I wouldn't know in connection to this case.

Q. Are you familiar with how advertisers can target their ads on Facebook and Instagram?

A. Maybe vaguely.

Q. What do you know about how they can target their ads?

A. I know from the information collected about users, they can tailor to user's habits, choices, lifestyles and things like that.

Q. Have you ever taken a look at Meta's

ad manager?

A. I don't remember.

Q. Do you remember ever seeing the list of targeting categories that advertisers can select?

A. You know, I can only speak for myself. When I've advertised I select things I want, like demographics that I'm aiming for. But besides that I don't know.

Q. And when you say you could select things like demographics, were you trying to target certain demographics for the ads you were showing for your travel videos?

A. Yep. People who were likely to travel.

Q. What other demographics were you looking to target with those ads?

A. You know, I met like an upcoming director kind of person in Los Angeles, and we had a cordial professional chat, I told him how I would love to be a travel show host. I'm originally from Nigeria. He's like one unique thing you bring is there really is not any major travel show host that's African and has lived in the U.S. pretty much all his life. So that

could be your niche. So I thought that was cool. So I started to target the kind of people who might enjoy seeing a Nigerian-American travel show host and I have found kind of a bit of traction. So I thought, you know, I could just take his honest advice and do things like that. And yeah, I just wanted to have, yeah, people in that demographic, people who would like my personality and think I was an original travel show host.

Q. So other than people who were likely to travel, what other characteristics did you think might help you identify people who would like your unique travel show?

A. General, honest kind of people who would connect with my honest personality and, um, from all parts of the world. I was able to choose countries. I will literally choose countries on every continent that I thought based on me traveling there, interacting with people from there, I would have a strong connection. And that was it.

Q. And were those characteristics you were able to select through Google Ads?

A. Yes.

Q. Do you remember exactly what characteristics or boxes you checked?
A. Country, age group, both genders. And I think -- yeah, those were really -- there wasn't like too much. You know, I couldn't tell their income and things like that.
Q. What age group were you targeting?
A. Was I targeting, because this was in the past. It was like 18 to like 70 or so.
Q. Do you know how Google identifies the people that they put in those different audiences that you were trying to target?
MR. MIGOTSKY: Objection; calls for speculation.
A. I think -- I don't know. I think it's speculative. Yeah, I don't.
Q. Did you ever read Google's terms or privacy policy with respect to their advertising tools?
A. Prior to advertising I've seen it, you know, took it in good faith that nothing kind of suspicious might happen. So yeah.
Q. Were you concerned about the privacy of the people who were being selected based on these characteristics to see your ads?

A. I knew the rule of law, due process and everything was going to, um, overrule anything, and I simply put, you know, went ahead in good faith. Because generally speaking, consumers are protected -- protected, advertisers like me are protected. So I -- with a clear conscience I went ahead and advertised, knowing I wasn't doing anything wrong. Just trying to promote my brand.

Q. So you agree you weren't doing anything wrong, trying to promote your brand by targeting ads to certain people with certain characteristics, right?

A. Yes. Because personally I know people who told me they enjoyed my travel video. So I just wanted more people like that who would not necessarily know in person but who would also enjoy my travel video. I just simply wanted to grow my base.

Q. So if people were enjoying the content that's being shown to them based on data about them, does that mean that there's no privacy concerns from your perspective?

A. I don't know. Um, I trusted the process to be fair and non-intrusive.

Q. So you trusted Google?
A. Generally, yeah. I wouldn't say -- you know, generally places where I advertised, I know we live in a country, in a world mostly where people are protected by a lot of consumer agencies, so I knew that. As long as you have clear intentions and you try to follow due process, you're going to be fine. So that's what I did. I wanted people, for example, neighbors, family, friends who literally told me they enjoyed my video, I wanted to multiply that in good faith. Which I kind of did. I had a few people reach out, telling me they liked it.
Q. Are there ads that you enjoy seeing?
A. Yeah, on social media. Some.
Q. What types of ads do you like?
A. Ads that are congruent with my personality and interests. Like travel, aviation, entertainment, movies. Even my analytical side. Things related to, like, space, Mars, tourism, math. Those are all fun. And if they're advertised honestly with -- yeah, I would -- I would click them. Or at least view them.
Q. So if you are watching certain

videos on a site, do you enjoy getting recommendations for other videos that you might like based on the videos you have already looked at?

A. Yeah, you know, enjoy, translate, you know, are two different -- they're not synonyms. If I feel my privacy has been intruded on, even if I do like the video then I get cautious. So yes, do we live in a world where people's viewing habits, you know, even the best of companies might share for marketing purposes? Yes. But I just feel it should be with the consumer's consent.

Q. Do you read privacy policies generally?

A. I have an idea. I try to skim through them.

Q. So if a privacy policy is saying that they're going to use your viewing habits to show you ads and you review that privacy policy then you're okay with them using your viewing history to show you ads, right?

MR. MIGOTSKY: Objection; speculative.

A. I don't know.

Q. What gives you pause?

A. I feel -- I just feel that defendants's counsel is speculating on what I do or don't, you know, my habits, as far as online, you know, ads and things like that. And as mentioned, I just try to follow due process, have a clear conscience. If any company in the world had my consent to advertise anything and they do, then they're not breaking any laws. So ... yes, and that's all I can say.

Q. Would you agree that most websites you visit are using your data for advertising purposes and analytics purposes to help grow their business?

MR. MIGOTSKY: Objection; calls for speculation.

A. Yeah, I don't know either.

Q. Do you assume that websites you visit are using your data for ads and analytics?

MR. MIGOTSKY: The same objection.

A. I don't know.

Q. How would you find out if you want to know whether a website is using your data for advertising and analytics?

A. I don't fully know, but I can -- I

have expert attorneys. I have resources, family, attorneys who I can ask questions. People in law enforcement. Yeah, on all sides, both coasts across the U.S., I can easily call, reach out to. I have technology. I have resources. And I'm not -- yeah, I'm not gullable to simply -- but generally again, due process, good faith. The U.S. is a country of laws. Most countries have laws that protect the consumer. So yeah, I'm not worried about what most companies do. Because they can't get away with intruding on people. It's like the saying, you can fool some people all the time, all the people some of the time, but not all of the people all of the time. So I'm relaxed and calm, no one can get away with it forever.

MS. BARRERA: Move to strike as nonresponsive.

Q. That wasn't my question. I was just asking a much simpler question, which was if you wanted to find out whether a specific website is using ads and analytics or your data for ads and analytics, what would you do to figure that out?

A. I don't know. But again, I kind of answered it. I have lots of resources I can use

to figure it out.

Q. Have you ever decided not to use a website or app because you were -- you didn't want your data to be used for ads and analytics?

A. That's possible, um, yeah.

Q. When has that happened?

A. I don't know exactly, but I think there was a time I lived in Los Angeles, me and this group of friends connected to one person I know who is an attorney for decades, and we were discussing how certain media giants, social media or whatever might use your data. So that gave me pause and I was cautious. Do I know which exact situation or app? I don't know. But I do know not everyone has the consumer's best interests at heart.

Q. What social media companies were you talking about with that group of friends?

A. I don't know. But could it have been Meta/Facebook/Instagram? Possibly. It was -- yeah, definitely tech giants, some of them, try and see what they can get away with, which gives me pause about what to share and things like that.

Q. Did you stop using Instagram or

Facebook after having that discussion with that group of friends?

A. I know I have stopped using Instagram. But was it as a knee-jerk reaction to that conversation? I wouldn't say so. But after like a year or two after that conversation I stopped.

Q. Why did you stop using Instagram?

A. I wouldn't say strictly due to intrusive privacy kind of issues. It's that and personal reasons.

Q. What are the personal reasons?

A. I'm not at liberty to disclose that.

Q. You have to answer my questions, even if you don't want to.

A. Okay. Yeah, personal reasons. I just felt like, I've mentioned I had two Instagram accounts, one personal, one professional and I just felt like at this time I wanted to take a pause from Instagram for now. It wasn't serving me.

Q. Why wasn't it serving you?

A. Um, I felt led to put my, the whole social media, acting and TV hosting on pause for now and pursue teaching.

Q. So you stopped using your -- let's talk about the two Instagram accounts separately. You had a personal one and you had one for your travel?

A. TV hosting activities.

Q. TV hosting. So you decided to pursue teaching instead of the travel hosting so you stopped using that Instagram account because you were no longer pursuing the travel hosting, is that right?

A. That's one of the reasons, yes.

Q. What were the other reasons?

A. I -- yeah, I felt it was time to pause, as mentioned, and I, um, yeah, I don't know, just wanted to -- wanted -- I would just say I felt like it.

Q. Okay. So just as a reminder, you're under oath. So if you have other personal reasons that led you to stop using Instagram I need you to tell me what they are.

A. Okay. Safety. I'm not going to disclose, because it is safety, as mentioned. My personal safety was part of it.

Even law enforcement was involved. I won't give full details, because this is not a

matter that pertains to that, totally different cases. But physical safety was one of them.

Q. How is physical safety impacted by your use of Instagram?

A. Well, for things such as posting photos, you know, people who are stalkers might try to figure out my location. Things like that.

Q. Did you delete your account or you just left it and stopped using it?

A. Yes, I deleted it. I believe Instagram mentioned that there's a policy after 30 days, if you're sure you don't want it, it's gone forever. So that's what I think I did.

Q. So you think your Instagram account is gone forever now?

A. I believe so.

Q. When did you delete it?

A. Late 2025.

Q. So after you filed this lawsuit, right?

A. Yes.

Q. Do you know that you have an obligation as part of this lawsuit to retain and preserve documents that might be relevant to

this lawsuit?

A. Yes. And, you know, anything I thought I might need I -- you know, my decision to delete Instagram was simply because of a career change, you know, pausing, what do I want in life at this time, physical safety. Not related to this lawsuit. And if anything was needed for this lawsuit I tried my best to preserve anything that I would possibly need. Not even thinking of this lawsuit, but generally anything I might need.

Q. Did you preserve anything from that Instagram account before you deleted it --

A. Yes.

Q. -- for this lawsuit?

A. Yes.

Q. What?

A. Screenshots and I think like maybe some data they allowed me to download. I don't remember.

Q. Have you produced that in this case?

A. I would say I don't remember if I did.

Q. Okay. So the two reasons that you decided to delete your Instagram account were

because you were no longer pursuing the travel business and also because of physical safety. Were there any other reasons why you deleted your Instagram account?
A. I don't recall at this time. I think those are two great reasons that encompass a lot, you know, my mindset at the time. Just like generally Instagram isn't serving me at this time. I don't feel too safe, so let's just kind of put that -- let's shelve it for now, and possibly come back.
Q. Okay. But it wasn't for analytics and advertising, because that wasn't one of the reasons, right?
A. No, it wasn't.
Q. Okay. And what about the personal Instagram account, do you still have that account?
A. No. The same date, kind of shelved both of them. I axed them.
Q. I'm sorry. I didn't mean to interrupt you.
A. No problem. I axed both of them the same date.
Q. Okay. And for the same reasons?

A. Yes.
Q. What about your Facebook account, do you still have a Facebook account?
A. Yes.
Q. And so you decided not to delete your Facebook account?
A. Correct.
Q. Why is that?
A. Because I feel Facebook is different from Instagram. For example, there's an English teaching school in Prague, there are quite a few, because English speakers go all over the world and it's easier to use Facebook to connect with all students and candidates, alumni. Things like that. Facebook is fundamentally different from Instagram so I kept that. And I think it has little more privacy in it. So that's why.
Q. Why more privacy do you think Facebook has over Instagram?
A. It's harder, if you want to go on lockdown mode, I think it's harder for people to find you. Let's see.
Yeah, and Facebook is more -- you know, using Prague is an example, if I meet

another American, Nigerian, an English speaker in Prague, Facebook is more of a personal connection, let's connect on Facebook kind of thing than Instagram. Instagram is more media, photos focused. Which is why I used it for media, TV, acting.

Q. You said -- you referenced lockdown mode on Facebook. What are you referring to?

A. Just like more private. You know, I -- honestly I'm not sure how to be -- there are like different tiers and levels of security. I know I've had friends, especially female friends who told me, you know, just as a friend, like if you want to ad me on Facebook I have to add you. Because I have a stalker or something like that. So that, conversations like that kind of gave me confidence that Facebook is safer than Instagram and a lot of social media companies. So I try to make my Facebook private. But I -- yeah. So the short answer is, um, based on conversations, especially with female friends, I think Facebook can offer more privacy. And it's more of a personal connection tool, which I've had since -- for decades, longer than Instagram. That's why I kept it.

Q. Okay. And you said you made your Facebook private so only your friends can see your content, is that right?
A. I try, yes. I'm not sure how effective, but I try.
Q. I am going to show you a few documents just to confirm your Facebook and Instagram accounts. For your Facebook account you signed up in October of 2015, is that right?
A. Yes.
Q. Okay.
MS. BARRERA: So I am going to introduce Exhibit 2, which is profile information from your Facebook account.
(Odumosu Exhibit 2, Facebook profile information was marked for identification, as of this date.)
BY MS. BARRERA:
Q. Okay. This is an excerpt from a document that was produced in this case with the Bates stamp Pixel_Starzinski_000014307.
And do you see at the top it says Profile Information, and then it has your name at the top, correct?
A. Yes.

Q. And your user name. That's your Facebook profile, correct?
A. Yes.
Q. Okay. And when you signed up for Facebook you provided your birthday, November 10, 1982, right?
A. Yes.
Q. And your email address, is that your correct email address?
A. It's one of two.
Q. Okay. Do you still use that email address?
A. Yes.
Q. Okay. And you provided your gender as male, is that correct?
A. Yes, I did.
Q. And your current city, Buffalo, New York, that was at the time that you signed up for Facebook?
A. Roughly. I moved to Buffalo around that date.
Q. Okay. And then you also provided your relationship status, it looks like you may have updated that in March of 2017 --
A. Yes.

Q. -- as single, right?
A. Correct.
Q. And then you also provided some of your education history; Arizona State College, Union High School, right?
A. Yes.
Q. Okay. You can put that aside. Have you ever had more than that one Facebook account?
A. Yes.
Q. What other Facebook accounts did you have?
A. I had one way back when I lived in New Jersey, I think it was when Facebook was very new. And, um, then I don't remember if this is the second or third Facebook account. The one of those. New Jersey, Arizona, and now this one. And no more than three.
Q. Are the ones that you created in New Jersey and Arizona still active?
A. No. Only this.
Q. When did you delete the New Jersey and Arizona accounts?
A. Usually following a major change, like moving across the country or something like

that.

Q. Why did you want to start separate accounts when you had a major change?

A. Usually to connect with the local crowd in the city I moved to.

(Odumosu Exhibit 3, Instagram account was marked for identification, as of this date.)

BY MS. BARRERA:

Q. So Exhibit 3, this is also a document that was produced in this case, it's an excerpt from Pixel_Starzinski_0000017165.

Is this your Deji Odumosu Instagram account?

A. Deji. It's pronounced day, like "today" and the letter G. Deji. Yes.

Q. Deji. Apologies.

A. No problem.

Q. This is the Instagram account that you were using for your travel videos, right?

A. Travel, acting modeling, and generally those. And as you see it says like pilot, TV host, you know, geographic. So generally things like travel, entertainment, space, tourism, activist. Kind of ... yeah.

Q. So you are looking at the second page of Exhibit 3 and it lists a phone number there. Is that your phone number?
A. That's my former phone number.
Q. You don't use that number anymore, but it was accurate at the time?
A. Yes.
Q. Okay. And then again it listed your gender and your date of birth, right?
A. Yes.
Q. And in your bio, as you said, it listed that you were a model, activist and TV host among other things?
A. Correct.
Q. When did you create that account?
A. I believe this was the summer of 2020.
Q. Have you ever had a WhatsApp account?
A. Yes.
Q. Do you still have a WhatsApp account?
A. Yes.
Q. What number or user name is associated with your WhatsApp account?

A. I believe it's my European number.
Q. And what's that number?
A. I don't -- so I moved to Europe partly to build a new life and for privacy, I don't know if I should share it.
Q. There's a protective order in this case, so you don't have to worry about the information being shared broadly. But I do need to know the number?
A. Okay.
Q. Or the WhatsApp -- if you would be more comfortable sharing your WhatsApp name or handle so that we can identify the right account?
A. Okay, let me check. I just moved to Europe recently, I don't have the number memorized.
MS. BARRERA: Just let the record reflect that the witness is looking at his phone to check for his WhatsApp information.
THE WITNESS: Yeah, it's ... so plus 420. The country code is 420, Czech Republic. 737-161-831.
Q. Okay. Thank you. Did you say when

you got your WhatsApp account?
A. This one I think -- let's see. Yeah, I believe I got this recent -- current WhatsApp account within the last two years, and the -- I might have my European number and my most recent U.S. number on it. I'm not sure. Because I see both American and European chats on it.
Q. So you have two -- do you have two separate WhatsApp accounts?
A. I don't. I'm looking at it now and I only see one. And it's chats. I've had other ones from previous phone numbers. I see one right now and I see chats both with Europeans and Americans, as mentioned. So maybe when I imported my number over it just brought over the American chats.
Q. Okay. Can you put your phone away, please.
So you said previous ones. Was one of your previous accounts associated with the number in Exhibit 3 that we looked at, that you said was your old number?
A. Yes.
Q. Okay. Were there any other numbers

associated with other WhatsApp accounts?
A. Yes, I think I had older phone numbers like the ones from Minnesota, Canada and Buffalo. Maybe Arizona also. And besides that I don't know.
Q. Do you remember any of those numbers off the top of your head?
A. So there's this one, the old Los Angeles. There's the 4-612-987 -- yeah, I know a few. But I would have to look up all of them.
Q. Just tell me what numbers you do remember off the top of your head? I don't need you to look them up if you don't remember.
A. Okay. 612-987-4601.
(Reporter requests clarification.)
A. Yes. 612-987-4601.
Q. Any others that you remember?
A. Prior to that was a Canadian one, I don't remember. There was a Buffalo one. So 716-715, maybe 6727. That's my best recollection without looking it up.
Q. Okay. Have you ever had a Threads account?
A. I don't think so.
Q. So for your account settings you

said for Facebook you think that it's set to private, correct?

A. Yes.

Q. And for your two Instagram accounts, were those set to private or public?

A. The -- the professional one was public. The personal was private.

MS. BARRERA: So Exhibit 4 is going to be a printout of your Facebook profile as of May 2026. What's publicly available.

(Odumosu Exhibit 4, Facebook profile was marked for identification, as of this date.)

BY MS. BARRERA:

Q. Is this your current Facebook account?

MR. MIGOTSKY: Take a second to look through the document.

(The witness reviews document.)

A. Yeah, I have one interesting -- a few interesting things I want to say. So first you did mention May. So that was a month ago. And secondly, it seems to not have a comprehensive view of my profile, and it seems to have certain posts which I did post,

repeated. I don't know, for example, I've been to Sweden, loved the country, they stand for justice, integrity, honesty and respect. So that's why I have the Swedish women's football team. But it does have it listed like three times or so, and I think I only posted it once. It has Chinese or Asian characters. I don't know where those came from. In one of the photos there's a white square right in the middle. I don't know where it came from.

And then my activism, to point out how there's a hypocrisy in the U.S. Declaration of Independence, calling Native Americans merciless Indian savages, and saying that Caucasian savages would not be acceptable, which I did indeed post. However, it's also tripled. You know, we have a duplicate of the actual Declaration, with the words "Indian" replaced by "Caucasian" by me. However, there seems to be an emphasis on that, making it look like, you know -- yeah, it just seemed a little bit skewed from things I've posted, and cherry-picked. So that's my caution about that. So I hesitate to say yes.

So yeah, my profile had some things

tweaked, changed and amended, to my surprise.

Q. Okay. I'll represent to you that this was -- there are printing issues sometimes with printing things from the public profile. But there was nothing that was tweaked here. But we can try to get a cleaner copy at a break.

Just looking at the posts, it does -- do you see on the very last page it says that you posted that on April 11, 2017 when you updated your cover photo --

A. Right.

Q. And then the next version which you said was a duplicate, if you turn to the second-to-last page was from March 28, 2023, do you see that?

A. I do.

Q. And it says you updated your cover photo. Were those accurate posts that you made when updating your cover photo on those dates?

A. Yes, I know I have updated. What just concerns me is there's an emphasis on that, which I think needs to be emphasized as something dear to my heart. But why post -- why focus on that aspect of my profile. But could I have made those edits on those dates? I think

so. There was a Canadian supervisor who told me he liked this 2017 version, researched me, liked it, hired me probably for one of -- my boldness in speaking up against that injustice and hypocrisy.

Q. What do you mean that there's an emphasis on that? I'm not following.

A. Okay. For example, I do post things like posts having to do with faith or maybe funny, hilarious things. When my mother passed away from cancer I think I posted a photo of her. Those don't show up. But these do. Which I mean I appreciate the more people know of this hypocrisy, the better. But why focus on them, of other things I posted? Why isn't -- that seems skewed.

Q. So you're saying you've posted a lot more than what's reflected here?

A. Yes. It seems quite skewed.

Q. Just a reminder. This is what's available publicly. But you do have -- you are aware that you can select the audience for your posts, right? So there could be some posts that you selected to share only with friends and others that you selected to share publicly; are

you aware of that?
A. I am aware. It still seems skewed. And I wonder why there are some Asian characters by the -- it could have to do with, you know, the source maybe. But it does seem to misrepresent me. But maybe I can check and double-check what I'm posting and how it appears as a stranger, you know.
Q. Yeah, we will find a way to help you confirm that after a break.
Just going back to the first page. This is your picture and your profile name, correct?
A. Yes.
Q. And an accurate reflection that you have 157 friends?
A. As of May that sounds right.
Q. Okay. We can put that aside for now.
How often do you log into your Facebook account?
A. I know that Facebook has evolved from when it, you know, from its infancy, and when you had to log in each time. Now you can virtually leave it on for hours, if not days,

and stay logged in. So short answer, how often do I log in? As often as it logs me out, it requires I log back in.

Q. My question was not precise, so let me ask you a different question which is just how often do you use Facebook?

A. In a week multiple times. I wouldn't say everyday. So something like a few times a week.

Q. And what do you use it for?

A. Things like connecting, you know, the Prague kind of social community I'm building. Or maybe just, you know, average things, inspiration from friends. Things like that.

Q. Has the frequency of your use of your Facebook account changed since you got it in 2015 or have you used it about, you know, a few times a week since then?

A. Yeah, I would say roughly. It also depends, you know. If I just moved to a new place it will probably spike to connect more with people.

MS. BARRERA: Let's introduce the next exhibit which will be Exhibit 5.

(Odumosu Exhibit 5, "Your Privacy Checkup Interactions" was marked for identification, as of this date.)
BY MS. BARRERA:
Q. So Exhibit 5 is also an excerpt from a document produced in this case. Pixel_Starzinski000014307.
This is titled "Your Privacy Checkup Interactions." And do you see this says it was generated by you on February 17, 2026?
A. I see it.
Q. Do you recall doing a privacy checkup in September of 2021?
A. I don't. It's been five years.
Q. Do you remember doing a privacy checkup at any point in time?
A. Yeah, vaguely. You know, I don't remember exact dates. But every now and then I want to be sure I'm safe.
Q. So when you do those privacy checkups what are you -- what kind of changes are you making?
A. I think it's, you know, general safety. Making sure there are no stalkers. I am trying to see how I might appear to

strangers, and that I'm safe enough.

Q. How often do you post on Facebook?

A. I don't have an exact number, but in a month I would say a couple.

Q. And is that to your profile or in groups?

A. Mostly to my profile.

Q. What types of things do you post about?

A. Things that interest me. It could be activism. Like the Declaration of Independence should not call the beautiful people who gave us this land savages. That's wrong.

It could be like how I love Sweden and I started following the family soccer team, the first -- or second after Nigeria, national women's soccer team I followed. Or it could be matters of faith. Things gotten from friends I met at church or, you know, different places. Or other things that interest me about which I have discussed in this deposition, like travel, videos, space, tourism, the moon, Mars. So things like that I might occasionally post.

Q. Do you think about the audience for

each one of your posts and select who you want to be able to see each post?

A. Most of the time.

Q. What impacts your decision about who you want to share your posts with?

A. If it's something that, you know, I just use general common sense. Is this funny? Does this affect my safety. And things like that.

Q. Can you explain what you mean by that, if it affects your safety, how would that impact your decision to share with people?

A. For example, as an African-American who is tired of being pulled off I have recorded a few live videos of police interactions and broadcast on Facebook Live. So that's like a perfect example.

For those I think it depends. Sometimes I try to make it global. Sometimes family and friends only. It just depends how I feel about that particular interaction.

So what else? If it's a general -- there was a time I was going for a photo shoot in Los Angeles. The rule of thumb is go with a friend. But it was a Thursday morning so I

posted alone, because Thursday morning, last minute, no friend to go with. So I posted to my inner circle only. So things like that. Like, you know, safety. This is the address of the photographer, in case anything happens, if it's a general funny thing. So I try to use common sense and wisdom what I think would be appropriate that I want the world to know. Which is why the "merciless Indian savages," as you see, I believe the whole world knows that because I want the whole world to know. I got it from my hero Mark Charles, who is a Native American. A very courageous man. The most courageous American who ever lived, in my opinion. So I got that photo of 17 -- July 4, 1776 from him. And as you see there's a globe there, because such a thing needs to be broadcast. The world should know it's not okay to call people savages. So things like that.

Q. Do you know how your posts on Facebook and your interactions with Facebook groups and pages are used by Facebook and Meta?

A. Not fully, but from this recent revelation, in ways that are very harmful to some of the users, like sharing and broadcast --

sharing our viewing habits to third parties without our consent. So that's one.

And I'll be honest, that group I mentioned, we had a lawyer leading a small church group, Facebook was one of the media giants, and a fellow actor in that group cautioned the whole group, yeah, they are known for snooping around.

Let's see. Maybe there might have been another one or two. But I remember Facebook. Maybe, you know, general social media giants, be careful. They don't have your best interests at heart.

So yeah, I try to be careful. But one thing I do know is no one -- no matter -- it's like a sliding scale, you know. Any human, corporation, company, they might possibly steal your info or have unethical practices. So you just have to kind of pick your poison. Totally different conversation. For instance, was Starbucks, when I lived in Arizona. Many of the folks I hung out from church loved going to Starbucks. They were like 20s and 30s, you know, people like I was at the time. Which was kind of a popular place for people that age.

And the conversation just kind of yeah, how ethical are these people. And then we left it at the fact that we live in an imperfect world, no matter how perfect someone seems they might be doing something, if you dig deep, that you don't agree with.

So the short answer to your question is how, you know, I think you said something like how much am I aware of what Facebook does. I just kind of entrust myself to kind of the process, due process, God, you know, my conscience is clear. There's nothing any tech giant can do as long as I have a good conscience.

Q. Okay. I have a question about something you said. So you said from this recent revelation, like sharing and broadcast, sharing our viewing habits to third parties without our consent. Are you alleging that Facebook or Meta shared your viewing habits with third parties?

A. The very technical yes or no answer to that, I -- I would say that there is evidence that Facebook is tracking what users do. So do they share what I do with third parties? I

would just go with what I know. There's evidence Facebook tracks what I do on Facebook -- on its platform.

Q. So I just want to make sure that I am understanding your claims and what you're objecting to here.

Are you claiming -- there's one thing with ESPN sharing data about what you viewed on ESPN with Meta or Facebook. There's another thing if it's Facebook or Meta that sharing your video viewing data that ESPN shared with it with other third parties.

Which of those two things are you claiming happened here or are you claiming both of those things happened?

A. You know, the direction and things like that I'm not a hundred percent sure. But do I know if Facebook has a history of tracking? Absolutely. This goes back over a decade I've had ads. When I lived in Arizona that made me think how did they know I would like that. I didn't sweat it, I didn't bring a lawsuit. I just kind of knew that life is not perfect. People may or may not target -- serve targeted ads.

So yeah, the direction, I don't know. But Facebook and Meta, are they companies that I see as companies that never track me? No, not necessarily so.

Q. So you've understood for over a decade that Facebook is using your data to show you ads, right?

A. Mm-hmm.

Q. Do you remember -- you said in Arizona you saw some ads that made you think like how would they know that. What ads are those?

A. Yeah, I don't remember all the details, but some of them have to do with a few things mentioned in this deposition, like helicopters. I think I saw an ad to get your pilot's license or so.

Another was a church. You know, how do they know that I go to church.

Um, you know I thought that personally, but I didn't tell anyone. I just -- I thought it was just one of those facts like you can't escape targeted ads.

Q. And do you object to targeted ads?

A. I don't know. One thing I would say

is I would object to using info, peoples information without their knowledge and consent.

Q. Have you ever read Facebook's privacy policy?

A. I think I might have seen it. You know, I'm aware. But I don't know, you know, maybe I browsed or skimmed.

Q. Did it tell you that Facebook would use your data for advertising and analytics purposes?

A. I don't know.

Q. Have you seen any ad for TV shows or sport matches or anything like that?

A. I think I must have. You know, YouTube, acting, things like that. You know, it's kind of all over. People who follow me publicly would know, let alone tech giants with tools and capability, and obviously they do, so they can easily advertise TV shows, sporting events they know I would enjoy.

Q. When do you recall first seeing ads for sporting events or TV shows that you might like?

A. I'm not sure. I've moved quite a bit as you know. I've changed careers. So



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

somewhere in the course of life and moving and watching TV, being on TV myself. So something like that. Word gets around, ads get around, cookies get around. And we all get ads that target us.

Q. Can you recall any specific ads that you have seen for TV shows or sporting events?

A. I don't -- I can't -- I may need time to think. But I just let it roll off my back. Knowing that in life you can't always control everything.

MS. BARRERA: Okay. Let's take a look at some of your posts and profile updates that you've made on Facebook.

(Odumosu Exhibit 6, Facebook profile update history was marked for identification, as of this date.)

BY MS. BARRERA:

Q. Okay. So this is Exhibit 6, this is also an excerpt from a document produced in this case, Pixel_Starzinski_000014307. And this is profile update history for your Facebook account. Right?

A. Yes.

Q. And that's your picture at the top?

A. Yes, it is.
Q. So you can see --
MR. MIGOTSKY: You can take a second to just review it.
THE WITNESS: Oh, I can?
MS. BARRERA: Yes, go ahead and review the document and let me know when you're ready.
(The witness reviews document.)
THE WITNESS: Yeah. What was the question you just asked? Profile picture. Yeah. That is me. And then what else?
Q. So all of these things that are listed here are things that you added to your Facebook profile, right?
A. They do look accurate. Maybe one or two comments, similar to the one made about the profile -- the public one you generated, they do seem skewed. This might be me -- excuse me. They do seem skewed towards like organizations of faith, which, you know, I am a man of faith. So maybe -- maybe it's just a me thing.
And like the previous one, this might also -- because Jackie Chan is obviously a man of Chinese origin. I don't know why the

characters are showing so many Asian, you know, like the other one also. This might be minor. I'm just trying to make sure it's a good faith portrayal of my actual Facebook account.

But besides that everything looks like things I know I've subscribed to, added pages, people I've followed. Everything else looks accurate.

Yeah.

Q. And there are a number of actors and TV shows that you added to your profile, right?

A. Yes, I see a few like Idris Elba, a famous actor. Yeah. Let's see. There are some -- you are right. Because that mostly coincides with the time I lived in Los Angeles. Like Chris Tucker, you know, famous actor with Jackie Chan from Rush Hour. And I did live in LA at that time, 2021, when I added both of them to my profile.

Q. And some shows like The Daily Show you added to your profile, right?

A. Yes.

Q. And those were shows and actors that you liked?

A. Correct.

Q. And those weren't things that you felt were confidential otherwise you wouldn't have added them to your profile, right?

A. Yeah, I can still add things that are confidential but I try to go around, you know, limit it to the audience. But generally everything you see on this Exhibit 6, they're all things I wouldn't mind my inner circle knowing, because they know all this describes me.

Q. And you also wouldn't mind Facebook knowing, otherwise you wouldn't put it in your Facebook profile, right?

A. Probably. That -- I mean Facebook owns the entire site, so yeah. I guess I wouldn't mind Facebook knowing anything I put on Facebook. But not profiting off it, though. That I never gave my consent to.

Q. So you're saying you didn't give your consent to Facebook using the information you provided to Facebook for ads?

A. Yeah, ads against my consent. I don't recall ever giving them consent to do things without my consent.

Q. But you don't recall whether the

privacy policy that you agreed to when you signed up for Facebook got your consent to use your data for ads?

A. Yes, I don't recall. But one thing I know is that anything that could be considered snooping around, intrusive, that's just wrong and I would never -- I'll never knowingly, you know, sign up for that.

MS. BARRERA: Let's take a look at pages you liked.

(Odumosu Exhibit 7, "Pages You've Liked" was marked for identification, as of this date.)

MS. BARRERA: This is Exhibit 7, right?

THE COURT REPORTER: Yes, ma'am.

BY MS. BARRERA:

Q. Can you take a minute to take a look at this document, which again is a document that was produced in this case, it's an excerpt from Pixel_Starzinski_000014307.

(The witness reviews document.)

THE WITNESS: Yep, this looks like a faithful representation of things I like. There are some things that I don't

remember, but I would say 90 percent of them are things I do.

Q. And these are pages you've liked through your Facebook account, correct?

A. Yes.

Q. And some of the pages that you liked related to TV shows and sporting events or athletes that you liked, right?

A. The majority are not athletes and sporting events. But -- oh, yeah, I see Cristiano Ronaldo is a famous athlete from Portugal. So yeah. But, you know, you can see on the first page is the only clear athlete. So -- Svensk fotboll, Swedish football. So only a minority are athletic in nature.

MR. MIGOTSKY: Also objection; the document speaks for itself.

Q. I wasn't asking about the majority or a minority but just that some were. And some are TV shows, right? Like you have The Daily Show page that you followed on December 1, 2022? Geographic Entertainment on August 25, 2022, correct?

A. I don't see the exact pages. But yeah, I have seen The Daily Show. And I

think -- yes, I see Geographic Entertainment. The third page. Yeah, and like my counsel mentioned, it does speak for itself, what I like are mostly a few I don't remember. But I would say 90 percent of them I do.

Q. Okay. On page 3, you said you didn't see it, but do you see on page 3 The Daily Show at the top and then Geographic Entertainment at the bottom?

A. Yes.

Q. Okay. And again these were things that you didn't consider confidential, that you liked these pages, these shows, these athletes, right?

A. You know, I don't know what I considered them at the time. I just wanted to follow them because I liked them. That's all I can say.

Q. Right. But pages that you follow are public, right? Other people who follow those pages may be able to see that you also follow those pages, right?

A. I wasn't thinking of that. I wasn't aware. I just followed, because I liked them.

Q. And you didn't mind other people

knowing that you liked these pages, right?
A. I don't know. My best friends, inner circle, sure. But outsiders, I don't know. I was thinking of what I liked when I followed them.
Q. And you didn't mind Facebook knowing that you liked these pages because you liked them on Facebook?
A. Yeah, as mentioned with the previous exhibit, I liked them on Facebook because I knew that Facebook can pretty much see everything that you do on Facebook. It's their platform.
MS. BARRERA: Okay. I'm just going to show you one more document and then we'll take a break for lunch.
(Odumosu Exhibit 8, "Oladeji Odumosu shared a link" was marked for identification, as of this date.)
BY MS. BARRERA:
Q. Okay. Exhibit 8 is another excerpt from Pixel_Starzinski_000014307. And this is a link that you shared on your Facebook account, correct?
A. Is that possible? Yeah. But it's been five years. I don't remember.

Q. Do you see at the top it has your name and it says that you have shared a link?
A. I do.
Q. Okay. And do you have any reason to believe that you didn't actually share that link from ESPN?
A. Yeah, I -- because I know I watched an ESPN match in 2022, but this one I don't -- Naomi Osaka is kind of a known name, I believe she's mixed, Japanese and black. So that might have ... but do I know any other person? It does not sound familiar. I don't recall, July 2021, sharing this.
Q. And you don't recall watching that?
A. I honestly don't. There's another tennis match I know I watched. Not this one. I don't remember.
Q. Did anyone else ever post on your behalf on Facebook?
A. No.
MR. MIGOTSKY: Shall we break for lunch? If you have any more questioning ...
MS. BARRERA: Yeah, let's go ahead and break for lunch.

THE VIDEOGRAPHER: This will end media unit 2. Going off the record at 12:02.

(Lunch recess taken at 12:02 p.m.)

A F T E R N O O N S E S S I O N

(12:39 p.m.)

THE VIDEOGRAPHER: We are back on the record at 12:39. This will begin media unit 3.

\- - -

OLADEJI ODUMOSU,

resumed as a witness, having been previously sworn by a Notary Public, was examined and testified further as follows:

MS. BARRERA: I am going to introduce the next exhibit, Exhibit 9.

Q. I would like you to confirm whether this is your -- the website you used to have.

(Odumosu Exhibit 9, website was marked for identification, as of this date.)

(The witness reviews document.)

A. So like the previous exhibits, I would give the same answer. Yes, but things are missing. It could just be printing error. But right above, on page 2 above "Theatrical Reel" it should have like a still image from a video.

Which it doesn't. And on the LA page, there's something covering my face. But those are probably minor. The commercial reel is also blank. They're probably just minor things. The short answer is yes. But with some glitches.

Q. Okay. Thank you. Yes. Sometimes printing from websites is definitely glitchy.

MS. BARRERA: Now I am going to introduce Exhibit 10.

(Odumosu Exhibit 10, Facebook post was marked for identification, as of this date.)

BY MS. BARRERA:

Q. So Exhibit 10 is an excerpt from a document produced in this case, Pixel_Starzinski_000014307. And this is an updated status from your Facebook account, correct?

A. Yes.

Q. Can you read what the post says?

A. Yeah. The -- do I have to read every word? Because you can see it.

Q. Yes, please.

A. Okay. "I just spent an hour watching YouTube videos of the cosmos. Oh, my

God! Great and magnificent are you. Who can stand before you? From the tiniest bug to the farthest reaches of the universe, your name is majestic. I highly suggest every Christian spend time watching online videos of an astronomical nature and invest in a high quality telescope."

Q. This was a post you made on Facebook on July 23, 2020, right?

A. I think around that time, yes.

Q. Did you post this publicly or just to your friends?

A. Probably just to my friends. I don't remember.

Q. And you were comfortable sharing with your friends and with Facebook that you were watching YouTube videos of the cosmos, right?

A. Yes. And I just want to add from the tone you can tell it's supposed to be for my Christian friends, kind of, you know, nothing commercial, exploitative. Just to inspire them.

Q. Did you ever tailor posts, or the audience of posts to just your Christian friends?



Veritext Legal Solutions
866-299-5127 calendar-ca@veritext.com www.veritext.com

A. I try to sometimes. I can -- for some posts you can pick, as you might know, Facebook let's you tailor and pick individual, you know, audience members. So I don't remember who it was for this one. But possibly. I don't know.

Q. Okay.

MS. BARRERA: I am going to introduce the next exhibit, which is Exhibit 11.

(Odumosu Exhibit 11, Facebook post was marked for identification, as of this date.)

BY MS. BARRERA:

Q. Exhibit 11 also an excerpt from a document produced in this case, Pixel_Starzinski_000014307. And this is another -- this is a link that you shared on your Facebook account, right?

A. Yeah, I remember seeing funny videos like that around that time. Yeah.

Q. Can you read the post?

A. Laugh out loud, "LOL," this is exactly how French people sound to me. Made me curious how we sound to foreigners. So I

Googled it. That was intriguing, too. Updated July 6, 2021 11:30:28 p.m.

Q. And the link above the post is from a YouTube video, right?

A. Yes.

Q. So you were sharing a YouTube video on Facebook, right?

A. Correct.

Q. Do you remember what the YouTube video was about?

A. I think it might have been key appeal to American comedians. Sound in French, in a very dramatized and funny way.

Q. And did you post this video publicly or with your friends only?

A. I don't remember. Maybe friends only.

Q. And again you were comfortable sharing that you watched this YouTube video with your friends and with Facebook, right?

A. Yeah, I meant it to be more of an inner circle, my make friends laugh kind of thing.

(Odumosu Exhibit 12, Facebook post was marked for identification, as of this

date.)

MS. BARRERA: Okay, I am going to introduce the next exhibit which is Exhibit 12.

BY MS. BARRERA:

Q. Exhibit 12 is another excerpt from the same document produced in this case, Pixel_Starzinski_000014307. And this is another link that you shared on your Facebook account, right?

A. It looks like it. I -- I think I did.

Q. Can you read this post?

A. The only thing I'd change about his message is add that today's Israel is a political one. God is more concerned about the spiritual Israel. Updated November 30, 2023. At that time, 5:52 p.m.

Q. And this was another -- above your post you had another link from YouTube, right?

A. Yes.

Q. And that was a video that you watched and shared on Facebook?

A. Correct.

Q. And did you share this video with

your friends or publicly?
A. I don't remember.
Q. And again you were comfortable sharing that you watched this YouTube video with your friends and with Facebook, right?
A. Friends first, before Facebook.
Q. But you posted it on Facebook, so you were comfortable with Facebook knowing that you watched this video?
A. I don't know. But friends, I can say yes to that.
Q. Well, you wouldn't post things on Facebook that you didn't want Facebook to know, right?
A. Comfortable in the sense that it was their platform, so they would know. But nothing more than that. Not sharing or capitalizing, profiting. None of that. Just, yeah, the bare minimum.
MS. BARRERA: Okay. Let's introduce the next exhibit, which will be Exhibit 13.
(Odumosu Exhibit 13, Facebook post was marked for identification, as of this date.)
BY MS. BARRERA:

Q. Okay. The Bates stamp is a little funky on this one, but in the middle it says this is an excerpt from Pixel_Starzinski_000014307. It's an excerpt from the same document produced in this case. This is another link that you shared on Facebook, right?

A. I don't remember. I'm looking at the link: Former-president-barack-obama-join-nba-africa strategic-partner minority-owner-sources-say. I don't remember. This was five years ago. I don't remember.

Q. Do you recall this article?

A. Not really honestly.

MS. BARRERA: I can introduce the article as Exhibit 14.

(Odumosu Exhibit 14, article was marked for identification, as of this date.)

BY MS. BARRERA:

Q. Does seeing this article refresh your recollection about posting this link on Facebook?

A. I'm looking through it. So far it

does not.

Q. Do you remember reading this article?

A. No. I'm trying ... what I can say with clarity and confidence is that as a Nigeria American I'm, of course, interested in partnerships and collaborations between both places. So have I seen things for Nigerians, Africans, African-Americans, the former president investing in Africa? Yes. This one particularly, I don't know.

Q. And you said nobody else has ever posted on your Facebook account other than you?

MR. MIGOTSKY: Asked and answered.

A. What my counsel said.

Q. You still have to answer my question.

A. I believe I already answered that negatively.

MS. BARRERA: Okay. Let's take a look at Exhibit 15.

(Odumosu Exhibit 15, "Connected Apps and Websites" was marked for identification, as of this date.)

BY MS. BARRERA:

Q. Exhibit 15 is also an excerpt from Pixel_Starzinski_000014307, which was produced in this case. And do you see at the top it shows that these are connected apps and websites that you connected to your Facebook account?

A. It does say that. However, do I agree with all of them? Do I remember all of them? I don't know.

Q. I'm just going to direct you to a few specific apps here. Do you see on the first page it says you connected IMB -- sorry. IBM Video Streaming on January 1, 2017?

A. Yes, I see it.

Q. Do you remember connecting IBM Video Streaming to your Facebook account?

A. I don't.

Q. Do you remember why you may have done that?

A. One thing that comes to mind is something mentioned earlier, I'm a black male, who is being followed or pulled over by law enforcement unfairly. So I remember 2017 especially. 2016 was the last time that happened. So in early 2017 I had a personal goal to expose and document unfair detentions

and harassment by law enforcement. Do I remember IBM particularly? I don't know. But I know I was researching video streaming in order to catch and document and expose predatory police officers to show it's not acceptable. So could I have used IBM streaming? I don't know. Facebook I've mentioned I've used. Facebook Live streaming.

Q. What is IBM video streaming?

A. I don't even remember. It might be something like Facebook Live. To broadcast things like that live. Yeah. It's been over nine years, like nine and a half years now. I don't recall. But there's a possibility I was researching tools used to catch police officers who were potentially racist.

Q. Okay. Let's look at the third page. And at the top of the third page it shows that you connected Fox Community to your Facebook account on June 22, 2017; do you see that?

A. Yes.

Q. Was Fox Community related to the news Fox?

A. I don't know. I'm not sure what that is.

Q. You don't remember connecting Fox Community to your Facebook account?
A. No.
Q. Do you have that app on your phone, Fox Community?
A. No. Not now I don't. I don't know what it is.
Q. Let's look at the next page, on the bottom it shows that you connected Spotify to your Facebook account on January 12, 2021; do you see that?
A. Yes.
Q. Do you remember connecting Spotify to your Facebook account?
A. I think so. I don't know the date, but I know there's a connection between both accounts.
Q. And why did you connect your Spotify account to your Facebook account?
A. I believe it just made it easier to log in. Yeah, there was no other reason. I didn't want to share anything. I think -- yeah, there's like a single sign on or something, that just helps me sign in easy, more easily.
Q. When you sign in through Facebook,

does Spotify share information with Facebook?
A. I don't know.
Q. Did you look into that?
MR. MIGOTSKY: Objection; calls for speculation -- the original question called for speculation.
A. Yeah, the same. I don't know. Speculation.
Q. Was it something that mattered to you when you decided to connect your Spotify account to your Facebook account?
A. Again, it's speculatory. And I only did it for ease, as mentioned. I ... yeah, as I've mentioned in this deposition I try to use good faith, good intentions that although companies might do things I don't agree with, I want to give them the benefit of the doubt. So I just did it in hopes that it will just be for a single sign on.
Q. So the convenience of having that single sign on was more important to you than whether or not Spotify was going to share data with Facebook, is that accurate?
MR. MIGOTSKY: Objection.
A. I don't know.

MR. MIGOTSKY: Misstates the testimony.

A. Yeah, I don't know.

Q. You didn't make that calculus at the time?

A. I wasn't -- yeah. I don't know.

Q. On the next page it says Vimeo - Video Maker; do you see that?

A. Yes.

Q. It says you connected Vimeo - Video Maker on your Facebook on January 27, 2022, right?

A. It does say that. That's possible. I was using Vimeo at the time.

Q. What were you using it for?

A. Things related to my video hosting, travel, TV show, acting and those kinds of pursuits.

Q. And why did you connect Vimeo - Video Maker to your Facebook account?

A. I think it's probably similar to Spotify. At the time I wanted to garner support for my actor -- you know, acting reels. And I think doing that might have helped streamline the process and have my Facebook friends "like"

my videos more, maybe. But privacy was not -- again, I just gave these companies the benefit of the doubt. I didn't think anything like this might happen.

Q. So you didn't look into whether Vimeo - Video Maker was sharing data with Facebook, right?

A. No, I hoped for the best and thought I was going to be safe. Which most of the time I am. So my concern was just connecting the two to promote my acting and TV modeling ambitions.

Q. What about Streamlabs, which is at the bottom of that page? It says you connected Streamlabs to your Facebook account on August 12, 2025. Is that right?

A. It might be. I think Streamlabs is another T -- like live TV, live video streaming app. Did I connect it to Facebook? Maybe. I think -- I think I used the app for video streaming. I don't remember connecting to Facebook.

Q. That's a lot more recent, August 2025. Do you still use Streamlabs?

A. No.

Q. Why not?

A. I moved to Prague, where the chance of being followed by a police officer for my skin color is virtually zero.

Q. So you were using Streamlabs for that same purpose?

A. That was the intention. I ended up not using it. Instead of Facebook Live, I wanted to diversify and have several apps. So probably sometime, I don't remember the exact date, there was Streamlabs and another one I don't remember. And after moving to Prague this spring I don't use such things anymore. That's one beauty about Europe. People of different colors can live without fear of police harassment as compared to North America.

Q. Okay. You can put that aside. We talked a bit earlier about ads that you have seen and you couldn't remember any specific ads for sporting events, but I want to come back to that.

Are there any ads that you have seen that you think were shown to you based on data that ESPN shared with Meta?

MR. MIGOTSKY: Objection; calls for speculation.

A. Yeah, I don't know honestly. I don't know.

Q. So sitting here today there aren't any ads that you can remember that you saw that you were like uh, I think I saw that because I just watched that video on ESPN?

A. I don't know.

MR. MIGOTSKY: Objection.

Q. You can't remember today any example of that?

A. I don't know.

Q. Well, this is a yes or no question. I am asking you right now do you remember any ads that you have seen that you thought were shown to you because of ESPN sharing information with Meta?

MR. MIGOTSKY: The same objection. Calls for speculation.

A. I don't remember.

Q. Okay. And how about Hulu? Are there any ads that you have seen that you think were shown to you because of things you viewed on Hulu?

A. I also don't remember.

Q. Do you believe that ESPN is sharing

your data with Meta currently?
A. I don't know.
Q. Do you believe that Hulu is sharing your data with Meta currently?
A. I'm also not sure of that.
Q. Okay. Are you familiar with Facebook's ad preferences?
A. Not really.
Q. Are you familiar with some aspect of them? You said "not really."
A. Yeah, I don't know if these might have anything to do with, you know, the whole ads in general or the one I might have used, you know, as a TV actor kind of guy. Yeah, I'm just not sure how that whole world works.
Q. Have you ever used the hide ad tool to hide an ad that you didn't want to see?
A. On YouTube, yes. Facebook, I'm not sure.
Q. Have you ever reported an ad on Facebook?
A. I think I might have. I know Instagram I did. But Facebook I don't know.
Q. What ads did you report on Instagram?

A. Probably ads that were too exploitative. I know people posting on my photos and videos, yes. A hundred percent I've done that. Ads on Instagram? Possibly. I don't remember for sure. But maybe things that were too explicit or something.
Q. Can you remember any specific examples of ads that you reported on Instagram?
A. I don't remember.
Q. Have you ever used the hide advertiser tool to hide ads from one specific advertiser?
A. I don't know.
Q. Have you ever tried to limit ads based on certain topics?
A. That I think is possible.
Q. What topics did you limit ads to?
A. For example, if there is, you know, I've mentioned I'm a man of faith, if there's a group I consider a cult that advertises, and I for some reason see that ad a lot, I tend to block it.
Q. And have you done that on Facebook or Instagram?
A. Social media in general. I don't

remember which.
Q. Are you familiar with Facebook's Off-Facebook activity settings or Off-Meta Technology settings?
A. No.
Q. Sometimes they're referred to as OFA or OMT. Have you heard of those terms before?
A. No.
Q. Have you ever visited the audience based advertising page on Facebook or Instagram?
A. No.
Q. Are you familiar with the term -- strike that.
MS. BARRERA: Let's take a look at Exhibit 16.
(Odumosu Exhibit 16, Facebook post was marked for identification, as of this date.)
BY MS. BARRERA:
Q. Okay. Exhibit 16 is another excerpt from Pixel_Starzinski_000014307. This is a comment that you made on "Volkswagen's photo," right?
A. It looks like it. This is one of those that seem vague. It looks like something

that I could make. But I don't remember, because of time.

Q. And is this post -- can you read the post, actually, please?

A. Yeah. Hiatt Films. Bravo VW! I'm all for progress and safety (and fully support ads that feature cute kids playing my favorite sport.) Also, check out another Hiatt Films link, Jetta. The same one. Jetta.

Q. And this post is from October 19, 2021, right?

A. Yes.

Q. What is Hiatt Films?

A. I don't know. But I think it's something related to the whole film industry I was pursuing when I lived in LA on that date.

Q. Okay. And you don't remember why you posted this?

A. I don't. As mentioned, it could be me. It could not be. It looks like it might be. Film -- it sounds a bit familiar. I just don't remember precisely, yeah.

Q. Okay. You can put that aside. Do you ever use Facebook Marketplace?

A. Yes.

Q. What do you use it for?
A. Selling. My most recent use was very, you know, relevant to my move to Prague. I sold my car from the Marketplace.
Q. How long have you been using the Facebook Marketplace?
A. I don't remember, but a few years. You know, I'm not sure. But I definitely have, you know, used it before.
Q. What other things have you sold besides your car?
A. I think I might have sold a few things I was getting rid of, moving across the Atlantic. I helped a former roommate sell a TV. You know, if I look I'll remember more. So kind of like Craig's List. Random stuff. Buying and selling. But the car was the most, you know, important one lately.
Q. Did you ever sell any DVDs back when we still used DVDs?
A. I don't remember. Um, you know, I might have used eBay more. I don't remember.
Q. Okay. I want to turn now to the different video streaming services that you use. What video streaming services do you currently

use?

A. I honestly don't remember. So Netflix of course is a big one which I used in years past. Do I subscribe to any right at this moment? I don't think so. But I don't remember.

Q. You don't subscribe to Netflix right now?

A. Right now, no. I'm not a paying subscriber. I just have one of the old skeleton accounts.

Q. Okay. From 2015 to the present, can you list for me all of the video streaming services that you have used?

A. I can try. I've used some like Netflix, as mentioned. Amazon Prime. Of course ESPN. Hulu. And maybe Sling TV. And I don't remember anything else.

Q. Is there a difference between ESPN and ESPN+?

A. I don't know all the details but I think it's like most of these streaming services, they have the plus as like an extra, or something. But I don't know.

Q. Did you use ESPN or ESPN+ or both?

A. I am not sure. I know I had an ESPN app on my phone and I was streaming. I don't know the difference.
Q. So let's go through each one, and I want to talk about a few different things.
For Netflix when did you -- strike that.
When did you subscribe to Netflix, if ever?
A. So if you're only talking about streaming, right?
Q. Mm-hmm.
A. Not the old DVD way?
Q. Right.
A. Yeah, the first time ever was like some years ago, maybe, I don't know, at the time I lived in like Buffalo, Canada, and Minnesota. So that was like 2019-ish. 20 -- something like that. When did I -- so I've had my own subscription to Netflix, which -- yeah. I don't remember the last time I paid Netflix. But something like when I started being an actor around 2018. Something like that.
Q. So you think -- you said you think you started using it around 2019. Do you think

you started using it earlier?
A. Yeah. I remember actually 2016, when I lived in Buffalo I was watching, you know, a show a lot of people used to like, it's still popular, The Walking Dead. So 2016 for sure. I was watching The Walking Dead in Buffalo, late 2016. After that I'm not sure. Kind of hazy. You know, I started acting. Maybe I kept it. I might have kept it to see some of the shows I was on myself as an actor and then unsubscribed sometime. I don't know. Maybe it's cost or something. But somewhere in the 2016 to early 2020s, it's fuzzy. Something like that.
Q. Do you know if Netflix shares video viewing information with Meta or other third parties?
A. I don't.
Q. Did you read Netflix's privacy policy?
A. Probably like most of them, I probably skimmed or something.
Q. Okay. For Amazon Prime, did you have a subscription to Amazon Prime previously?
A. Yes. I've seen -- I've had -- yes,

I remember seeing myself on a few of the Amazon shows I've been on.
Q. What years were you a subscriber of Amazon Prime?
A. So as far as the video I've subscribed to like 2019 for sure. And then I've used Prime in general for their faster two-day delivery as recently as this year. But as far as for video streaming purposes, it's been years I last watched anything on Prime Video.
Q. Have you ever watched anything on Amazon Prime Video when you weren't a subscriber?
A. I don't recall.
Q. Did you ever watch anything on Netflix when you weren't a subscriber?
A. I don't remember either.
Q. Do you share your Netflix log-in with any friends or family when you had it?
A. No.
Q. How about Amazon Prime with any friends or family?
A. No.
Q. Okay. Have you ever watched videos on someone else's Amazon Prime account?

A. I don't think I did.

Q. Did you ever watch videos on someone else's Netflix account?

A. I think when I had a roommate in Canada we wanted to watch another hit show, Stranger Things, together. And maybe once. But it wasn't like, you know, a stolen password, login, whenever you want. You know, it wasn't like that. I think, yeah, just with a roommate.

Q. Are you familiar with a feature on Netflix where you can add different accounts within one subscription so you could add your child or something else there?

A. I know many platforms allow it. I don't know if Netflix did. But I've heard of things like that. Not only -- not limited to video streaming, but also -- streaming but also like family plans. Things like that, yes.

Q. Have you ever added any other people to your Netflix account?

A. No.

Q. Okay. All right. So for ESPN when did you first subscribe to ESPN or ESPN+? I am going to refer to it as ESPN generally because you don't know any distinction between the two,

right?
A. Yeah, I don't.
Q. Okay. So when did you first subscribe to ESPN?
A. It might have been maybe when I lived in Canada, the 2018 World Cup was on then, and I think I might have been watching it through ESPN.
I remember, one thing I can say for certainly is the late last decade or early this decade I used ESPN. Canada, Minnesota, California. I don't know exact dates. So that would be like 2018 to 2022-ish. 2018 to 2023, that window I used ESPN for sure.
Q. Were you a subscriber during that whole time, from 2018 to 2023?
A. Probably not the whole time. Maybe on and off.
Q. When exactly were you a subscriber and when were you not?
A. I don't recall. The World Cup I mentioned, I think I used ESPN for both the previous World Cups, World Cups 2018 and '22. And then when did I, you know, go off, come back? I don't know.

Q. Did you ever watch anything on ESPN when you were not a subscriber?

A. Yes. A tennis match.

Q. When did you watch a tennis match when you were not a subscriber?

A. January 22, which was only weeks after the 22 FIFA football World Cup. Oh, wait. Was it before? No, in January -- yeah. So in January the World Cup was later that year. So maybe you can say I subscribed the whole of 2022. I don't remember. But as mentioned, between 2018 to '23 I was an on and off user of ESPN. If I checked like my bank statements I would be able to show -- or my ESPN statements, I might be able to pinpoint exactly. But I know 2022-ish, that period, I was using it.

Q. But you said you watched the tennis match when you were not a subscriber?

A. Um, yes, I did say that. But I honestly don't remember. When I was a paid subscriber I don't remember. I might have been one January 2022, because I don't know how you can watch a tennis match if you don't pay. So maybe I was a paid subscriber. But in 2022 for sure I know the tennis match in January and the

football or soccer World Cup in December, ESPN.

Q. What tennis match did you watch?

A. Nadal versus Medvedev.

Q. Was that a big significant tennis match? How do you remember that?

A. Yeah, because you know, both names, especially Nadal was a pretty well-known tennis star.

Q. Are there any other instances when you watched anything on ESPN when you were not a subscriber?

A. Again, I don't know if it's possible. You might have to subscribe to watch.

MS. BARRERA: Okay. I am going to introduce another exhibit. Exhibit 17.

(Odumosu Exhibit 17, Amended Responses and Objections to Defendant Meta Platform, Inc.'s First Set of Interrogatories was marked for identification, as of this date.)

BY MS. BARRERA:

Q. Exhibit 17 are your Amended Responses and Objections to Defendant Meta Platform, Inc.'s First Set of Interrogatories. Right?

A. Yes.
Q. And you reviewed these and confirmed the accuracy of everything in them, right?
A. Yes.
Q. Let's take a look at the very last page. It has your signature dated May 20, 2026 where it says that you declare under penalty of perjury that the foregoing responses are true and correct, right?
A. Yes.
Q. Okay. So let's take a look at your response to rog number 1. This interrogatory asks you --
MR. MIGOTSKY: I'm sorry. Can I have just a second?
MS. BARRERA: Yes.
MR. MIGOTSKY: It's page 4.
THE WITNESS: Yes.
Q. Are you ready?
A. Yes, I am.
MS. BARRERA: Counsel, are you ready?
MR. MIGOTSKY: Yes.
Q. This rog response asked you about certain streaming services that you used and the

time frame in which you used them. If you look at your response to interrogatory 2, at the top of page 5, it says plaintiff subscribes to ESPN+ and created an account in June of 2018. That's what you told me just now, right? It was around 2018 when you first subscribed to ESPN?
A. Yes. So that's congruent with my statement about the FIFA soccer World Cup.
Q. But then the last sentence says, "this ESPN+ account was disabled in September of 2018."
Do you see that?
A. I do.
Q. But you just told me that you also watched videos in 2022 on ESPN, right?
A. Yes.
Q. But that's not listed here?
A. Yes. It might be possibly elsewhere. But again -- let's see. First accessed, last used it.
Q. Let's take a look at your response to interrogatory 2 which is right underneath that. And you said in the last sentence of rog 2, "to the best of his recollection, he first accessed ESPN+ in June of 2018 and last used it

in September of 2018."

So that's not accurate, is it?

A. I think it could possibly be accurate, and I reconcile it with the fact that I watched the tennis match and the 2022 World Cup possibly with ESPN but not plus. Or it's possible to watch it without subscribing. Because I know in 2018 I was a paid subscriber. And if you see that mostly it kind of aligns with the soccer World Cup. So maybe I paid, went off, came back on as an unpaid. Or something. Or ... but I have used ESPN after September 2018.

Q. So you can't explain, though, because you said earlier you don't know if there's a difference between ESPN and ESPN+, and you also said you don't know if you can watch things without being a subscriber, right?

A. I did say that. But I accessed it, I mean there's proof I used it. I remember watching the match. There's actual concrete proof I used it. And I can find out for sure whether I used it for the 2022 World Cup, which I might have. Or something -- another similar. But, um, but I have used ESPN after 2018.

Q. So why didn't you say that in this interrogatory response?
A. I must have just had the Canadian version in mind. I wonder if it's somewhere else in this document.
Q. Please feel free to look through it.
A. Because throughout that 2018 I lived in Canada, like 90 percent of that year. Almost 99 or so.
Q. So I can direct you to another response, which is your response to interrogatory 10, which is an interrogatory where we were asking you where you were when you watched these different streaming services, and you said, while you said that you watched Hulu in California you said that you watched ESPN only in Canada and in Minnesota. You never said that you watched ESPN in California.
A. Okay. Here's one thing I know. I think some of these are like the clause, "including but not limited to." I can have proof that I watched Hulu in Minnesota. It just doesn't say it. Does that mean I didn't? No. I just saw it in two states.
So I saw ESPN in Canada and

Minnesota. Does that exclude California? No. It does not say it anywhere.

Q. Well, can I direct you to the question, which is interrogatory 10. And it says identify all geographic locations where you were located when you accessed each subject website.

So are you telling me now that this is not a complete list of everywhere where you watched ESPN?

A. Yeah, um, I don't know for a fact, but, um, I know I have seen ESPN outside those jurisdictions. And there's a statement in the same interrogatory that does say I further object, you know, I have not completed my investigation, discovery is ongoing. I was still kind of -- yeah, it's not limited to it.

Q. Well, it is, because the question requires you to list all geographic locations. And you verified this under oath with your signature in May of 2026. So what has changed in the last month that you now have new information that wasn't disclosed in your verified interrogatories?

MR. MIGOTSKY: Objection;

argumentative.

A. Yeah, I don't know. I know I watched ESPN outside those places. California for a fact.

Q. And you just suddenly remembered that in the last month?

A. So it says identify all, and I tried to identify all to the best of my knowledge. But I must have -- my investigation and discovery was not complete, so I might have recalled I used ESPN. Whether plus or not, I don't know. But outside those jurisdictions, in California, in 2022.

Q. So what refreshed your recollection? So today you're so sure that you watched ESPN in California in 2022, but one month ago you didn't remember that. And you verified under oath that this was the complete list to the best of your knowledge at that time, which was one month ago.

A. Yeah --

MR. MIGOTSKY: Objection; argumentative.

A. Yes. And I think I found more evidence that I watched ESPN, I don't know which of the two, outside those geographic locations.

Q. What evidence did you find?
A. I'm not a hundred percent sure on everything, but part of the whole discovery data. Subscriptions, Facebook data. I believe Facebook itself shows I was watching ESPN in California in 2022.
Q. So you reviewed Facebook's data since you verified this interrogatory and then suddenly remembered that you did actually watch ESPN in 2022?
A. That's possible.
MR. MIGOTSKY: Misstates earlier testimony.
Q. Any other documents that refreshed your recollection in the last month?
A. I can't think of any. But it is quite possible that you can find something you didn't think of that shows concrete irrefutable evidence that something occurred which was not placed on a document.
Q. Okay. Other than 2022 when you watched the tennis match and 2018 when you watched the World Cup, did you ever watch anything else on ESPN or ESPN+?
A. It's possible. Maybe, um, 2022,

'23. But by 2024 I think I no longer had ESPN.
Q. What else do you think you watched in 2022 or 2023?
A. Possibly the 2022 World Cup, as mentioned. And I don't know some -- I actually do have to use the restroom.
MR. MIGOTSKY: Shall we take a break?
MS. BARRERA: I would like him to finish answering this question. But then I'm happy to take a break.
THE WITNESS: Okay.
MR. MIGOTSKY: Can you repeat the question?
BY MS. BARRERA:
Q. What else do you think you watched in 2022 or 2023?
A. I watched possibly the World Cup. The one held in Qatar. So after my 2018 -- the 2018 one. I mentioned obviously the tennis match in 2022 or '23. Oh, the women's World Cup. I mentioned I started following, besides Nigeria, Sweden women's teams which was held in the summer. So that might have been something I subscribed to with ESPN+ or not.

Q. Summer of what year?
A. Of 2023. So I can find evidence. But that's likely.
Q. Did you watch any other tennis matches other than the January 2022 one?
A. I'm not sure. I would have to dig.
MS. BARRERA: Okay. We could take a break.
THE WITNESS: All right.
THE VIDEOGRAPHER: This will end media unit 3. Going off the record at 1:27.

(Recess.)

THE VIDEOGRAPHER: We're back on the record at 1:46. This will begin media unit 4.

BY MS. BARRERA:
Q. Can you pull up Exhibit 4 that was your public Facebook profile we were talking about earlier.
A. Yes.
Q. I am going to give you a computer which has your Facebook profile pulled up, and I would like you to scroll through it and confirm that the printed document reflects your public

profile. There weren't things that we omitted when printing it.

A. Yeah, I already see something omitted, the first -- the first post from November 2024 that talks about looking for a photographer in the Santa Clarita, Northern LA area. So I think that's part of what I said earlier, that it's selective. Maybe that's why all the spaces, there's a lot of white space on the printout, the glitches you mentioned. But yeah, besides those glitches it might be -- okay. Yeah, it might be mostly accurate.

Q. It reflects the Chinese characters that you were commenting on, right?

A. Let's see. Yeah, I see them here.

Q. And it has the duplicate pictures of the Declaration of Independence?

A. It does.

Q. Other than the blank space that that one post didn't appear, are there any other differences?

A. Let's see. Yeah, maybe just the -- the photos. The photos of the women's soccer teams are slightly different. But for the most part, you know, besides the glitches I think

it's the same.

Q. You had commented that you were surprised that you had posted a lot of other things like about your mom that weren't appearing here, but you can see that your publicly available profile doesn't include those additional posts, right?

A. Yeah, you know, maybe it's public profile -- I chose to post. But I mean I'm still surprised. But, um, let's see. Yeah, I'm still a little surprised, if I'm honest. My cover shows I made this April 2017. My mom died in September 2019. And I'm surprised -- maybe I deleted. I don't know. But, um, as mentioned, yeah, this is all I see (indicating), and it looks like -- yeah, it just -- again it could be a glitch. It could be stuff I myself deleted. I don't know. But, um, so far it looks like my actual profile except for those minor things.

Q. Okay. We can take the computer. Thank you. We were talking before about watching a tennis match in January of 2022. Were you in -- and you had said previously that you were in Arizona sometime in January. Did you watch that tennis match in Arizona or in

California?

A. California.

Q. And how do you remember that?

A. Because I'm sure it was late January, but I left Arizona early January. After the break.

Q. Have you ever watched ESPN in other places besides Minnesota, Canada and California?

A. It's possible I watched it in Arizona. Oh, you know what? Speaking of that, there was an England match, this might be another piece of evidence -- yeah, there was an England -- remember I started following the women's soccer in general. After the Olympics 2021 there was an England match where the English women played a smaller team and beat them 20-zero, around Christmas 2021.

I remember my cousins from London visited me in Arizona. And I told them look, you guys are crushing them. That could be on ESPN and that gives me more proof that I had ESPN around that window of '21/'22, with not only technological proof, but a human corroborator.

Q. Did you look for your subscriber

records and produce them in this case?
A. I just thought of it right this second so I could look and find more evidence that I did have ESPN indeed at that time.
Q. Right. But this is a different question. Did you look for your ESPN subscriber records and produce them in this case?
A. I believe I did. Um, but somehow I didn't -- yeah, I believe I did look partially. But I'm going to look even more, for more evidence that, you know, conclusive evidence I had ESPN at that time.
Q. So you do have access to records of when you were a subscriber and when you were not over time for ESPN?
A. Mostly. Could some have somehow evaporated? Possibly. As you know, I use multiple email addresses. There are two I believe I mentioned today. I had another for my acting ambitions, which I don't use anymore. But can I dig up more? Possibly. Can I dig up all of them? I don't know.
Q. What were the email addresses that you used with ESPN?
A. The one associated with my Facebook.

So basically I believe you have both of them. There's one that's my first name, last name @gmail.com. And there's another email address that's my first name, middle initial, last name, @gmail.com. And both of them have been used to subscribe to all kinds of things, like Facebook, Hulu, ESPN. And so I have generally used at least four different email addresses. I might find more. Now I'm -- yeah, there might be more evidence, irrefutable evidence I used ESPN in January 2022.

Q. When you watched ESPN where did you watch? Were you watching on a TV? On your phone? On a laptop?

A. I think it was mostly on my phone but I did what a lot of people would do, if it's an important match, broadcast it, you know, screen share it with a larger device. Especially to share with others.

Q. And would you watch it through the ESPN app or you would go to the browser on your phone?

A. Maybe both I think.

Q. And what phone were you using at the time that you were watching videos on ESPN?

A. I would mostly use Samsung phones, so Android.

Q. I assume you don't remember off the top of your head the different makes and models of the phones you used?

A. Kind of. I've used Samsung S9. I have that in my hotel now. I've used a Samsung S20FE, I think. Those are mostly Samsung Android phones I've had for many years.

Q. And do you remember when you first downloaded the ESPN app?

A. The first time ever was probably like maybe the 2018 World Cup or shortly before.

Q. And do you know if you uninstalled the app in 2019 when you initially stopped subscribing to ESPN?

A. That's possible. And maybe came back.

Q. Do you have a record of that on your phone, when you downloaded an app and when you uninstalled it?

A. I might, if I look it up.

Q. When you said sometimes you would watch through the app and sometimes through a browser on your phone, what browser would you

use?

A. The two main ones I use are Google Chrome, and the second one might be one I use a lot, especially on mobile devices. Because as mentioned, I'm a man of faith so I don't want to open myself up to temptation to watch crazy things that I will regret that might hurt my future marriage. So there's one called Purity Browser that's very strict and only allows things like sports and family friendly material.

Q. Did you use any other browsers besides Chrome and Purity Browser to watch ESPN?

A. It's possible. But those are like 95 percent of the browsers I've used on my phone.

Q. Have you ever watched ESPN on a laptop or a computer?

A. Yes.

Q. What laptop or computer?

A. Mac and windows.

Q. And what time frame did you use each of those to watch ESPN?

A. Just, you know, the general times I've been a subscriber. I mentioned, you know, late last decade to early this decade. Any time

of the day between 2016-ish, maybe 2018-ish to 2023-ish on and off.

Q. So you would switch back and forth between using the app, the browser on your phone and browser on your computers?

A. Yes.

Q. And on your Mac and Windows computers did you also use Chrome and Purity browsers?

A. Purity is mostly for mobile devices, I believe. I don't know, I could be wrong, but it's mostly for smaller devices. Chrome mostly. And maybe other browsers on my larger devices.

Q. What other browsers did you use on your Mac and windows, besides Chrome?

A. Some of the popular ones like Firefox, Opera, Safari. Maybe Edge and, you know, IE. But Chrome has been my -- on computers I've used mostly Chrome, and -- yeah. Maybe the slight majority of my browser use has been Chrome.

Q. Have you ever watched ESPN or other shows at a hotel or an Airbnb?

A. That's --

MR. MIGOTSKY: That's a compound